UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KENTON SHERWOOD,

                              Plaintiff,

                                                              9:17-CV-00899
v.
                                                              (BKS/TWD)
RICHARD SENECAL, et al.,


                              Defendant.
_____

APPEARANCES:                              OF COUNSEL:

KENTON SHERWOOD
14-A-5303
Plaintiff pro se
Otisville Correctional Facility
Box 8
Otisville, New York 10963

HON. LETITIA JAMES                        NICHOLAS LUKE ZAPP, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

Plaintiff Kenton Sherwood, a practicing Rastafarian, has commenced this *pro se* civil

rights action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons

Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1(a)(1)-(2). The claims remaining after initial

review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A are against Defendant Richard

Senecal ("Senecal") for violation of Plaintiff's First Amendment right to the free exercise of

religion and RLUIPA.  (Dkt. No. 8 at 12-13.[1])  Senecal has moved for summary judgment (Dkt.

No. 25) pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that: (1)

Plaintiff failed to exhaust his administrative remedies before filing his complaint; (2) Defendant

is entitled to judgment as a matter of law on Plaintiff's First Amendment Free Exercise Clause

claim; and (3) Plaintiff's claim under RLUIPA is moot and in any event fails as a matter of law.

(Dkt. No. 25-1.)  Plaintiff has filed responsive papers.  (Dkt. No. 30.)  For reasons explained

below, the Court recommends that Defendant's motion for summary judgment be granted in part

and denied in part.

## I.    FACTUAL BACKGROUND

Senecal was a Corrections Officer at Barehill Correctional Facility ("Barehill") while

Plaintiff was housed there in March 2017.  (Dkt. Nos. 1 at ¶ 7; 25-4 at ¶ 3.[2])  Plaintiff had never

seen or had any interaction with Senecal prior to being confronted by him while Plaintiff was in

line in the Bare Hill mess hall on March 31, 2017.  (Dkt. Nos. 1 at  ¶¶ 8-10; 25-2 at 23-24; 30 at

¶ 14.)  Plaintiff had proceeded ahead of two inmates who had come to a halt in the line and told

him to go ahead, and Senecal approached him and asked why he had skipped the line.  (Dkt. Nos.

1 at  ¶¶ 8-10; 25-2 at 46-47.)  According to Plaintiff, before allowing him to explain, Senecal

asked for his identification card and watch, and upon observing Plaintiff's religious crown asked

him what was on his head.  (Dkt. Nos. 1 at ¶ 11; 25-2 at 49-50.)  Plaintiff claims he informed

Senecal it was a religious head covering and tried to explain that as a Rastafarian, he was allowed

_____

[1]  Page references to documents identified by docket number are to the page numbers
assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2]  Paragraph numbers preceded by the paragraph symbol are used where documents
identified by the CM/ECF docket number contain consecutively numbered paragraphs.

to wear the head covering in the mess hall.  *Id*.  Plaintiff contends Senecal then snatched

Plaintiff's religious head covering from his head, threw it on the floor, spat on it, and began

stomping and wiping his foot on it.  (Dkt. Nos. 1 at ¶ 12, 25-2 at 50-53.)  According to Plaintiff,

Senecal then began to yell racial slurs at Plaintiff.  (Dkt. Nos. 1 at ¶ 13, 25-2 at 50-53.)  Plaintiff

testified at his deposition that he threw the crown away because Senecal's desecration of the

crown totally destroyed its religious significance, and he never could have worn it again.  (Dkt.

No. 25-2 at 53-54.)  Plaintiff was without a religious head covering until he received two new

turbans and two crowns from his uncle, a Rastafarian, on May 8, 2017.  (Dkt. Nos. 25-2 at 26,

76-77.)

Senecal was responsible for facilitating the safe movement of inmates from the foyer

leading into the mess hall during meal times on March 31, 2017.  (Dkt. No. 25-4 at ¶ 4.)  Senecal

denies grabbing Plaintiff's head covering, throwing it on the floor, stomping on it, spitting on it,

and wiping his foot on it.  *Id*. at ¶ 9.  Senecal also denies making any racially derogatory

statements to Plaintiff, pointing his finger in Plaintiff's face, or telling him to go back to his

dorm.  *Id*.  Senecal denies interfering with Plaintiff's ability to practice his religion on March 31,

2017, or at any other time.  *Id*. at ¶ 10.

## II.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

3

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A verified complaint is to be treated as an affidavit.[3] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury

---

[3] Plaintiff's complaint in this case was properly verified under 28 U.S.C. § 1746. (Dkt. No. 1 at 11.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

could *reasonably* find for the plaintiff."  "To defeat summary judgment, . . . nonmoving parties

"may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys*, 426 F.3d at

554 (citation and internal quotation marks omitted).  "At the summary judgment stage, a

nonmoving party must offer some hard evidence showing that its version of the events is not

wholly fanciful."  *Id*. (citation and internal quotation marks omitted).  "[T]o satisfy Rule 56(e),

affidavits must be based upon 'concrete particulars,' not conclusory allegations.  "*Schwapp v.*

*Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)  (citation omitted).  "Statements that are devoid

of any specifics, but replete with conclusions, are insufficient to defeat a properly supported

motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball*

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is proceeding *pro*

*se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret

them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790

 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not

sufficient to overcome a motion for summary judgment."  *Cole v. Artuz*, No. 93 Civ. 5981

(WHP) (JCF), 1999 WL 983876 at \*3 (S.D.N.Y. Oct. 28, 1999)[4] (citing *Carey v. Crescenzi*, 923

F.2d 18, 21 (2d Cir. 1991)).

---

[4]  Copies of all unpublished decisions cited herein will be provided to Plaintiff in
accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

III.   **ANALYSIS**

A.   **Exhaustion**

1.   Legal Standard for Exhaustion

Under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, ___ U.S. ___,136 S. Ct. 1850, 1854-55 (2016).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations marks omitted)).  In New York State prisons, DOCCS has a well-established three-step Inmate Grievance Program ("IGP").  N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence.  *Id*. § 701.5(a)(1).  A representative of the facility's Inmate Grievance

Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.5(d)(3)(ii).

There are special procedures that may be used when, as in this case, the relevant grievance is code 49 involving staff misconduct. *Id*. § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id*. § 701.8(f). If the grievant wishes to appeal a decision by the superintendent to CORC, he must file a notice of decision to appeal with the IGP clerk at the bottom of the superintendent's decision within seven days of receipt of the decision. *Id*. § 701.8(h). CORC is required to render a written decision

within thirty calendar days of receipt of the appeal.  *Id*. § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period.  "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP.  *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 NYCRR § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can—and must—be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA.  *See Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (internal quotations marks and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotations and

citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id*. at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860. The illustrations of unavailability in *Ross* guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the plaintiff inmate had been transferred to a new facility after an unsuccessful attempt to file a grievance. The plaintiff never received a response to the grievance and failed to appeal to the next step as instructed in 7 NYCRR § 701.6(g)(2). The Second Circuit, citing *Ross*, reversed the dismissal of the action by the district court for failure to exhaust on unavailability grounds finding that "the regulations plainly do not describe a mechanism for appealing a grievance that was never filed," and "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id*. at 126.

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). Plaintiff must then establish that the IGP

grievance procedure was unavailable to him under *Ross*. *See Jones*, 549 U.S. at 216.

      2.    Analysis

It is undisputed that on April 17, 2017, Plaintiff filed Grievance BRL-14592-17 regarding the incident with Senecal. (Dkt. Nos. 25-5 at ¶ 13; 30 at ¶ 8; 30-4 at 7.) The Grievance was denied by the IGRC on April 27, 2017, and was subsequently denied by the Superintendent on May 1, 2017, following Plaintiff's appeal. (Dkt. Nos. 25-2 at 84-85; 30 at ¶ 10; 30-4 at 7.) Plaintiff's appeal to CORC was received on May 9, 2017. (Dkt. No. 30-4 at 9.) Plaintiff commenced this lawsuit on August 16, 2017, sixty-nine days after the thirty day period CORC had to render a decision on Plaintiff's appeal under 7 NYCRR § 701.5(d)(3) had expired, but prior to receiving the CORC decision. (Dkt. Nos. 1; 25-2 at 88.) According to Plaintiff, he commenced the lawsuit because CORC had failed to issue a decision on his grievance appeal in thirty days, rendering the IGP unavailable. (Dkt. No. 30 at ¶¶ 11-12.)

CORC ultimately rendered its decision denying Plaintiff's Grievance on June 20, 2018. (Dkt. No. 25-5 at ¶ 14 and 5.) Senecal claims entitlement to summary judgment on exhaustion grounds because receipt of a decision from CORC is necessary for complete exhaustion, and Plaintiff commenced this action before CORC had issued a decision. (Dkt. No. 25-1 at 9-10.)

Receiving a decision from CORC after filing a federal lawsuit, as Plaintiff did in this case, does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit and any such action, absent a determination that the IGP was unavailable to plaintiff, must be dismissed without prejudice. *See Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds by Porter*, 534 U.S. 516. Furthermore, a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was

commenced, so that is not an option available to Plaintiff. *Livingston v. Hoffnagle*, No. 9:17-CV-1158 (MAD/DEP), 2019 WL 409366, at *4 (N.D.N.Y. Feb. 1, 2019) (citation omitted).

Based upon the foregoing, the Court finds that Plaintiff failed to exhaust his administrative remedies with respect to his claims against Senecal prior to filing this action. The question remains, however, whether exhaustion under the IGP was unavailable to Plaintiff under *Ross* and *Williams* where Plaintiff waited sixty-nine days beyond the thirty day deadline for CORC to issue its decision under the IGP to commence this action, and CORC did not issue its decision until more than a year after Plaintiff filed his appeal.

Courts within the Second Circuit are split regarding whether a failure by CORC to timely respond to an appeal constitutes unavailability excusing a failure to exhaust. *Compare Berkley v. Ware*, No. 9:16-CV-1326 (LEK) (CFH), 2018 WL 3736791, at *6 (N.D.N.Y. July 6, 2018) (finding five month delay by CORC in rendering decision on appeal did not excuse Plaintiff from exhaustion requirement); *Loccenitt v. Labrake*, No. 14-CV-6703-FPG, 2018 WL 826850, at *3 (W.D.N.Y. Feb. 12, 2018) (finding that a delay by CORC in rendering a decision on a plaintiff's appeal was not a defense to the exhaustion requirement) *with Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance, . . . such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA); *Rossi v. Fischer*, No. 13-CV-3167 (PKC) (DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) (where CORC did not decide appeal until more than four months after it was filed, court found administrative remedies were not available to the plaintiff and denied dismissal for failure to exhaust).

A number of the more recent district courts deciding the issue of availability of exhaustion when CORC has failed to render a timely decision have considered the issue under *Ross,* 136 S. Ct. at 1858-59, and *Williams,* 829 F.3d at 126, and concluded that exhaustion was unavailable to inmates in various instances where CORC had failed to decide an appeal in a timely manner under the regulations.  In *Rodriguez v. Reppert*, No. 14-CV-671-RJA-MJR, 2016 WL 6993383, at *2-3 (W.D.N.Y. Nov. 11, 2016), the plaintiff filed his complaint two weeks before CORC issued its decision nearly two months after DOCCS regulations had required it to do so.  The district court relied on *Williams* in finding that exhaustion had been unavailable to the plaintiff.  The district court explained that while 7 NYCRR § 701.6(g)(2) authorizes an inmate to appeal to the next level when a lower level had not issued a timely determination under the IGP, "CORC'S failure to timely decide any appeal is fundamentally different than, for instance, a superintendent's failure to timely decide an appeal, because the CORC decision is the final step in the DOCCS' internal grievance program" and "a prisoner whose CORC appeal was not timely decided has no other administrative body to which he can appeal." *Id*. at *3.

In *High v. Switz*, No. 9:17-CV-1067(LEK/DJS), 2018 WL 3736794 (N.D.N.Y. July 9, 2018), the court found plaintiff had taken all the steps he could to fulfill the last step of the appeal process. *Id.* at *5.  The plaintiff had filed his appeal with CORC on February 6, 2017, and had heard nothing from CORC as of August 25, 2017, when he wrote to CORC asserting that CORC had exceeded the time frame for deciding the appeal, and that he had therefore exhausted his administrative remedies and intended to file a claim in court. *Id*. at *3.  The court, relying on *Ross* and *Williams*, found that exhaustion was unavailable, noting that "while the regulations at the preliminary stages [of the IGP] contemplate a next step for a grievant to take in the event he

does not receive a response, there is no direction on any action a grievant may take if he does not receive a response from CORC. Indeed, 'the regulations give no guidance whatsoever' regarding what a grievant should do in this circumstance." *Id*. at *5 (quoting *Williams*, 829 F.3d at 126).

In *Bell v. Napoli*, No. 9:17-CV-850 (ATB), 2018 WL 6506072 (N.D.N.Y. Dec. 11, 2018*)*, CORC received the plaintiff's appeal on May 26, 2017, and a decision should have been rendered by June 26, 2017. *Id*. at *4-5. Plaintiff waited from May 26, 2017, to August 4, 2017, with no decision from CORC before commencing his lawsuit. *Id*. at *5. The court noted that "the regulations contain[ed] no instructions on how an inmate should proceed if the CORC continue[d] to ignore him after he [had] been informed that his appeal was 'received.'"[5] Finding that administrative exhaustion had been unavailable to the plaintiff under *Williams*, the Court explained:

> The "next step after the CORC may be a federal action. However, if the "next step" language does not apply to the CORC's decision, an inmate who never receives a decision from the CORC, after the appeal is filed, will be unable to exhaust administrative remedies. In addition, by ignoring an inmate's appeal, as it appears to have done in this case, the CORC could delay a plaintiff's exhaustion indefinitely, making the remedy "unavailable" by thwarting plaintiff's attempt to exhaust.

*Id*. at *7.

The Court, finds the decisions in *Rodriguez*, *High*, and *Bell*, which rely significantly on

---

[5]  The court properly distinguished *Gizewski v. New York State Dept. of Corr. and Community Supervision,* 692 F. App'x 668 (2d Cir. 2017), in which the plaintiff did not receive notice of filing of his appeal from CORC due to a clerical error and failed to take further action under 7 NYCRR § 701.5(d)(3) when he did not receive the written notice within forty-five days of filing his appeal. *Bell*, 2018 WL 6506072, at *5. In this case, CORC issued written notice of receipt of Plaintiff's appeal on May 9, 2017. (Dkt. No. 30-4 at 9.) Plaintiff testified at his deposition that he received the notice, rendering § 701.5(d)(3) inapplicable. (Dkt. No. 25-2 at 87.)

*Williams*, to be well-reasoned and applicable to the issue of the availability of exhaustion in this case. Therefore, the Court concludes that exhaustion was unavailable to Plaintiff and recommends that Defendant's motion for summary judgment on exhaustion grounds be denied.[6]

### B.    First Amendment Free Exercise of Religion Claim

#### 1.    Legal Standard

It is well established that prisoners "retain some measure of the constitutional protections afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). A burden on inmates' free exercise rights is justified if it is reasonably related to a legitimate penological concern. *Id.*

Plaintiff must first establish that the disputed conduct substantially burdens his sincerely held religious beliefs.[7] *See Salahudin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006) (a prisoner "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.") (citing *Ford* 352 F.3d at 591). To show a belief is "sincere," an inmate "need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme

_____

[6] Even if the Court were to recommend that Defendant be granted summary judgment for failure to exhaust, the recommendation would include that it be without prejudice. Thus, if the District Court were to recommend denial of Defendant's summary judgment motion on other grounds, as this Court is recommending, Plaintiff would be allowed to immediately refile his complaint as a new action since CORC has now decided his appeal. *See Loccenitt v. Labrake*, 18 WL 826850, at *3.

[7] In *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014), the Second Circuit discussed, but found it unnecessary to decide, the continued vitality of the substantial burden requirement in light of *Emp't Div. v. Smith*, 494 U.S. 872, 887 (1990). In the absence of controlling precedent to the contrary, this Court will assume the continued validity of the substantial burden test in its analysis of Plaintiff's claim.

of things, religious." *Ford*, 352 F.3d at 588 (citations, alterations, and quotation marks omitted).

"[A] substantial burden exists where the state puts substantial pressure on an adherent to modify

his behavior and violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)

(citations, alterations, and quotation marks omitted).  "Significantly, the plaintiff's burden in

demonstrating substantial burden is not a particularly onerous task." *Rossi,* 2015 WL 769551, at

*7 (internal quotation marks omitted).  "[I]n evaluating this factor the court must be wary of

'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of

particular litigant's interpretations of those creeds[,]' and instead may consider only whether the

particular plaintiff holds a belief which is religious in nature." *Jackson v. Boucaud*, No. 9:08-

CV-1373 (TJM/DEP), 2009 WL 6066799, at *5 (Dec. 31, 2009) (quoting *McEachin v.

McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004)).

Once a plaintiff has satisfied the burden of showing that the defendant's actions

substantially burdened his sincerely held religious beliefs, defendant must identify a legitimate

penological purpose justifying the action or decision under scrutiny.  *Salahudin*, 467 F.3d at 274-

75.  This is a "relatively limited burden of identifying the legitimate penological interests . . .

justifying [the] impinging conduct."  *Id*. at 275.  "A prisoner's First Amendment rights . . . are

[b]alanced against . . . the interests of prison officials charged with complex duties arising from

the administration of the penal system," and "a prisoner's free exercise claims are 'judged under

a reasonableness test less restrictive than ordinarily applied to infringements of fundamental

constitutional rights.'" *Gilliam v. Baez*, No. 15-CV-6631 (KMK), 2017 WL 476733, at *4

(S.D.N.Y. Feb. 2, 2017) (quoting *Ford,* 352 F.3d at 588).  The burden remains with the inmate to

show that the articulated penological interests are irrational.  *See Salahudin*, 467 F.3d at 275.

15

"Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guard, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests." *Rose v. Annucci*, No. 9:16-CV-787 (BKS/ATB), 2018 WL 2729259, at *9 (N.D.N.Y. April 19, 2018).

2.    Application

a.    Sincerely Held Beliefs

The Court finds that Plaintiff's religious beliefs are sincerely held based upon the evidence in the record discussed below showing that Plaintiff's religious beliefs regarding the wearing of religious head coverings are based upon his life time as a Rastafarian, who was raised in a Rastafarian family, and Plaintiff's own practices as a Rastafarian.  (*See* Dkt. No. 25-2 at 25-40.)  *See Ford*, 352 F.3d at 588 (sincerity of religious beliefs is shown by demonstrating that the beliefs are sincerely held and in the inmate's scheme of things, religious.

Defendant appears to question the sincerity of Plaintiff's religious beliefs based upon his not wearing a head covering during his first year of incarceration.  (Dkt. No. 25-1 at 4.)  At his deposition, Plaintiff explained that there was a period of time when he first came into DOCCS custody in 2013 that he did not wear religious head covering.  *Id*. at 36.  According to Plaintiff, he was the only member of his family that had ever been locked up, and under the Rastafarian faith, he had brought shame to his family.  *Id*. at 36.  When a Rastafarian does something the religion forbids, like going to prison, he has to cut off his locks and start fresh, which is what

16

Plaintiff did.  *Id.*  In 2014, when his hair had grown long enough, Plaintiff obtained a crown from

his family when they came to visit.  *Id.* at 37, 39.  Plaintiff subsequently obtained two more

crowns that were made in a crocheting class by Rastafarian inmates at Otisville.  *Id.* at 40.

Plaintiff explained at his deposition that for a Rastafarian, wearing a religious head cover

is mandatory unless you are with the high priest, elders, or family members.  *Id.* at 27-28.

Plaintiff further explained that in the Ethiopian Orthodox Church, locks are considered to be

high-tension wires, and these high-tension wires are divine energy to Jah the creator.  *Id.* at 26-

27.  When the high-tension wire locks are exposed, evil can come among you.  *Id.* at 27.

Rastafarian practice requires that you pray to Jah and make the sign of the holy Trinity with a

circle before removing a religious crown.  *Id.* at 26-28.

According to Plaintiff, the crown Senecal had pulled from Plaintiff's head and thrown to

the floor was picked up by an inmate after Senecal left the mess hall and given to another inmate

take back to Plaintiff's dorm.  (Dkt. No.  25-2 at 67-68.)  Plaintiff had been taught from his youth

that if a crown is desecrated you cannot restore it and have to get a new one and consecrate it and

put it on your head.  *Id.* at 54.  Based upon those teachings, Plaintiff threw the desecrated crown

away.  *Id.* at 54.

2.    Substantial Burden

The Court further finds that there are, at the very least, questions of material fact as to

whether Senecal's alleged actions substantially burdened Plaintiff's sincerely held religious

beliefs by depriving him of the religious head covering mandated by his religious beliefs for

thirty-seven days.  *See Rossi*, 2015 WL 769551, at *7 (plaintiff's burden in demonstrating

substantial burden is "not a particularly onerous task.")

Plaintiff had only one crown at the time of the March 31, 2017, incident with Senecal because he knew his family had insufficient funds to send him more crowns during that time. *Id*. at 345-36. Plaintiff called his uncle on the same day of the incident and told him what happened. *Id*. at 35. His uncle did not have sufficient funds to send Plaintiff a new crown at the time and was unable to do so until May 8, 2017, when he sent two crowns and two turbans. (Dkt. Nos. 25-2 at 26, 74-77.)  Crowns like Plaintiff wore typically cost around fifty dollars. *Id*. at 74. Plaintiff had asked his uncle to send him the crowns because his uncle bought the right crowns, the good ones. *Id*. at 74-75.

Plaintiff had no crown or other religious head covering from March 31, 2017, to May 8, 2017, a total of thirty-eight days. *Id*. at 77. As a result, Plaintiff's locks were exposed to the curious and a lot of evil and dirt. *Id*. Plaintiff had to deal with those things because he had done nothing to disrespect his religion which would require him to cut off his locks. *Id*. Plaintiff testified at his deposition that he could not have borrowed a crown from anyone else because he could not take another Rastaman's crown with his spiritual energy and put it on his own head for spiritual energy. *Id*. at 69.

According to Plaintiff, the commissary did not have any type of head coverings, and the catalogs in the commissary did not have the type of head covering necessary to properly cover his locks. *Id*. at 37-38. Plaintiff testified that the facility chaplain for Rastafarian inmates never had extra crowns, and he did not ask the facility chaplain about obtaining a new crown because they usually did not give the inmates anything. *Id*. at 70. Plaintiff's testimony is disputed by Alan Lamica ("Lamica"), a Chaplain at Bare Hill, who states in his declaration that he assists with making religious accommodations for Rastafarian inmates since there is no Rastafarian Chaplain

18

at Bare Hill, and that during the relevant time period he had provided Rastafarian inmates with catalogs containing religious items that could be ordered by inmates from vendors with money in the inmate's offender account.  (Dkt. No. 25-6 at ¶¶ 2, 6-7.)  Plaintiff testified at is deposition that Lamica was the Chaplain to whom he spoke most often and, according to Lamica, Plaintiff never spoke to him about the crown incident or informed him he had no head wear.  (Dkt. Nos. 25-2 at 71-72; 25-6 at ¶¶ 8-10.)  There are no catalogs showing the availability of crowns to Plaintiff in the record, nor is there evidence in the record showing that Plaintiff had money in his account with which to purchase a new crown, rather than have his uncle send him one.

Defendant contends that Plaintiff's sincere religious beliefs were not substantially burdened by being without a crown for over a month because Plaintiff was not "forced to alter or abandon his religious affiliation or practices at any time."  (Dkt. No. 25-1 at 12-13.)  The record evidence discussed above, however, at the very least raises a genuine issue of fact regarding whether Plaintiff was forced to abandon wearing the crown, which was not only an important part of the practice of his Rastafarian faith but considered mandatory by his high priest Nyabinghi, and his Rastafarian uncles, who are high priests in the Bobo Ashanti Rastafarian tribe to which Plaintiff belonged.  (Dkt. No. 25-2 at 27, 30.)

As noted above, in determining whether a genuine issue of material fact exists, the court is required to resolve all ambiguities and draw all reasonable inferences against the moving party. *See Salvino*, 542 F.3d at 309.  Doing so, the Court finds that given the evidence presented by Plaintiff on the issue of substantial burden, whether Defendant is correct that the destruction of Plaintiff's crown, leaving his head uncovered for thirty-seven days was *de minimis* or insubstantial (Dkt. No. 25-1 at 13), raises a material issue of fact on the issue of substantial

burden.

Senecal denies removing Plaintiff's crown, throwing it on the floor, and stomping and spitting on it. (Dkt. No. 25-4 at ¶¶ 8-10.)  Defendant, however, has made no attempt to argue that if Senecal did do those things, his actions could be justified by a legitimate penological concern.  *See Salahudin*, 467 F.3d at 274-75 (defendant must identify a legitimate penological purpose justifying the action under scrutiny).  Therefore, based upon the foregoing, the Court recommends that Defendant be denied summary judgment on Plaintiff's First Amendment Free Exercise claim.

### C.    RLUIPA

Defendant seeks summary judgment on Plaintiff's RLUIPA claim on the grounds that it is moot and fails as a matter of law.  (Dkt. No. 25-1 15-16.)  Defendant correctly asserts that RLUIPA "does not authorize claims for money damages against state officers in either their individual or official capacities."  *Rose,* 2018 WL 2729259, at *12.  Defendant also correctly contends that the sole remedies available under RLUIPA – declaratory or injunctive relief – have become moot by virtue of Plaintiff's transfer from Bare Hill.  *Id.*  Therefore, the Court recommends that Defendant be granted summary judgment on Plaintiff's RLUIPA claim.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 25) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED** that Defendant be **GRANTED** summary judgment on Plaintiff's RLUIPA claim; and it is further

**RECOMMENDED** that Defendant be **DENIED** summary judgment on Plaintiff's First

Amendment Free Exercise Clause claim; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance with

the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.

Dated: May 20, 2019
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[8]  If you are proceeding pro se and are served with this Order and Report-
Recommendation by mail, three additional days will be added to the fourteen-day period,
meaning that you have seventeen days from the date the Order and Report-Recommendation was
mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed
period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of
the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2018 WL 6506072
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Amar BELL, Plaintiff,
v.
J. NAPOLI et al., Defendants.

9:17-CV-850 (ATB)
|
Signed 12/11/2018

**Attorneys and Law Firms**

AMAR BELL, Plaintiff, pro se.

AIMEE M. COWAN, Asst. Attorney General, for defendants.

**MEMORANDUM DECISION and ORDER**

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** On April 10, 2018, this matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 38, 39). Plaintiff has filed this civil rights complaint alleging that on April 4, 2017, at Marcy Correctional Facility, defendants used excessive force against him in the course of extracting plaintiff from his cell. (Complaint ("Compl.") ¶ 6, Facts). Plaintiff originally named four corrections officers: J. Napoli, A. Farina, R. Rugari, and M. Music. (Compl. at 1). On September 18, 2017, defendant M. Music was dismissed by Order of District Court Judge David N. Hurd. (Dkt. No. 11).

Presently before the court is a motion for summary judgment filed by the remaining defendants, arguing only that plaintiff has failed to exhaust his administrative remedies. (Dkt. No. 48). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt. Nos. 52, 54). Plaintiff filed an additional letter in support of his opposition. (Dkt. No. 55). For the following reasons, this court agrees with plaintiff and will deny the defendants' motion for summary judgment.

**DISCUSSION**

**I. Summary Judgment**

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

**II. Exhaustion of Administrative Remedies**

**1. Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002) ). Inmates

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 1

must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*2** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d).

There is a special section for complaints of "harassment." *Id.* § 701.8. Harassment grievances are defined in another section of the regulations as "those grievances that allege employee misconduct meant to annoy, intimidate, or harm an inmate." *Id.* § 701.2(e). Based on this definition, section 701.8 has been found applicable to claims of excessive force by staff. *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at \*7 n.7 (S.D.N.Y. Sept. 28, 2018) (citing *Torres v. Carry*, 691 F.Supp.2d 366, 369-70 (S.D.N.Y. 2009) ).

Complaints of harassment are handled by an ***expedited*** procedure which provides that such grievances are forwarded directly to the superintendent of the facility, [1]

after which the inmate must appeal any negative determination to the CORC by filing a form within seven calendar days of the inmate's receipt of the Superintendent's response. *Id.* §§ 701.8(h) & (i), 701.5. The regulations then provide that "unless otherwise stipulated in this section, all procedures, rights, and duties pertaining to the processing of other grievances as set forth in section 701.5 of this Part shall be followed." *Id.* § 701.8(i). Thus, if a procedure is not described in 701.8, the inmate must refer to section 701.5. [2]

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*3** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 136 S.Ct. at 1857. " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at \*2, 656 Fed.Appx. 577 (2d Cir. Sept. 1, 2016) (quoting *Ross*, —— U.S. at ——, 136 S.Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, —— U.S. ——, 136 S.Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 2016 WL 4572321, at \*2, 656 Fed.Appx. 577. An administrative procedure is "unavailable" when

(1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking

advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, —— U.S. ——, 136 S.Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, —— U.S. at ——, 136 S.Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860. Thus, if a plaintiff fails to exhaust his administrative remedies, the court must consider whether those remedies were "available" to him.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a Department of Corrections and Community Services ("DOCCS") regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g) (2) ).

The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. [3] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

**2. Application**

**\*4** In this case, unlike *Williams*, it is undisputed that plaintiff filed a grievance regarding the alleged incident of excessive force. Defense counsel has filed the Case History and Record of the excessive force grievance. (Cowan Decl. Ex. B) (Case History and Record) (Dkt. No. 48-4). The case history indicates that, on April 18, 2017, plaintiff filed his grievance, claiming that the defendants used excessive force against plaintiff. (*Id.*) The case history further indicates that, on the same day, the grievance was "passed through" to the Superintendent. (*Id.* at 2). On May 16, 2017 the grievance was "passed through" by the Superintendent to the CORC. (*Id.*) Under the heading "Appeal to CORC," the document states that "Grievant states he wishes to appeal as passed through to CORC." (*Id.*) This notation is dated May 18, 2017. (*Id.*)

Thus, plaintiff brought a grievance and expressed his desire to appeal the grievance to both the Superintendent and the CORC, even though it is clear that no investigation was done at either the IGRC or the Superintendent level. [4] In fact, defendants have attached a letter from plaintiff to the Grievance Clerk of the IGRC, dated May 9, 2017, in which plaintiff observes that twenty days had passed without response by the Superintendent, and without an extension request from the Superintendent. Because of this, plaintiff stated that he wished to appeal his grievance to the CORC. (Cowan Decl. Ex. B at 3). The last line of plaintiff's letter specifically states "I want my appeal sent on to the CORC." The plaintiff's letter is stamped "received" by the IGRC on May 12, 2017, and defendants do not dispute this fact. The letter also contains the initials "JB," with May 18, 2017, written next to the initials. (*Id.*) May 18, 2017 is the date that the other facility documents, and the receipt that plaintiff was sent in June of 2018, indicate that the grievance was "passed through" to the CORC.

(Cowan Decl. Ex. B at 2; Seguin Decl. Ex. B at 1). The CORC received plaintiff's appeal on May 26, 2017. (Seguin Decl. Ex. A at 2).

It is also undisputed that the CORC had not rendered a decision when plaintiff filled this action on August 4, 2017, nor had the CORC rendered a decision by July 19, 2018, when Rachel Seguin signed her declaration, which has been filed as an exhibit in this case. (Seguin Decl. ¶ 10) (Dkt. No. 48-5). Rachel Seguin is the Assistant Director of the IGP, whose duties include being the custodian of records maintained by the CORC. (Seguin Decl. ¶¶ 1, 2). Although the CORC documents submitted by Rachel Seguin indicate that the "Sched Date" for the grievance was August 8, 2018, there is no indication, and defendants do not argue, that the grievance was ever addressed. (Seguin Decl. Ex. A at 1).

Thus, the CORC has failed to issue a decision or even investigate plaintiff's grievance from May 26, 2017 until at least August 8, 2018, and there is no indication that the CORC has ever addressed the grievance, even to the present day. [5] Although Assistant Director Seguin states that plaintiff was sent a "Receipt of Appeal" on July 6, **2018**, [6] it is clear from that receipt, that plaintiff's appeal was passed through to the CORC on May 18, **2017**, and the CORC received plaintiff's appeal on May 26, **2017**. (Seguin Decl. Ex. B).

 **\*5** Defendants argue that plaintiff did not exhaust his administrative remedies because he filed this federal action before the CORC issued a decision on his administrative appeal. Plaintiff does not dispute that the CORC has failed to issue a decision. This court has recommended dismissal for failure to exhaust when a plaintiff files his federal lawsuit before the CORC has decided plaintiff's appeal. *See Scott v. Miller*, No. 9:17-CV-520 (MAD/ ATB) (Dkt. No. 54) (Rep't Rec. (6/25/18) ) (adopted, Dkt. No. 56 (8/13/18) ). However, often, in such cases, the federal action was filed before the deadline for the CORC decision. *Id.* (Rep't Rec. at 9-10).

In this case, plaintiff waited from May 26, 2017 until August 4, 2017, with no response from the CORC, to file his action. The CORC has thirty days to decide an inmate's appeal or ask for an extension, which may only be granted with the "written consent of the grievant." 7 N.Y.C.R.R. §§ 701.5(d)(3); 701.6(g)(2). The regulations provide that if there is no timely response, for either

the IGRC or the Superintendent's appeal, plaintiff may appeal to the "next step." [7] *Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016) (citing 7 NYCRR §§ 701.6(g)(2), 701.8(g) ). If the CORC received plaintiff's appeal on May 26, 2017, unless there was an extension of time, a decision should have been rendered by June 26, 2017. Although the regulations specifically discuss what the "next step" is in cases of IGRC and Superintendent's review, it is less clear whether the language applies to the CORC, and if so, what the "next step is."

In *Williams*, the court found that the administrative remedies were "unavailable" because the regulations did not explain how an inmate should appeal a grievance that was never filed, because the time limits provided in the regulations for "appeal to the next step" did not apply when a grievance was never filed. In this case, there is no specific indication what the inmate must do if the CORC (the last step) received the appeal, but failed to render a timely decision, or any decision. The regulations do provide that if the plaintiff does not get a "receipt" from the CORC within 45 days of the date he filed his appeal, he should contact the IGP to make sure that his appeal was "received." 7 N.Y.C.R.R. § 701.5(d)(3)(i). Contacting the IGP could afford the CORC the opportunity to obtain plaintiff's appeal if the appeal had somehow failed to reach the CORC.

In *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:14-CV-124, 2016 WL 3661434, at *13 (N.D.N. Y July 5, 2016), Chief U.S. District Judge Glenn Suddaby held that plaintiff did not exhaust his administrative remedies because he failed to take further action under section 701.5(d)(3)(i) when he did not receive written notice of receipt by the CORC within 45 days of filing his appeal. [8] In *Gizewski*, the CORC did not receive the plaintiff's appeal for five months due to a "clerical error." *Id.*

Although the Second Circuit affirmed Judge Suddaby's dismissal of Gizewski's complaint, the Second Circuit did not specifically decide the issue of inordinate delay by the CORC. *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 692 F. App'x 668 (2d Cir. 2017). The Second Circuit stated that "even if we assume arguendo that the long delay occasioned in part by clerical error constituted constructive denial," there was no genuine issue of material fact because the issues raised on that final administrative appeal to CORC pertained to requests for

items that had already been provided to the plaintiff as part of a reasonable accommodation. *Id.* at 670.

**\*6**  In *High v. Switz*, No. 9:17-CV-1067, 2018 WL 3736794 (N.D.N.Y. July 9, 2018), (Rep't-Rec.), adopted, 2018 WL 3730175 (N.D.N.Y. Aug. 6, 2018), Magistrate Judge Daniel Stewart distinguished *Gizewski* and cited a split in the Second Circuit regarding whether a failure to respond by the CORC constitutes unavailablity under *Ross v. Blake*. 2018 WL 3736794 at \*4-5 (citing cases). Magistrate Judge Stewart cited *Williams* and found that

> [s]imilarly, here, while the regulations at the preliminary stages contemplate a next step for a grievant to take in the event he does not receive a response, there is no direction on any action a grievant may take if he does not receive a response from CORC. Indeed, "the regulations give no guidance whatsoever" regarding what a grievant should do in this circumstance.

*Id.* at \*5 (quoting *Williams*, 829 F.3d at 126). Magistrate Judge Stewart found that High's failure to exhaust aligned more with *Williams* than with *Gizewski*, because High had taken all the steps that he could regarding the status of his appeal, the CORC continued to ignore him, and although the CORC ultimately decided the appeal, it was a year later, "after the motion to dismiss had been filed." *Id.* Judge Stewart made it clear that under "the hopefully unique facts of [that] case," plaintiff's failure to exhaust would be excused.

In *Rodriguez v. Reppert*, No. 14-CV-671, 2016 WL 6993383, at \*2 (W.D.N.Y. Nov. 30, 2016), the court found that plaintiff's failure to exhaust should be excused in a situation somewhat similar to that in this case. In *Rodriguez*, plaintiff filed his appeal with the CORC, but the CORC did not decide the appeal within the thirty-day period required by DOCCS regulations. *Id.* at \*1. Plaintiff in *Rodriguez* filed his complaint before the CORC issued a decision, and the CORC ultimately decided the plaintiff's appeal two weeks after the plaintiff filed his federal complaint, but nearly two months after the DOCCS regulations' requirement. *Id.* Magistrate Judge Roemer, recommended denying the motion for summary judgment, finding that the CORC's failure to decide the appeal, together with the absence of any mechanism to ask the CORC to issue a decision after thirty days elapsed, meant that the inmate's remedies were "unavailable." *Id.*

District Judge Richard Arcara adopted the Magistrate Judge Roemer's recommendation in *Rogriguez*, citing *Ross* and *Priatno*, stating that after the CORC neglected to decide Rodriguez's appeals within thirty days, administrative remedies were no longer available to him, and his only option was to file the federal action. *Id.* There was simply no more that the plaintiff could do to force the CORC to follow its own deadline for deciding an appeal. *Id.* The defendants belatedly raised the argument that the plaintiff should have contacted the IGP supervisor if he did not receive written notice of the receipt of the appeal within 45 days. *Id.* at 2. The court did not consider the argument because it was not raised before the Magistrate Judge. [9] *Id.* The court cited *Williams's* holding that administrative remedies are "opaque," and therefore "unavailable - when those remedies do not address the situation in which a prisoner finds himself." *Id.* at 3. The regulations do not address a situation in which the CORC fails to render a decision within the deadline after receiving an appeal. [10]

**\*7**  In this case, there is no question that plaintiff's appeal was received by the CORC in May of 2017; however, it was never investigated, nor decided. There is no evidence in the record of plaintiff contacting the IGP after 45 days, [11] although plaintiff testified at his deposition that he wrote to the CORC "multiple times." (Pl.'s Dep. at 133). Contacting the IGP would not have changed the situation in this case because the response to plaintiff's inquiry would simply have been that the CORC did receive the appeal. The 30 days within which the CORC had to answer plaintiff's grievance would already have run without extension. That is essentially what happened in June of 2018 when plaintiff was told that the CORC received his appeal in May of 2017, and nothing further was done. Although according to the documents the grievance was "sched" for August 8, 2018, there is no indication that an extension was requested or consented to by the plaintiff. The regulations contain no instructions on how an inmate should proceed if the CORC continues to ignore him after he has been informed that his appeal was "received." [12]

The "next step" after the CORC may be a federal action. However, if the "next step" language does not apply to the CORC's decision, an inmate who never receives a decision from the CORC, after the appeal is filed, will be unable to exhaust his administrative remedies. In addition

by ignoring an inmate's appeal, as it appears to have done in this case, the CORC could delay a plaintiff's exhaustion indefinitely, making the remedy "unavailable" by thwarting plaintiff's attempt to exhaust. [13] *See Ross, 136 S.Ct. at 1860* (administrative remedies are unavailable when "prison administrators thwart inmates from taking advantage of the grievance process by machination, misrepresentation, or intimidation"). In this case, unlike the plaintiff in *Williams*, plaintiff tried to appeal his grievance to the "next step," after the Superintendent level, but was not able to do so because the CORC appears to have ignored his grievance until after he filed the lawsuit, and it has apparently continued to ignore his grievance to this day. Thus, I find that plaintiff's failure to exhaust may be excused, and defendants' motion for summary judgment is denied.

**\*8** This court must point out that my finding that the administrative remedy was "unavailable," and that plaintiff's failure to exhaust should be excused, is based upon a review of the specific facts in this case.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the defendants' motion for summary judgment based on plaintiff's alleged failure to exhaust (Dkt. No. 48) is **DENIED**.

### All Citations

Slip Copy, 2018 WL 6506072

Footnotes

1    The regulation states that "[a]llegations of employee harassment are *of particular concern to the administrators of department facilities*." 7 N.Y.C.R.R. § 701.8 (emphasis added).

2    The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

3    My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at \*8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

4    The court understands that the incident took place at Marcy, and at the time of the appeal, plaintiff was at Five Points. Additionally, as stated above, complaints of employee "harassment" are handled by an expedited process whereby the grievance is passed through the IGRC, directly to the Superintendent. However, in this case, the grievance was additionally passed through to the CORC.

5    The court also notes that, though Assistant Director Seguin states that plaintiff's grievance was "denied," the grievance documents state that the grievance was "passed through" to the Superintendent and then "passed through" to the CORC. (Cowan Decl. Ex. B at 2). That notation is not a denial because the grievance was never investigated. (Seguin Decl. ¶ 9).

6    (Seguin Decl. ¶ 9).

7    Section 701.6(g)(2) specifically provides that, "[a]bsent [an] extension, matters not decided within the time limits may be appealed to the next step."

8    The court notes that, unlike this case, in *Gizewski*, if plaintiff had contacted the IGP after 45 days, it would have been determined that the CORC had not received the appeal, and the defendants would have had the opportunity to cure the problem.

9    The court must point out that defendants in this case argued only that plaintiff failed to exhaust because he did not wait for the CORC's decision. They did not raise the argument that plaintiff should have written to the IGP supervisor if he did not receive a receipt for his appeal.

10   Most of the cases cited by defendants predate *Ross*, and defendants' argument is based upon the absence of "special circumstances," which is no longer the appropriate analysis after *Ross*. However, defendants do cite a recent decision in their reply (Dkt. No. 54), written by Magistrate Judge Christian Hummel, in which he found that delay in the CORC decision does not constitute "unavailability." See *Berkley v. Ware*, No. 9:16-CV-1326, 2018 WL 3736791 (N.D.N.Y. July 6, 2018) (Rep't-Rec.), adopted 2018 WL 3730173 (N.D.N.Y. Aug. 6, 2018). The facts in *Berkley* are distinguishable from this case. Plaintiff in *Berkley* filed his federal action six days before the CORC ruled on his grievance, and the delay was five months. *Id.* at \*6. Judge Hummel specifically distinguished a case in which the court held that administrative remedies were no longer "available" to a plaintiff who had been awaiting a decision from the CORC "for more than two years." *Id.* (citing *Henderson v. Annucci*, No. 14-CV-445A, 2016 WL 3039687, at \*10 (W.D.N.Y. Mar. 14, 2016) ). This

facts in this case are more similar to *Henderson* than to *Berkley* in that the CORC has still not decided plaintiff Bell's grievance appeal more than 18 months after it received the appeal.

11    Contacting the IGP to determine whether an appeal was received is not an "appeal." The IGP would only inform the plaintiff whether the appeal was received. If the appeal was not received, then presumably the plaintiff would resubmit his appeal. If the appeal was received, there is no further action contemplated.

12    Plaintiff's deposition on this subject was unclear. Plaintiff stated that he appealed to the CORC, but after he filed the lawsuit, he received the printout of his grievance history, indicating that the appeal was sent to the CORC on May 18, 2017. (Pl.'s Dep. at 131-32) (Dkt. No. 48-3). Plaintiff states that he never got a receipt for the appeal, and he speculated that an IGP employee "falsified it and said she sent it and never sent it." (*Id.* at 132). It is unclear what plaintiff means by that statement, but he then states that "a couple of weeks later ..., she sends me the appeal form from the Superintendent, with the current date on it. (*Id.*) Plaintiff was confused because the CORC was sent his appeal approximately one year earlier. (*Id.* at 133). Plaintiff also claims that he wrote to the CORC "multiple times," although there is no indication of any of these letters in the records. (*Id.* at 133). Defense counsel asked plaintiff if he filled out the appeal form that he was sent "in the last few weeks" before the deposition. (*Id.* at 134). Plaintiff first states that he filled out the appeal, but then hesitated, and wondered why he would fill out the form when the appeal was filed a year before with the CORC. (*Id.* at 135). It appears that DOCCS began sending plaintiff appeal forms, and "scheduling" the grievance after this lawsuit was filed. Although the court does not find that anyone "falsified" documents, it is clear that plaintiff's appeal was ignored for whatever reason.

13    The court must point out that *Ross* uses the term "prison administrators" in its analysis of unavailability, clarifying that it does not have to be one of the defendants who prevents plaintiff from using or completing the grievance process. 136 S.Ct. at 1860.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3736791
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher BERKLEY, Plaintiff,

v.

H. WARE, Defendant.

No. 9:16-CV-1326 (LEK/CFH)
|
Signed 07/06/2018

**Attorneys and Law Firms**

Christopher Berkley, 15-R-1631, Mid-State Correctional
Facility, P.O. Box 2500, Marcy, New York 13403, pro se.

Attorney General for the State of New York, OF
COUNSEL: HELENA O. PEDERSON, ESQ., Assistant
Attorney General, The Capitol, Albany, New York 12224,
Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

**CHRISTIAN F. HUMMEL**, U.S. MAGISTRATE
JUDGE

**\*1** Plaintiff pro se Christopher Berkley ("plaintiff"), an
inmate who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS") brings this action pursuant to 42
U.S.C. § 1983, alleging that corrections officer ("C.O.")
Helen Ware—who, at all relevant times, was employed
at Franklin Correctional Facility ("Franklin")—violated
his constitutional rights under the Eighth Amendment.
See Dkt. No. 1 ("Compl."). Presently pending before
the Court is defendant's Motion for Summary Judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Fed. R. Civ. P."). Dkt. No. 21. Plaintiff did
not oppose the motion. For the following reasons, it is
recommended that defendant's motion be granted.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable
to plaintiff as the nonmoving party. See subsection II.B.
infra. Plaintiff contends that on May 20, 2016, he injured
his right hand playing basketball. Compl. at 5. The
infirmary nurses issued him a hand brace to prevent
further injury. Id. On May 25, 2016, plaintiff's vocational
teacher informed him that he could not attend the class
because he had a hand brace on, and that he could not
participate in any activities. Id. The teacher sent plaintiff
into the hallway to return to his dorm. Id. On entering
the hallway, C.O. Ware questioned plaintiff as to why he
was not in class. Id. at 5-6. Plaintiff informed C.O. Ware
that he could not participate in class due to his sprained
wrist, and C.O. Ware instructed him to return to class. Id.
at 6. Plaintiff complied, and the vocational teacher again
"kicked [plaintiff] out of the classroom." Id. Once in the
hallway, C.O. Ware instructed plaintiff to return to class.
Id. Plaintiff informed his teacher that C.O. Ware ordered
his return, and that he "didn't want any problems[.]" Id.
Plaintiff asked his teacher if he could speak with C.O.
Ware, but the teacher told him to leave the classroom. Id.

After plaintiff entered the hallway for the third time,
C.O. Ware "threw [him] against the wall" and "bumped
[his right] hand against the wall[.]" Compl. at 6. Plaintiff
informed C.O. Ware that his hand hurt, and she "grabbed
[his] hand and slammed it against the wall," stating, "I said
to keep your fucking hands on the wall" and "shut the fuck
up." Id. She further stated, "as a matter of fact [sic] give
me this fucking brace [sic] there's nothing wrong with your
fucking hand." Id. C.O. Ware removed plaintiff's brace
and handcuffed him, further injuring his hand. Id. at 7.
On June 9, 2016, plaintiff received a hard cast for his right
hand. Id. at 7.

### B. Defendant's Recitation of the Facts

In support of this motion, defendant filed a Statement of
Material Facts. [2] On May 20, 2016, plaintiff injured his
right hand and wrist while playing basketball. Dkt. No.
21-3 ¶ 4. Plaintiff informed the Franklin medical staff that
he heard a "popping sound" after he ran into the wall and
"rolled" his wrist. Id. ¶ 7. The medical staff noted that
plaintiff had limited range of motion and could not make
a complete fist. Id. Plaintiff was referred to the Emergency
Room at Alice Hyde Memorial Center ("AHMC") for
further evaluation. Id. ¶ 8. X-ray results indicated that
plaintiff did not sustain a fracture or dislocation to his

2018 WL 3736791

hand or wrist, and that he only suffered a sprain. Id. ¶ 10. Plaintiff received a splint, a soft sleeve with a hard insert at the underside of the wrist—also known as a brace—as well as ibuprofen, and was discharged. Id. ¶¶ 11, 12. Plaintiff also received a work release form, which indicated that he would be able to return to programming on May 24, 2016. Id. ¶ 12. A follow-up appointment was recommended with an orthopedist to rule out any hidden fractures or ligamentous injuries to plaintiff's hand and/or wrist. Id. ¶ 13.

**\*2** On his return to Franklin, the medical staff prescribed plaintiff a medical pass excusing him from work. Dkt. No. 21-3 ¶ 14. The pass expired on May 25, 2016. Id. On May 25, 2016, plaintiff went to the commissary before reporting to the Vocational School, which caused him to be late for his Building Maintenance class. Id. ¶ 23. Plaintiff had previously been late for class, and had been given direct orders to be on time in the future. Id. ¶ 24. When he reported to class plaintiff was wearing a brace on his right hand/wrist, but did not have a valid medical excuse pass. Id. ¶ 25. Because he did not have a valid medical excuse pass, C.O. Ware instructed plaintiff that he had to attend class even if he could not participate. Id. ¶ 26. Plaintiff refused to remain in the classroom; instead, he asked to go to the infirmary to renew his medical excuse pass. Id. ¶¶ 27, 28. C.O. Ware called the infirmary regarding plaintiff's medical excuse pass, and the nurse on duty informed her that plaintiff could attend class even though he could not participate. Id. ¶¶ 29, 30. The nurse also stated that because plaintiff only had a sprain, the situation was not an emergency and plaintiff did not need to visit the infirmary. Id. ¶ 30. C.O. Ware relayed this information to plaintiff. Id. ¶ 31.

Later that day, plaintiff's vocational class instructor informed C.O. Ware that plaintiff wanted to go to emergency sick call. Dkt. No. 21-3 ¶ 32. As nothing had changed since the first time plaintiff attempted to leave the classroom, C.O. Ware did not believe that this was an emergency situation. Id. C.O. Ware called the infirmary to explain that plaintiff felt it was an emergency. Id. The nurse stated that because this was not an emergency and did not require urgent care, plaintiff would be written up for abusing emergency sick call if he went just to get a new medical excuse pass. Id. ¶ 33. C.O. Ware reiterated this information to plaintiff, but he insisted on going to the infirmary. Id. ¶¶ 34, 35. Pursuant to DOCCS Directive 4910, C.O. Ware pat-frisked plaintiff before allowing him

to leave the Vocational School. Id. ¶ 36. C.O. Ware pat-frisked plaintiff in the hallway outside of the Building Maintenance classroom. Id. ¶ 37. C.O. Ware directed plaintiff to put his hands against the wall and spread his feet apart. Id. ¶ 38. She patted down his neck, chest, back, arms, and legs on the outside of his clothing. Id. C.O. Ware did not remove plaintiff's brace, nor did she throw plaintiff against the wall or attempt to choke him. Id. ¶¶ 39, 40. C.O. Ware did not "slam" plaintiff's right hand and/or wrist against the wall during the pat-frisk. Id. ¶ 41. C.O. Ware did not yell at plaintiff, threaten him, use racial slurs, or handcuff plaintiff during the pat-frisk. Id. ¶¶ 42, 43. During the pat-frisk, C.O. Ware informed plaintiff that if he went to emergency sick call to ask for a new permit, he would be written up as that did not qualify as an emergency. Id. ¶ 44. C.O. Ware sent plaintiff to the infirmary after the pat-frisk. Id. ¶ 45.

At the infirmary, the medical staff observed that plaintiff only had minimal swelling, and that his splint was still in place. Dkt. No. 21-3 ¶ 46. The medical staff informed plaintiff that there was "nothing wrong" with his hand and/or wrist, and that he could attend class. Id. ¶ 47. As such, the medical staff did not treat plaintiff at that time. Id. ¶ 48. On May 31, 2016, Franklin medical staff examined plaintiff in conjunction with a grievance he filed concerning the alleged May 25, 2016 incident. Id. ¶ 50. Plaintiff reported pain in his right thumb, but the medical staff did not observe swelling or bruising. Id. ¶ 51. Plaintiff did not request pain medication. Id. ¶ 52. On June 9, 2016, plaintiff attended a follow-up appointment with nonparty orthopedist Dr. Macelaru, who confirmed that plaintiff suffered a sprain, and that there were no hidden fractures or torn ligaments. Id. ¶¶ 15, 16. Dr. Cahill, Facility Health Services Director at Franklin, determined that the sprain diagnosed on June 9, 2016 was the same injury as the sprain diagnosed on May 20, 2016 because there were no new injuries to plaintiff's right hand and/or wrist. Id. ¶ 17. As a result of plaintiff's appointment with Dr. Macelaru, plaintiff's right hand and wrist were placed in a hard cast to prevent further injury and allow for quicker healing. Id. ¶¶ 18, 19. Plaintiff's cast was removed on or around July 15, 2016.

## II. Discussion [3]

## A. Failure to Respond

**\*3** Plaintiff failed to oppose defendant's Motion for Summary Judgment. Plaintiff was notified of the consequences of failing to respond to a summary judgment motion. Dkt. No. 23. Given this notice, plaintiff was adequately apprised of the pendency of defendant's motion and the consequences of failing to respond. "Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that movant is proceeding *pro se.*" Jackson v. Onondaga Cty., 549 F.Supp.2d 204, 209 (N.D.N.Y. 2008) (footnotes omitted). However, if "the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit." Id. at 210. "[T]o be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory." Id. Even if a verified complaint is deemed nonconclusory, "it may be insufficient to create a factual issue where it is (1) largely unsubstantiated by any other direct evidence and (2) so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." Id. Plaintiff's complaint states, "I declare under penalty of perjury that the foregoing is true and correct." Compl. at 9. Therefore, as plaintiff's complaint is verified,[4] the undersigned will accept plaintiff's complaint as an affidavit to the extent that the statements are based on plaintiff's personal knowledge or are supported by the record. See Berry v. Marchinkowski, 137 F.Supp.3d 495, 530 (S.D.N.Y. 2005) (collecting cases to support the proposition that a court may consider an unsworn assertions on a motion for summary judgment where they are based on the plaintiff's personal knowledge and in light of special solicitude).

## B. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law"....

**\*4** Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### C. Exhaustion

As a threshold matter, defendant argues that plaintiff has failed to exhaust his administrative remedies prior to filing this lawsuit. See Dkt. No. 21-1 ("Def. Mem. of Law") at 9-11. On May 27, 2016, plaintiff filed a grievance (FKN-12752-16) alleging that C.O. Ware assaulted him during the May 25, 2016 pat-frisk and injured his right hand. Dkt. No. 21-3 ¶¶ 49, 64; Dkt. No. 21-5 at 20-21. On June 3, 2016, the Superintendent denied plaintiff's grievance. Id. ¶ 65; Dkt. No. 21-5 at 17. Plaintiff appealed the Superintendent's determination on or about June 8, 2016. Id. ¶ 66; Dkt. No. 21-5 at 7. The Central Office Review Committee ("CORC") mailed the determination of plaintiff's grievance to Franklin on November 2, 2016. Id. ¶ 67. Plaintiff filed the complaint in the underlying action on October 27, 2016. Id. ¶ 68.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted).

The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[5]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies are "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?[6]

**\*5** It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions." Peoples v. Beldock, 212 F.Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at \*2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); Couvertier v. Jackson, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at \*3 (N.D.N.Y. June 19, 2014) ("In the event the defendant establishes that the inmate plaintiff failed to fully complete [ ] the administrative review process prior to commencing the action, the

plaintiff's complaint is subject to dismissal.") (internal citation and quotation marks omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).

Here, the record is clear that plaintiff filed this action on October 27, 2016, and at that time CORC had yet to issue a decision on plaintiff's appeal. [7] DOCCS IGP Assistant Director Rachael Seguin declared that based on her review of DOCCS records, CORC mailed their determination on plaintiff's grievance to the Franklin Inmate Grievance Review Committee ("IGRC"), for transmittal to plaintiff, on November 2, 2016—six days after plaintiff commenced this action. Dkt. No. 21-11 ("Seguin Decl.") ¶¶ 15, 16. Moreover, plaintiff's complaint makes clear on two occasions that he was aware he had not fully exhausted his administrative remedies prior to commencing suit: (1) "my grievance was denied by Superintendent D. LaClair and now my appeal to the CORC is pending"; and (2) "[t]hus I am still waiting for a result from the C.O.R.C. in this matter[.]" Compl. at 8. Thus, plaintiff did not fully exhaust his administrative remedies prior to filing this lawsuit because CORC's decision was outstanding. See Peoples, 212 F.Supp.2d at 142; McMillian, 2017 WL 8894737, at *2; Couvertier, 2014 WL 2781001, at *3; White, 2011 WL 4478988, at * 3.

### 2. Availability of Administrative Remedies

Read broadly, plaintiff seems to suggest that the grievance process was unavailable to him because of CORC's "absurd" delay in rendering their final determination. See Dkt. No. 1-1 at 27 (setting forth a memorandum from IGP Director Karen Bellamy regarding receipt of plaintiff's appeal). First, although plaintiff claims that CORC did not receive his appeal until September 14, 2016, the plain text of the memorandum seems to suggest that CORC received the appeal on June 14, 2016; rather, the memorandum sent to plaintiff was dated September 14, 2016. See id. ("Your grievance FNK-12752-16 entitled Assaulted by C.O. was rec'd by CORC on 6/14/2016.").

Second, courts within this Circuit are split as to whether a delay by CORC constitutes unavailability

that would excuse a plaintiff's failure to exhaust his administrative remedies. Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by 2015 WL 7864161 (N.D.N.Y., Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did not render the grievance process unavailable) with Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination").

*6 Here, there is no dispute that plaintiff filed a grievance with the Franklin IGRC on May 27, 2016; received the Superintendent's determination on June 3, 2016; and appealed that determination to CORC on or about June 8, 2016. See Dkt. No. 21-5 at 2-7. CORC received plaintiff's appeal on June 14, 2016; sent him a receipt of that appeal on September 14, 2016; and ultimately issued their determination on November 2, 2016. See id. at. 1; Dkt. No. 1-1 at 27. Plaintiff has not proffered evidence that he wrote to the Franklin IGRC or CORC inquiring as to the status of his appeal. The letters plaintiff does provide predate plaintiff's appeal to CORC and do not reference any unavailability in the grievance process. See Dkt. No. 1-1 at 18-26; see also 7 N.Y.C.R.R. § 701.5(d) (3)(i) ("If a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC."). Thus, the undersigned finds that CORC's approximately five month delay in rendering a decision did not excuse plaintiff from the exhaustion requirement. Cf. Henderson v. Annucci, No.

14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA.").

Thus, as plaintiff failed to exhaust his administrative remedies prior to commencing this action, it is recommended that defendant's motion be granted.[8]

**D. Eighth Amendment**

Alternatively, C.O. Ware argues that plaintiff's Eighth Amendment claim must be dismissed "because there is no evidence in the record to suggest that [she] used excessive force against [p]laintiff." Def. Mem. of Law at 11. C.O. Ware also argues that to the extent that any force was used, it was de minimis. See id. "The Eighth Amendment protects prisoners from cruel and unusual punishment by prison officials." Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015) (quoting Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) ). To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).

The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9, 112 S.Ct. 995). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10, 112 S.Ct. 995 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."

Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

**\*7** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7, 112 S.Ct. 995). In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] ... the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

As to the objective element, plaintiff has failed to demonstrate that the his injury was "sufficiently serious to warrant Eighth Amendment protection." Hudson, 503 U.S. at 9, 112 S.Ct. 995 (1992) (internal citations omitted). Plaintiff fails to establish, and there is no indication in the record, that the injury to his right wrist/hand changed or worsened as a result of May 25, 2016 pat-frisk; nor is there any support for his claim that he broke and/or fractured his right hand and/or wrist as a result of the alleged assault. See Compl. at 9; Dkt. No. 1-1 at 10. The record is clear that on May 20, 2016 plaintiff sustained a sprain to his right wrist/hand while playing basketball. See Compl. at 5; Dkt. No. 21-3 ¶ 4. Plaintiff's medical records from May 20, 2016 indicate that there were "[n]o signs of fracture or dislocation," and state that plaintiff suffered a right wrist sprain. Dkt. No. 22 ("Pl. Medical Rec.") at 68-69, 97.[9] Plaintiff contends that on May 25, 2016, C.O. Ware "threw [him] against the wall" and "grabbed [his] hand and slammed it against the wall." Compl. at 6. Affording plaintiff special solicitude, even if the undersigned were to credit plaintiff's allegations,[10] his medical records show that immediately after the pat-frisk, plaintiff exhibited only "minimal swelling" and that his splint was still in place. Pl. Medical Rec. at 63. Non-party Dr. Cahill declared that on May 25, 2016, plaintiff reported "[n]o new injuries" to the medical staff after the alleged assault, and, therefore, it was unnecessary for

the medical staff to provide treatment. Dkt. No. 21-10 ("Cahill Decl.") ¶ 18. Medical staff examined plaintiff again on May 31, 2016 following the filing of his grievance. See Pl. Medical Rec. at 60. Although plaintiff reported pain in his right thumb, the medical records note that there was no swelling or bruising. Id. On June 9, 2016, non-party orthopedist Dr. Macelaru confirmed that plaintiff had sustained a sprain, and that there were no other fractures or torn ligaments. Id. at 59. [11] Dr. Cahill declared that in his professional medical opinion, "the sprain diagnosed on June 9, 2016 was from the same injury as the sprain diagnosed on May 20, 2016 because there were no new injuries to [plaintiff's] right hand and/or wrist between May 20, 2016 and June 9, 2016." Cahill Decl. ¶ 22. Further, Dr. Cahill stated that plaintiff's hand and wrist were placed in a hard cast "to fully immobilize and protect the wrist. Because it is hard and cannot be removed by the wearer, a cast is better than a splint to prevent further injury and allow for quicker healing." Id. ¶ 25. Moreover, plaintiff's medical records reference the May 20, 2016 basketball injury as the source of plaintiff's hand/wrist injury. See Pl. Medical Rec. at 60 (detailing May 31, 2016 appointment: "Inmate has a splint for rt wrist that he received for a wrist sprain on 5/[20] from AHMC."); 95 (detailing June 9, 2016 orthopedic appointment: "Inmate injured [rt] wrist when he fell while playing basketball."). Thus, as defendant has proffered evidence that any injury plaintiff sustained to his right hand/wrist occurred as a result of the May 20, 2016 basketball injury, and plaintiff has not provided evidence to the contrary, the undersigned finds that plaintiff has failed to demonstrate a sufficiently serious injury attributable to C.O. Ware's pat-frisk for the purposes of an Eighth Amendment analysis. See Henry v. Brown, No.14-CV-2828 (LDH)(LB), 2016 WL 3079798, at *2 (E.D.N.Y. May 27, 2016) ("[W]here undisputed medical records directly and irrefutably contradict a plaintiff's descriptions of his injuries attributed to an alleged use of excessive force, no reasonable jury could credit plaintiff's account of the happening.") (internal citation and quotation marks omitted).

**\*8** To the extent that plaintiff's discomfort or swelling can be attributed to the May 25, 2016 pat-frisk, it has been held that a plaintiff's minor injuries or discomfort are de minimis and do not constitute a sufficiently serious injury under the objective element of the analysis. See White v. Williams, No. 9:12-CV-1775 NAM/DJS, 2016 WL 4006461, at *9 (N.D.N.Y. June 22, 2016) ("Reviewing the record as a whole, and drawing all inferences in

favor of Plaintiff, the Court finds that the de minimis use of force alleged by Plaintiff, and the resultant minor injuries or discomfort, are insufficient as a matter of law to satisfy the objective prong of an excessive force claim."); James v. Phillips, No. 05 Civ. 1539(PKC)(KNF), 2008 WL 1700125, at *4 (S.D.N.Y. Apr. 9, 2008) ("True, plaintiff need not show a significant injury but he must come forward with more than a de minimis use of force. In this case, there was nothing more than a shove of an inmate who was not then handcuffed. The swelling to the chin did not amount to much.").

As to the subjective element, there is no indication in the record that C.O. Ware acted "maliciously and sadistically to cause harm." Sims, 230 F.3d at 21 (internal quotation marks and citation omitted). Absent his conclusory allegations, plaintiff has failed to proffer evidence as to C.O. Ware's mental state sufficient to demonstrate that she maliciously or sadistically caused him harm. See id. C.O. Ware declared that she pat-frisked plaintiff pursuant to DOCCS Directive 4910, which allows for an inmate to be pat-frisked when going to and from program areas like the Vocational School. Ware Decl. ¶ 23. C.O. Ware further declared that because plaintiff had repeatedly refused to return to class, she performed the pat-frisk before allowing him to leave the infirmary in an effort to "maintain order and control." Id. ¶ 25.

Thus, in viewing the record in a light most favorable to plaintiff, the lack of evidence with respect to C.O. Ware's conduct, coupled with the absence of any injury attributable to the May 25, 2016 pat-frisk, fails to present a triable issue of fact for a jury to resolve. Accordingly, the undersigned recommends that defendant's Motion for Summary Judgment on this ground be granted. See Applegate v. Annucci, No. 9:02-CV-0276 (LEK/DEP), 2008 WL 2725087, at *18 (N.D.N.Y. July 10, 2008) (awarding summary judgment on excessive force claim where the plaintiff failed to file any response to the defendant's motion and the record lacked any evidence from which a reasonable juror could conclude that the defendant used excessive force).

### E. Qualified Immunity

Defendants argue that, even if plaintiff's Eighth Amendment claim is substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 17-19. Qualified

immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken v. Nixon, 236 F.Supp.2d 211, 230 (N.D.N.Y. 2002).

**\*9** Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See subsection II.D supra, at 16-21. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F.Supp.2d at 230. Accordingly, it is recommended that defendants' motion on this ground be granted.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 21) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[12]

**All Citations**

Slip Copy, 2018 WL 3736791

---

Footnotes

1    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

2    Local Rule 7.1(a)(3) states:

     Summary Judgment Motions

     Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

     The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute.

Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

**3**    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

**4**    The fact that plaintiff's complaint is not notarized is immaterial under 28 U.S.C. § 1746. See Hameed v. Pundt, 964 F.Supp. 836, 840-41 (S.D.N.Y. 1997) (deeming an unnotarized document admissible in support of a summary judgment motion so long as that document contains the statement "I declare under penalty of perjury that the foregoing is true and correct.").

**5**    In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

**6**    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**7**    Plaintiff's complaint is considered filed as of the date it was given to the prison official for forwarding. See Johnson v. Coombe, 156 F.Supp.2d 273, 277 (S.D.N.Y. 2001). "Although it is not clear when the plaintiff gave his complaint to prison officials, [a]bsent evidence to the contrary, the Court assumes that [the prisoner] gave his petition to prison officials for mailing on the date he signed it." Id. (internal quotation marks and citation omitted). Because plaintiff signed his complaint on October 27, 2016, the undersigned deems that the date of filing. See Compl.

**8**    "Ordinarily, the proper remedy where a prisoner has failed to satisfy the exhaustion requirement is to dismiss the complaint without prejudice, to give the inmate a chance to exhaust his administrative remedies and then refile his complaint." Brown v. Napoli, 687 F.Supp.2d 295, 298 (W.D.N.Y. 2009); see also Morales v. Mackalm, 278 F.3d 126, 128 (2d Cir. 2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion). However, because the undersigned recommends that plaintiff's Eighth Amendment claim against defendant be dismissed on the merits, the dismissal is with prejudice. See Ferrer v. Racette, No. 9:14-CV-1370 (GTS/DJS), 2017 WL 6459525, at *13 n.18 (N.D.N.Y. Dec. 18, 2017) ("Because there is an alternative basis for dismissing the claims against these Defendants that cannot be overcome by allowing Plaintiff a chance to exhaust his administrative remedies, the dismissal is with prejudice.").

**9**    AHMC documents incorrectly note that plaintiff sprained his left wrist. See Pl. Medical Rec. at 97.

**10**    C.O. Ware maintains that she did not use excessive force during the pat-frisk, nor did she use force maliciously or sadistically to cause plaintiff harm. See Dkt. No. 21-8 ("Ware Decl.") ¶¶ 32, 38.

**11**    Dr. Cahill declared that, in his professional opinion, it was reasonable to schedule plaintiff's follow-up appointment with the orthopedist for two to three weeks of from the date of the injury, instead of the two to three days recommended on his discharge papers, as "the [AHMC] radiology department indicated that [plaintiff] did not sustain any fractures or tears." Cahill Decl. ¶ 21 n.5.

**12**    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**End of Document**                       © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent inmates posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

Cole v. Artuz, Not Reported in F.Supp.2d (1999)
Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 41 of 125
1999 WL 983876

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell K. ELEBY, Plaintiff,
v.
G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing
Correctional Facility, 354 Hunter Street, Ossining, NY
10562, Pro Se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant
Attorney General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE
JUDGE

 **\*1** This is a civil rights action brought by *pro se*
plaintiff Terrell Eleby against three individuals employed
by the New York State Department of Corrections and
Community Supervision ("DOCCS"), one of whom has
since been dismissed from the action, pursuant to 42
U.S.C. § 1983. In his complaint, plaintiff alleges that two
of the defendants assaulted him in violation of his Eighth
Amendment rights, and the third defendant violated his
Fourteenth Amendment rights by issuing an allegedly
false misbehavior report against him and confining him in
the special housing unit ("SHU") at the prison facility in
which he was housed.

Currently pending before the court is a motion brought
by the remaining two defendants seeking the entry of
summary judgment in their favor based upon plaintiff's
alleged failure to exhaust available administrative

remedies before filing suit. For the reasons set forth below,
I recommend that the defendants' motion be granted.

I. BACKGROUND [1]
Plaintiff is a prison inmate currently held in the custody
of the DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although
plaintiff is now confined elsewhere, at the times relevant
to this action he was housed in the Auburn Correctional
Facility ("Auburn") located in Auburn, New York. *Id.* at
18.

In his complaint, plaintiff alleges that on January 14, 2015,
he was waiting in one of Auburn's hospital dormitory
rooms to be escorted to an outside facility for a medical
examination. Dkt. No. 1 at 4; Dkt. No. 29-2 at 54. At
approximately 10:00AM, defendants Smith and Vevone,
both of whom are corrections officers, arrived at plaintiff's
room to escort him on the medical trip. Dkt. No. 1 at
4. While plaintiff was attempting to remove his clothes
for a mandatory strip search, defendant Smith "violently
and physically attacked [him]." *Id.*; *see also* Dkt. No. 29-2
at 58. According to plaintiff, both defendants Smith and
Vevone "jumped on [his] back," and defendant Smith
punched him repeatedly in the eye, head, neck, back, and
ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant
in the action, arrived at plaintiff's dorm, physically
intervened, and ordered defendants Smith and Vevone to
cease the assault and leave the room. Dkt. No. 1 at 4-5;
Dkt. No. 29-2 at 58-59, 64. As a result of the alleged
assault, plaintiff suffered various injuries, including a
bloody and swollen eye, swelling and redness to his neck,
and sore ribs. Dkt. No. 1 at 5; Dkt. No. 29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing
him of violating six prison rules. Dkt. No. 22 at 9; Dkt.
No. 29-2 at 72. Following a superintendent's hearing to
address the charges, plaintiff was found guilty on four
of the six counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at
72. As a result of that finding, plaintiff was sentenced
to serve thirty days of disciplinary SHU confinement,
with a corresponding loss of commissary, package, and
telephone privileges. Dkt. No. 22 at 13; Dkt. No. 29-2 at
73-72.

II. PROCEDURAL HISTORY

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action.[2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Plaintiff's Exhaustion of Administrative Remedies

**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

### 1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 44 of 125

S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, ––– Fed.Appx. ––––, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules."[3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC")[4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(3)(i), (ii).

**\*4** The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to

render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/ or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can— and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to

**Eleby v. Smith, Not Reported in Fed. Supp. (2017)**
2017 WL 986123

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 45 of 125

exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA. [6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

### 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance, [7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone. [8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January 22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See Dabney*, 604 Fed.Appx. at 3 ("The IGP also has an expedited

2017 WL 986123

process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also Lopez v. Bushey*, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, *Terry*, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. *Hayes*, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g., Goodson v. Silver*, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 986123

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 47 of 125

2017 WL 986123

## Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

2    Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

4    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

5    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

6    According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

7    Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

8    In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

9    In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

10   If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00899-BKS-TWD   Document 37   Filed 05/20/19   Page 48 of 125

Gilliam v. Baez, Not Reported in Fed. Supp. (2017)
2017 WL 476733

2017 WL 476733
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Quddoos GILLIAM, Plaintiff,
v.
Sergeant BAEZ, Former Superintendent
Catherine Cook, Correctional Officer S.
Fatuk, Correctional Officer John Doe #1, and
Correctional Officer John Doe #2, Defendants.

15-CV-6631 (KMK)
|
Signed 02/02/2017

**Attorneys and Law Firms**

Quddoos Gilliam, Otisville, NY, Pro Se Plaintiff.

Eric T. Schneiderman, Esq., Christina Okereke, Esq., Office of the Attorney General of the State of New York, New York, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Pro se Plaintiff Quddoos Gilliam ("Plaintiff"), currently incarcerated at Otisville Correctional Facility ("Otisville"), brings this Action under 42 U.S.C. § 1983 against Sergeant Baez ("Baez"), Former Superintendent Catherine Cook ("Cook"), Correctional Officer S. Fatuk ("Fatiuk"), Correctional Officer John Doe #1, and Correctional Officer John Doe #2 (collectively, "Defendants").[1] Plaintiff alleges that Defendants violated his rights under the First Amendment, Fourteenth Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000 et seq., the New York State Constitution and State Correctional Law § 610. (See Compl. (Dkt. No. 2).) Before the Court is Defendants' Motion To Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (the "Motion"). (See Mot. To Dismiss the Compl. (Dkt. No. 21).) For the following reasons, Defendants' Motion is granted.

I. Background

A. Factual Background

The following allegations are taken from Plaintiff's Complaint and are treated as true for the purposes of resolving the instant Motion.

On June 27, 2013, Plaintiff—a "[p]racticing member[ ] of the [Nation of Islam ('NOI') ] religion," (Compl. ¶ 7)— ' 'signed out' to attend NOI class at 6:15 PM on the Pass List inside his Housing Unit ('H.U.')," (id. ¶ 8). At the time, "Plaintiff was serving 30 days Loss of Recreation ('L.O.R.') as part of a disciplinary sanction impose[d] by the Otisville Correctional Facility Administration." (Id.) When Plaintiff arrived at the location of the NOI class, he was informed that he "[could not] attend NOI class" and instructed to return to his H.U. (Id. ¶ 10.) Upon returning to his H.U., Plaintiff was told by Defendant Fatiuk that Defendant Baez had ordered Plaintiff back to his H.U. because of Plaintiff's L.O.R. status. (Id. ¶ 12.) The next day, Plaintiff approached Defendant Baez in the messhall and Defendant Baez confirmed that he had ordered Plaintiff to return to his H.U. and that "the policy of [Otisville] [was] that if an inmate is on L.O.R. status[,] the inmate cannot attend [r]eligious [c]lasses." (Id. ¶ 15 (internal quotation marks omitted).) Plaintiff was told that he was "not attending NOI [c]lasses until [he] g[o]t off L.O.R." (Id. ¶ 16 (internal quotation marks omitted).)

The following day, Plaintiff went to the Inmate Liaison Committee ("I.L.C.") and filed a report that inmates on L.O.R. status were being denied the opportunity to participate in religious classes and that Plaintiff would like the issue to be raised at the next I.L.C. agenda meeting. (Id. ¶ 17.) On June 30, 2013, Plaintiff "request[ed] to see Deacon Bormann[,] the facility coordinating chaplain." (Id. ¶ 18.) Plaintiff was told that "in order to speak with Deacon Bormann [Plaintiff] ha[d] to submit a formal request via 'interview slip' " or could approach Deacon Bormann when Plaintiff saw him on the facility compound. (Id.)

**\*2** On July 4, 2013, Plaintiff again attempted to attend NOI class, but was stopped by Defendant Fatiuk, (id. ¶ 19), and told that Plaintiff "[could not] leave [the] unit and attend religious class," (id. ¶ 20 (internal quotation marks omitted)). Plaintiff then decided to file a grievance with the Inmate Grievance Resolution Committee ("IGRC").

Gilliam v. Baez, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 49 of 125

2017 WL 476733

(*Id.* ¶ 21.) [2] Approximately three weeks after filing his grievance, Plaintiff received a decision that "[t]he issue ha[d] been resolved," that the facility had "outlined ... what can be attended when an inmate is on [L.O.R.] status," and that Plaintiff's "[r]equest [wa]s outside the purview of the IGRC." (*Id.* ¶ 22.) Plaintiff was instructed that he could appeal the decision to the facility Superintendent, (*id.*), and promptly did so, (*id.* ¶ 23.) In response to Plaintiff's appeal, he received a letter from the Superintendent stating that despite the fact that "[t]here [was] no evidence to show malfeasance by staff," the facility had "clarified ... what constitutes [L.O.R.]" and "[a] list ha[d] been distributed to all housing units." (*Id.* Ex. B at unnumbered 23.)

Plaintiff appealed the grievance to the Central Office Review Committee ("CORC") "in order to r[a]ise awareness of the unlawful conduct by the staff at Otisville ... because sometime[s] a lot of constitutional violation[s] ... occur at [Department of Corrections and Community Supervision ('DOCCS') ] facilities" and "the CORC [is] not aware of these violations." (*Id.* ¶ 24.)

As a result of Defendants' alleged violations, Plaintiff seeks declaratory judgment, compensatory damages in the amount of $60,000, punitive damages "in an amount to be proved at tr[ia]l," and disbursement, costs, and interest. (*Id.* at unnumbered 14 ¶¶ 1-5.)

### B. Procedural History

Plaintiff filed his Complaint on August 21, 2015. (Dkt. No. 2.) On December 1, 2015, Plaintiff's application to proceed in forma pauperis ("IFP") was granted by then-Chief Judge Loretta A. Preska of the Southern District of New York. (Dkt. No. 4.) [3] On December 15, 2015, the Court issued an Order of Service stating that "the Complaint [did] not provide sufficient information to permit the New York State Attorney General, which is the attorney for and agent of the New York State [DOCCS], to identify Correctional Officer John Doe #1 and Correctional Officer John Doe #2" and that "the Complaint lack[ed] any allegations addressing the conduct of any unnamed correctional officers." (Order of Service 2 (Dkt. No. 6).) Plaintiff was directed to "file an amended complaint within 45 days which [would] replace, not supplement, the original Complaint, in which Plaintiff [would] provide more detailed information regarding the John Doe Correctional Officers he wishe[d] to name as

Defendants and their alleged involvement in the events giving rise to [Plaintiff's] [c]ase." (*Id.*) Plaintiff did not file an Amended Complaint within the time allotted.

On June 16, 2016, Defendants filed the instant Motion To Dismiss and accompanying memorandum of law. (Mem. of Law in Supp. of Defs.' Mot. To Dismiss the Compl. ("Defs.' Mem.") (Dkt. No. 22).) On September 13, 2016, Plaintiff filed a response to Defendants' Motion. (Resp. to Defs.' Movement [sic] Defense and Movement [sic] For Summ. J. ("Pl.'s Resp.") (Dkt. No. 26).) [4] On September 30, 2016, Defendants filed a reply. (*See* Reply Mem. of Law in Further Supp. of Defs.' Mot. To Dismiss the Compl. ("Defs.' Reply") (Dkt. No. 29).)

## II. Discussion

### A. Standard of Review

#### 1. Rule 12(b)(1)

**\*3** "A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (internal quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247 (2010). While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration and internal quotation marks omitted); *see also Ray Legal Consulting Grp. v. Gray*, 37 F. Supp. 3d 689, 696 (S.D.N.Y. 2014) ("[W]here subject matter jurisdiction is contested a

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 50 of 125

Gilliam v. Baez, Not Reported in Fed. Supp. (2017)

2017 WL 476733

district court is permitted to consider evidence outside the pleadings, such as affidavits and exhibits.").

## 2. Rule 12(b)(6)

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678-79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the

sufficiency of a complaint we accept as true all factual allegations...." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we ... accept all factual allegations in the complaint as true...." (alteration and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n ruling on a 12(b)(6) motion, ... a court may consider the complaint[,] ... any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiffs' possession or of which [the] plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alteration and internal quotation marks omitted); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)); *Hendrix v. City of New York*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

**\*4** Where, as here, a plaintiff proceeds pro se, the court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (internal quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted).

### B. Analysis

#### 1. First Amendment

##### a. Failure to State a Claim

2017 WL 476733

Defendants seek to dismiss Plaintiff's Complaint on the basis that it fails to state a First Amendment claim. Defendants argue that "[P]laintiff fails to show any more than a de minimis burden, much less a substantial burden, on the free exercise of his religious beliefs." (Defs.' Mem. 8 (italics omitted).)

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), which includes the right to participate in religious services, *see Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). A prisoner's First Amendment rights, however, are "[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford*, 352 F.3d at 588 (internal quotation marks omitted); *see also Weathers v. Rock*, No. 12-CV-1301, 2014 WL 4810309, at *4 (N.D.N.Y. Sept. 23, 2014) (report and recommendation) (explaining that the right of inmates to freely exercise a chosen religion "is not limitless, and may be subject to restrictions relating to legitimate penological concerns"). Accordingly, a prisoner's free exercise claims are "judged under a reasonableness test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (internal quotation marks omitted).

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alteration and internal quotation marks omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 274-45 (2d Cir. 2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."); *Shapiro v. Cmty. First Servs., Inc.*, No. 11-CV-4061, 2014 WL 1276479, at *10 (E.D.N.Y. Mar. 27, 2014) ("At the motion to dismiss stage, a complaint must assert sufficient allegations necessary to establish that [the] plaintiff's claim is based upon a sincerely held religious belief." (alteration and internal quotation marks omitted)).[5] In determining whether a belief is "sincere" "an individual ... need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (alteration and internal quotation

marks omitted). Moreover, "[a] substantial burden on religious exercise exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Rossi v. Fishcer*, No. 13-CV-3167, 2015 WL 769551, at *7 (S.D.N.Y. Feb. 24, 2015) (internal citations and quotation marks omitted). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593-94. Once a plaintiff establishes this burden, "the defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin v. Goord*, 467 F.3d at 275 (alteration omitted). The burden then shifts to the inmate "to show that these articulated concerns were irrational." *Id.* (alteration and internal quotation marks omitted).

**\*5** Defendants do not contest the sincerity of Plaintiff's religious beliefs. The Court, therefore, will assume for the purpose of resolving the instant Motion that Plaintiff's religious beliefs are sincerely held. Accordingly, the Court addresses whether Plaintiff has adequately alleged that his ability to exercise his religious beliefs was substantially burdened.

Plaintiff asserts that on two occasions, Defendants "den[ied] [him] the opportunity to participate in NOI class." (Compl. ¶ 25.) In the Second Circuit, courts have held that preclusion from attending two religious services is not, without more, a "substantial burden" on a plaintiff's free exercise of religion. *See Jean-Laurent v. Los*, No. 12-CV-132, 2015 WL 1015383, at *6 (W.D.N.Y. Mar. 9, 2015) (explaining that "[c]ourts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religion" and collecting cases); *Blalock v. Jacobsen*, No. 13-CV-8332, 2014 WL 5324326, at *7 (S.D.N.Y. Oct. 20, 2014) (same); *Shapiro*, 2014 WL 1276479, at *11 ("[N]ot permitting a prisoner to attend two religious services 'is a de minimis, or insubstantial, burden on an inmate's ability to freely exercise his religion.' ") (italics omitted) (quoting *Smith v. Graziano*, No. 08-CV-469, 2010 WL 1330019, at *9 (N.D.N.Y. Mar. 16, 2010), *adopted by* 2010 WL 1332503 (N.D.N.Y. Apr. 6, 2010)). Here, Plaintiff only claims that he was prohibited from attending two religious classes on June 27, 2013 and July 4, 2013. (*See*

Compl. ¶¶ 8-10, 19-20.) Indeed, Plaintiff admits that "[f]or at least seven years prior to the deprivations imposed by ... Defendants, Plaintiff was permitted to participate in NOI class freely in other facilities whether on L.O.R. or not." (*Id.* ¶ 52.)

Moreover, Plaintiff does not allege that the specific services were " 'central or important' to his faith." *Rossi, 2015 WL 769551, at *8* (quoting *Ford, 352 F.3d at 593*). Indeed, Plaintiff notes that "[t]he NOI [c]lass is the best opportunity for [him] to learn the basic doctrines of the NOI faith," (Compl. ¶ 26), but that "[t]here are several options for Plaintiff to learn about his religion," albeit "limited" options, (*id.* ¶ 30). *See Turner v. Safley, 482 U.S. 78, 90 (1987)* (noting a factor "relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates"); *Holland, 758 F.3d at 222-23* (same); *Henry v. Schriro, No. 10-CV-7573, 2011 WL 3370394, at *3 (S.D.N.Y. Aug. 2, 2011)* (finding "the availability of alternative means of exercising the right to free exercise of religion" weighed in favor of granting the defendant's motion to dismiss); Accordingly, the Court grants Defendants' Motion to Dismiss Plaintiff's First Amendment claims on the grounds that Plaintiff has failed to "make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington, 2015 WL 1439348, at *9* (alteration and internal quotation marks omitted).

#### b. Qualified Immunity

Defendants further contend that they are entitled to qualified immunity on Plaintiff's claims for monetary damages under the First Amendment. (*See* Defs.' Mem. 10-13.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan, 555 U.S. 223, 231 (2009)* (internal quotation marks omitted). Qualified immunity " 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.' " *City and County of San Francisco v. Sheehan, 135 S. Ct. 1765, 1774 (2015)* (alteration in original) (quoting *Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)*). Because qualified immunity is "an

affirmative defense [that] ... reflects an immunity from suit rather than a mere defense to liability[,] ... it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss." *Betts v. Shearman, No. 12-CV-3195, 2013 WL 311124, at *4 (S.D.N.Y. Jan. 24, 2013)* (italics and internal quotation marks omitted), *aff'd, 751 F.3d 78 (2d Cir. 2014)*.

**\*6** In determining whether a right is clearly established, "th[e] inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson, 555 U.S. at 244* (internal quotation marks omitted). In the Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.' " *Schubert v. City of Rye, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011)* (quoting *Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004)*).

Here, as noted above, at the time Plaintiff was denied the ability to attend two NOI classes, it was far from clearly established that precluding an inmate from attending two religious classes violated the First Amendment. Indeed, courts in the Second Circuit have explicitly held otherwise. *See Jean-Laurent, 2015 WL 1015383, at *6* ("Courts within the Second Circuit have consistently held that missing two religious services does not pose a substantial burden on an inmate's religion."); *Blalock, 2014 WL 5324326, at *7* (same); *Shapiro, 2014 WL 1276479, at *11* (same); *see also Smith, 2010 WL 1330019, at *9* ("[T]he cancellation of two services did not violate [the] [p]laintiff's free exercise rights and such First Amendment claim should be dismissed."); *Williams v. Weaver, No. 03-CV-912, 2006 WL 2794417, at *5 (N.D.N.Y. Sept. 26, 2006)* (noting that inability to attend two religious services was not a substantial burden on the plaintiff's right to practice his religion). This is enough to safely conclude, at the absolute minimum, "a reasonable [prison official] would not have understood from the existing law that his conduct was unlawful." *Schubert, 775 F. Supp. 2d at 702* (internal quotation marks omitted). Thus, Plaintiff's claims for monetary damages pursuant to violations of the First Amendment are dismissed.

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 53 of 125

Gilliam v. Baez, Not Reported in Fed. Supp. (2017)

2017 WL 476733

#### c. Immunity Under the Eleventh Amendment

As to the declaratory relief Plaintiff seeks, (*see* Compl. at unnumbered 14, ¶ 1), Defendants assert that such relief is barred by the Eleventh Amendment, as Plaintiff's "alleged constitutional violation is not ongoing," (*see* Defs.' Mem. 14). The Supreme Court has held that declaratory judgment is an inappropriate remedy to a past violation of federal law. *Green v. Mansour*, 474 U.S. 64, 73 (1985) (finding there was no "claimed continuing violation of federal law" or "threat of state officials violating the repealed law in the future" and that the Eleventh Amendment precludes declaratory relief).

As both Plaintiff and Defendants note, following the submission of Plaintiff's grievance, Otisville "clarified ... what constitutes [L.O.R.]" and distributed a new list and revised Facility Operations Manual ("FOM") No. 223 to all housing units. (*See* Compl. Ex. B at unnumbered 23.) On the revised FOM No. 223, "Chaplain and Religious Services/Classes" is listed as an activity inmates *can* attend while on L.O.R. (*See* Decl. of Christina Okereke ("Okereke Decl.") Ex. A at 2 (Dkt. No. 23).) Therefore, without potential for future violations, the Eleventh Amendment prohibits declaratory relief and Plaintiff's claim for such relief is dismissed.

#### 2. RLUIPA

As with Plaintiff's free exercise claim under the First Amendment, Defendants seek dismissal of Plaintiff's allegations pursuant to RLUIPA for failure to state a claim. (*See* Defs.' Mem. 15.) RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). RLUIPA "provides a more stringent standard than does the First Amendment, barring the government from imposing a substantial burden on a prisoner's free exercise unless the challenged conduct or regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest." *Holland*, 758 F.3d at 224 (alterations and internal quotation marks omitted); *see also Salahuddin v. Goord*, 467 F.3d at 273 ("RLUIPA protects inmates by providing that a government shall not 'impose a

substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." (quoting 42 U.S.C. § 2000cc-1(a)) (footnote omitted)). While "RLUIPA does not define 'substantial burden,' ... the Second Circuit has assumed that '[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence[,] ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it.' " *Panayoty v. Annucci*, 898 F. Supp. 2d 469, 481-82 (N.D.N.Y. 2012) (second alteration in original) (quoting *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007)), *adopted sub nom. Bonilla v. Annucci*, 2012 WL 4378127 (N.D.N.Y. Sept. 25, 2012). "The Supreme Court has held that a substantial burden is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Id.* at 482 (alteration in original) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). Whether a prisoner sufficiently pleads a substantial burden on a sincerely held religious belief under RLUIPA involves the same threshold analysis as under the First Amendment. *See Valdez v. City of New York*, No. 11-CV-5194, 2013 WL 8642169, at *12 (S.D.N.Y. Sept. 3, 2013) ("To state a claim under both the Free Exercise Clause of the First Amendment and RLUIPA, an inmate must first allege that the government imposed a 'substantial burden' on his religious exercise." (citing *Salahuddin v. Goord*, 467 F.3d at 274–75)), *adopted by* 2014 WL 2767201 (S.D.N.Y. June 17, 2014); *Ramsey v. Goord*, 661 F. Supp. 2d 370, 395 n.12 (W.D.N.Y. 2009) (explaining that "the threshold inquiry of a religious freedom claim under both the First Amendment and the RLUIPA is the same"); *Pugh v. Goord*, 571 F. Supp. 2d 477, 504 (S.D.N.Y. 2008) (engaging in the same analysis for determining a plaintiff's sincerely held beliefs under both the RLUIPA and the Free Exercise Clause). "Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens [his or] her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (per curiam)(citing 42 U.S.C. § 2000cc-2(b)).

**\*7** "RLUIPA does not authorize claims for monetary damages against state officers in either their official or

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 54 of 125

Gilliam v. Baez, Not Reported in Fed. Supp. (2017)

2017 WL 476733

individual capacities." *Holland*, 758 F.3d at 224 (citing *Washington v. Gonyea*, 731 F.3d 143, 145-46 (2d Cir. 2013) (per curiam)); *see also Keitt v. Hawk*, No. 13-CV-850, 2015 WL 1246058, at *11 (N.D.N.Y. Jan. 8, 2015) (same). Instead, a plaintiff may only seek injunctive relief. *See Holland*, 758 F.3d at 224; *see also Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 520 (S.D.N.Y. 2010) ("It is readily apparent that injunctive relief constitutes appropriate relief under RLUIPA." (internal citations and quotation marks omitted)). However, here Plaintiff's does not seek injunctive relief. (*See* Compl. 14 ¶¶ 1-5.)[6] Accordingly, Plaintiff's claims under RLUIPA are dismissed.

### 3. Equal Protection Under the Fourteenth Amendment

Defendants further contend that Plaintiff has failed to state a claim under the Equal Protection Clause to the Fourteenth Amendment. (Defs.' Mem. 16-17.) "The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996) (internal quotation marks omitted). In other words, "the Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (internal quotation marks omitted); *see also Bailey v. Town of Evans*, 443 F. Supp. 2d 427, 430 (W.D.N.Y. 2006) (same). To state a violation of the Equal Protection Clause, a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *see also Barrow v. Van Buren*, No. 12-CV-1268, 2015 WL 417084, at *22 (N.D.N.Y. Jan. 30, 2015) (same); *Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008) ("In order to plead a facially valid equal protection claim ... [a] plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right.").

Plaintiff claims that by prohibiting Plaintiff from "attend[ing] NOI class," Defendants affected "the manner in which and how Plaintiff can practice his religion" and that Defendants had "discriminatory intent" in doing so. (Compl. ¶ 47.) Plaintiff asserts—and Defendants do not dispute—that at the time of the alleged incident, inmates were still "mandated" to attend "academic school, v[o]cational, R-SAT (substance abuse), ART (Aggression Recessive Training), OHM (Mental Health) [p]rograms" while on L.O.R. status, (*id.* ¶ 45), but were prohibited from attending religious classes, (*id.*).

**\*8** Here, the deficiency in Plaintiff's equal protection claim is that it "does not allege that [Plaintiff] was treated differently from *any* identified individuals, let alone individuals who he claims were similarly situated to him in any respect" and "is completely devoid of any reference to 'similarly situated' or 'substantially similar' individuals." *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 434-35 (S.D.N.Y. 2013) (dismissing the plaintiff's equal protection claim under theories of selective enforcement and class of one where the plaintiff "simply" alleged that the defendants "singled out [the] plaintiff, in part, because of his exercise of constitutional rights" (internal quotation marks omitted)); *see also Butler v. Bridgehampton Fire Dist.*, No. 14-CV-1429, 2015 WL 1396442, at *4-5 (E.D.N.Y. Mar. 25, 2015) (dismissing the plaintiff's equal protection claim under the selective enforcement and class of one theories because the complaint "only discusse[d] the harmful actions [the defendants] took with respect to [the] [p]laintiff, but there [was] no discussion whatsoever of any similarities between [the] [p]laintiff and others"). Indeed, Plaintiff specifically states that Defendants "don't allow[ ] Plaintiff *and other inmates who are on L.O.R. status* to attend religious class." (Compl. ¶ 45 (emphasis added).) Also, Plaintiff does not allege, for example, that Catholic inmates who were on L.O.R. status were allowed to attend religious services, while NOI observers were not. The absence of comparators is fatal to this claim and, therefore, Plaintiff's equal protection claim is dismissed.

### 4. State Law Claims

In addition to Plaintiff's federal claims, Plaintiff also asserts violations of the New York State Constitution and State Correctional Law § 610. (Compl. ¶¶ 55-64.) Where a district court "has dismissed all claims over

Gilliam v. Baez, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00899-BKS-TWD   Document 37   Filed 05/20/19   Page 55 of 125

2017 WL 476733

which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over any remaining claims. *See* 28 U.S.C. § 1367(c)(3). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction." *Kolari v. N. Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citation and internal quotation marks omitted). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) ("It is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims." (internal quotation marks omitted)); *see also Erie Grp. LLC v. Guayaba Capital, LLC*, 110 F. Supp. 3d 501, 511 n.68 (S.D.N.Y. 2015) (same).

The Court finds that nothing distinguishes this Action from "the usual case." Plaintiff's federal claims are all dismissed prior to trial, *see Dellutri v. Village of Elmsford*, 895 F. Supp. 2d 555, 575 (S.D.N.Y. 2012) (declining to exercise supplemental jurisdiction where "th[e] case remains in its initial stages, and the [p]arties have not yet proceeded to discovery"); *Middleton v. United States*, No. 10-CV-6057, 2012 WL 394559, at *1 (E.D.N.Y. Feb. 7, 2012) (declining to exercise supplemental jurisdiction because no federal claims survived a motion to dismiss), and none of the factors that the Supreme Court enunciated in *Cohill*—"judicial economy, convenience, fairness, [or] comity"—militate against such dismissal, 484 U.S. at 350 n.7. Thus, Plaintiff's state claims are dismissed without prejudice.

## III. Conclusion

For the above reasons, the Court grants Defendants' Motion To Dismiss. However, in light of Plaintiff's pro se status, and because this is the first adjudication of his claims on the merits, Plaintiff's claims are dismissed without prejudice. If Plaintiff wishes to file an Amended Complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30 days of the date of this Order. The failure to do so may result in the dismissal of this Action with prejudice.

The Clerk of Court is respectfully requested to terminate the pending Motion. (Dkt. No. 21.)

**\*9** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 476733

Footnotes

1   Defendants note that Fatiuk's name is spelled incorrectly as "Fatuk" in Plaintiff's Complaint. (*See* Mem. of Law in Supp. of Defs.' Mot. To Dismiss the Compl. 1 n.1 (Dkt. No. 22).) The Court refers to Defendant Fatiuk by the correct spelling of his name, despite the fact that the caption of this case reflects the misspelling. Additionally, the Court notes that in his letter to the Court filed June 3, 2016, Plaintiff requested to "remove officer S. Fatuk from [his] [Action], due to the fact that he was following orders under Sergeant Baez." (*See* Letter to Court (June 3, 2016) 1 (Dkt. No. 20).)

2   Despite the fact that Plaintiff alleges to have filed his grievance with the IGRC after the second denial to attend religious class on July 4, 2013, Plaintiff's grievance is dated July 2, 2013. (*See* Compl. Ex. A at unnumbered 20-21.) However, for the purposes of the instant Motion To Dismiss, the timing of Plaintiff's grievance to the IGRC is immaterial.

3   Plaintiff's case was initially assigned to Chief Judge Preska. On December 9, 2015, Plaintiff's case was reassigned to this Court. (*See* Dkt. (minute entry for Dec. 9, 2015).)

4   Plaintiff's response to Defendants' Motion To Dismiss is erroneously labelled as a response to a motion for summary judgment. (*See* Pl.'s Resp. 1). Nonetheless, the Court treats this filing as a response to the instant Motion To Dismiss.

5   The Second Circuit has acknowledged that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014). The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Id.* Accordingly, this Court "will follow the analysis in *Holland* and proceed to consider the First

2017 WL 476733

Amendment analysis, assuming that the substantial burden test is still valid." *Weathers*, 2014 WL 4810309, at *4; *see also* *Williams v. Fisher*, No. 11-CV-379, 2015 WL 1137644, at *16 (N.D.N.Y. Mar. 11, 2015) (same).

6   Even were Plaintiff to seek injunctive relief, "[t]he equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Here, because Otisville's policy now permits inmates on L.O.R. status to attend religious classes, (*see* Okereke Decl. Ex. A at 2), there is no future threat of injury to Plaintiff.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)
2016 WL 3039687

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 57 of 125

2016 WL 3039687
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Thomas Adam HENDERSON, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

14-CV-445A
|
Signed 03/14/2016

**Attorneys and Law Firms**

Thomas Adam Henderson, Alden, NY, pro se.

Christopher L. Boyd, NYS Attorney General's Office, Buffalo, NY, for Defendants.

## REPORT, RECOMMENDATION AND ORDER

JEREMIAH J. MCCARTHY, United States Magistrate Judge

**\*1** This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including the preparation of a Report and Recommendation on dispositive motions. [23]. [1] Plaintiff Thomas Adam Henderson brought this action pursuant to 42 U.S.C. § 1983 claiming that his civil rights were violated when the defendants allegedly assaulted him on September 10, 2013, October 22, 2013 and May 16, 2014. Complaint [1], pp. 11,13. Before me are defendants' motion to dismiss [22], plaintiff's motion to amend the complaint [31], and plaintiff's motion for appointment of counsel [32].

For the reasons stated below, I recommend that defendants' motion to dismiss be granted in part and denied in part, the plaintiff's motion to amend be granted in part and denied in part, and that plaintiff's motion for the appointment of counsel be denied.

## BACKGROUND

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 alleging that while he was incarcerated at the Attica Correctional Facility, Correction Officer Dunford

sexually assaulted him during a frisking on September 10, 2013. He asserts that after being cut down from a suicide attempt, Officer Dunford pulled up the waistband of his underwear so as to give him a "wedgie", and then swiped his fingers between plaintiff's butt cheeks "roughly pressing" against his anus. Complaint [1], p. 11. After complaining about this conduct, plaintiff states that he was informed that this procedure is known as a "credit card check", performed to determine if an inmate is hiding weapons. Id. at 11, 13, 14, 17. Plaintiff argues that the procedure constitutes a sexual assault.

He also asserts that the "credit card check" procedure was performed on him twice during a pat frisk on October 22, 2013 by Corrections Officer J. Hoinski. [2] Id. at p. 13. Finally, plaintiff alleges that Correction Officer B. Naab performed the "credit card check" on him on May 16, 2014. Id. at pp. 16-17.

Plaintiff claims that he complained to New York State Department of Corrections and Community Supervision ("DOCCS") Commissioner Anthony Annucci, DOCCS Chief Inspector General Vernon J. Fonda, Attica Correctional Facility Superintendent Mark L. Bradt, and others about the conduct which he considered to be sexual assaults. Id. at pp. 12, 15. He argues that these supervisory defendants failed to properly investigate and respond to his complaints in violation of his Eighth Amendment rights. Id. at 12. [3]

**\*2** In his original complaint, plaintiff stated that he did not file a grievance as to any of the incidents because he did not believe he had to file a grievance. Instead, he contended that he complied with DOCCS Directive 4028A. Id. at pp. 5, 19. The defendants move to dismiss on the grounds that plaintiff failed to exhaust his administrative remedies. Motion to Dismiss [22-1], p. 4. Subsequently, the plaintiff sought leave to amend his Complaint to allege that he did, in fact, file a grievance regarding one of the three "credit card check" incidents. Plaintiff's Motion to Amend [31], p.3. The defendants oppose that motion.

## DISCUSSION

**A. Standard of Review**
The defendants move to dismiss the claims in the Complaint pursuant to Rule 12 of the Federal Rules

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    1

Case 9:17-cv-00899-BKS-TWD   Document 37   Filed 05/20/19   Page 58 of 125

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

of Civil Procedure. The court accepts the material facts alleged in the complaint as true and draws all reasonable inferences in favor of the plaintiff and against the defendants. *See* Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998). However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness. Albany Welfare Rights Org. Day Care Center, Inc. v. Schreck, 463 F.2d 620 (2d Cir. 1972). The court is required to read the complaint broadly and with great latitude on a motion to dismiss. Yoder v. Orthomolecular Nutrition Institute, 751 F.2d 555, 558 (2d Cir. 1985). The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient". Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

The Supreme Court has clarified the pleading standard required to withstand a motion to dismiss. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense". Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (internal citation omitted). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief". Id.; *see also* Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565-66 (2007) (factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)). Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions. Iqbal, 556 U.S. at 680-81. "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth' ". Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). The court must then consider the factual allegations in the complaint to determine if they plausibly suggest an entitlement to relief. Iqbal, 556 U.S. at 681; *see also* Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).

Thus, while the pleading standard under Fed. R. Civ. P. ("Rule") 8 does not require detailed factual allegations, it demands more than unadorned, conclusory accusations. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action is not sufficient. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility requirement is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. Iqbal, 556 U.S. at 681.

**B. Exhaustion of Administrative Remedies**

 **\*3** The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), states in relevant part, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted". 42 U.S.C. § 1997e(a). This administrative exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong". Porter v. Nussle, 534 U.S. 516, 532 (2002).

"Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case". Nussle, 534 U.S. at 524-25. The act's "dominant concern [is] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court" (id. at 528), and clarify the contours of the controversy once it is litigated. Id. at 525. In Woodford v. Ngo, 548 U.S. 81, 83-84, 90, 126 (2006), the Court held that the exhaustion requirement of the PLRA cannot be satisfied by an "untimely or otherwise procedurally defective administrative grievance or appeal", and that the PLRA requires "proper exhaustion", which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)".

Although exhaustion under the PLRA is an affirmative defense, not a jurisdictional requirement, *see* Jones v.

Case 9:17-cv-00899-BKS-TWD   Document 37   Filed 05/20/19   Page 59 of 125
Henderson v. Annucci, Not Reported in Fed. Supp. (2016)
2016 WL 3039687

Bock, 549 U.S. 199, 211 (2007), a demonstrated failure to exhaust warrants dismissal of the plaintiff's claims. Jones, 549 U.S. at 216; *see also* Wilson v. Yussuff, 2015 WL 77433, *5 (E.D.N.Y. 2015) (holding that court must dismiss action where inmate did not exhaust administrative remedies).

However, the exhaustion requirement may be excused under the following circumstances: "(1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement". Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006).

**C. Available Grievance Procedure**
DOCCS maintains a three-tiered administrative review and appeals system for prisoner grievances. *See* N.Y. Comp. Codes R. & Regs. § 701.5. Prior to pursuing a § 1983 action in federal court, a prisoner in the DOCCS system must exhaust all three levels. *See* Porter, 534 U.S. at 524. First, an inmate may file an inmate grievance complaint form or a written grievance (if forms are not available) with the Inmate Grievance Resolution Committee ("IGRC"). *See* 7 N.Y.C.R.R. § 701.5(a). Second, if the inmate is dissatisfied with the IGRC decision, he may appeal to the prison superintendent. Id., § 701.5(c). Finally, DOCCS permits an inmate to appeal the superintendent's written decision to the Central Office Review Committee ("CORC"). Id., § 701.5(d).

On May 15, 2014, DOCCS amended Directive 4040, relating to sexual abuse and sexual harassment complaints. As revised, Directive 4040 states:

"The Department has zero tolerance for sexual abuse and sexual harassment. Consistent with this policy and the Prison Rape Elimination Act (PREA) Standards (28 C.F.R. § 115.52(a)), an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement (42 U.S.C. § 1997e(a)) before bringing a lawsuit regarding an allegation of sexual abuse as long as the matter was reported as set forth below."

**\*4**  *See* DOCCS Directive 4040, Plaintiff's Opposition to Motion to Dismiss, [27], Exhibit B, p.1.

Under the revised procedure, an allegation of sexual abuse shall be deemed exhausted for purposes of the PLRA "if official documentation confirms that:

(1) An inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office staff; to any outside agency that the Department has identified as having agreed to receive immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards (28 C.F.R. § 115.51(b)); or to the Department's Office of the Inspector General; or

(2) A third-party reported that an inmate is the victim of sexual abuse and the alleged victim confirmed the allegation upon investigation."

Id.

**D. Plaintiff's Efforts to Exhaust as to Defendants Dunford, Hoinski and Nabb**
The defendants' motion to dismiss is based entirely on the argument that plaintiff failed to exhaust his administrative remedies by filing grievances relating to the three "credit card check" incidents set forth in the complaint. Defendants' Motion to Dismiss [22]. As noted above, plaintiff's original complaint states that he did not utilize the three-tiered administrative grievance procedure to complain about the September 10, 2013, October 22, 2013 and May 16, 2014 incidents. Complaint [1], pp. 5, 19. Instead, plaintiff argued that he was not required to utilize the grievance procedure because of Directive 4028A. Id. In response to the motion to dismiss, plaintiff also points to the revised language of Directive 4040 as eliminating the need to follow the inmate grievance procedure. Plaintiff's Opposition to Motion to Dismiss [27], p. 5.

Directive 4028A addresses sexual abuse prevention and intervention (staff on inmate). The argument that Directive 4028A eliminated the need to utilize the inmate grievance procedure was asserted, but rejected, in Omaro v. Annucci, 68 F. Supp.3d. 359 (W.D.N.Y. 2014). [4]  In that case, Omaro's claim that he was sexually assaulted in connection with the pat-frisk procedure was remarkably

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 60 of 125

similar to the claims asserted in this case. Id. at p. 361. In response to the defendant's motion that plaintiff failed to exhaust his administrative remedies, Omaro argued that pursuant to PREA and Directive 4028A, he was not required to utilize the grievance procedure with respect to his sexual assault claim. Id. at 364-65. The court held that nothing in the text or legislative history of PREA suggested that it was intended to abrogate the PLRA's exhaustion requirement. Id. at 364 citing Porter v. Howard, 531 Fed. Appx. 792, 793 (9th Cir. 2013) (plaintiff provides no support for his contention that he was excused from the requirement that he file an administrative grievance by operation of PREA).

Similarly, the court in Omaro determined that nothing in the text of Directive 4028A suggested that it was intended to limit or abrogate the administrative remedies available to an inmate who alleged sexual misconduct by a staff member. Omaro, 68 F. Supp. 3d at 365. The court found that Directive 4028A addressed the manner in which a complaint of staff-on-inmate sexual misconduct may be initiated and obligations of the staff following such a complaint, but did not establish or address an inmate's administrative remedies once such a complaint has been made. Id. at p. 366.[5] Thus, the court held that the plaintiff's unexhausted claims were precluded by the PLRA. Id. at p. 368.

*5 Unlike Omaro, however, this case involves the application of the revised language in Directive 4040, and to that extent, appears to be a case of first impression. Omaro did not discuss the revised language of Directive 4040, which was raised for the first time in this case by the plaintiff in response to the defendants' motion to dismiss. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Neither party has presented authority interpreting the revised language of Directive 4040. In their reply, defendants do not dispute that Directive 4040, as revised, alleviates an inmate's need to exhaust the normal grievance procedure with respect to sexual assault and sexual harassment claims. Instead, the defendants argue that the revised language of Directive 4040 does not apply here because the plaintiff's allegations are insufficient to constitute a sexual assault under PREA. Defendants Reply in support of Motion to Dismiss [28], pp. 3-4. Defendants construe plaintiff's claims as merely challenging the "pat-frisk" procedure, and argue that such a claim would have to be pursued in the inmate grievance

process through exhaustion to satisfy the PLRA. Id. at pp. 5-6.

Plaintiff's claims relating to the "credit card check" procedure as set forth in the complaint, however, are presented as sexual assault claims. For example, plaintiff alleges that "Defendant Dunford's sexual abuse cause[d] me pain, suffering and mental distress". Complaint [1], p. 11, ¶ 2. He claims that he complained to defendant Annucci and others regarding the "sexual misconduct of staff-on-inmate sexual abuse". Id. at p. 12, ¶6. Plaintiff characterizes the defendants' conduct as constituting sexual assault or sexual abuse throughout his complaint. Id. at p. 13, ¶¶10, 13, 14, 15; p. 14, ¶¶ 16, 17, 18, 19, 21; p. 15, ¶¶ 22, 23, 24, 26, 27; p. 16, ¶¶ 29, 30, 31; p. 18, ¶¶ 43, 44, 45, 46. The conduct being challenged involves corrections staff contacting plaintiff's genitals, which, depending upon the manner in which performed, could arguably fall within the scope of conduct that can be construed as "sexual" in nature.

Whether these allegations by plaintiff are sufficient to establish a "sexual assault" or "sexual harassment" under PREA (or the Fourth and Eighth Amendments) is not currently before me. The defendants' motion to dismiss raised solely the issue of whether plaintiff had exhausted the inmate grievance procedure. Defendants' Motion to Dismiss [22]. the defendants did not put plaintiff on notice that their argument in support of dismissal was based upon the fact that plaintiff's allegations were insufficient to constitute sexual conduct under PREA. In any event, while I take no position as to whether the plaintiff's allegations allege sexual conduct sufficient to state a claim under the Fourth or Eighth Amendments,[6] inasmuch as they are presented as "sexual assault" claims, the revised language of Directive 4040 applies.[7] An inmate would be placed in an untenable position if he were required to adjudicate whether his allegations of sexual assault were sufficient under PREA prior to relying upon the language in Directive 4040 alleviating the need to utilize the normal grievance procedure.[8] Here, plaintiff presented his claims as sexual assault claims. Although the sufficiency of those claims is uncertain, the language in Directive 4040 clearly states that an inmate need not utilize the grievance procedure to exhaust such claims prior to bringing a federal court action for redress.

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 61 of 125

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

**\*6**  Directive 4040 was revised with respect to sexual assault claims on May 15, 2014. Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Although the defendants note that the amendment has not been incorporated into the New York Code, Rules and Regulations (see 7 N.Y.C.R.R. 701, et seq.), they do not argue that the revision is not in effect. Indeed, defendants acknowledge that if the revised language of Directive 4040 applies, plaintiff's claim against defendant Nabb involving the May 16, 2014 incident has been exhausted. Defendants' Reply in Support of Motion to Dismiss [28], p. 6. Because plaintiff reported the May 16, 2014 incident involving defendant Nabb to the facility staff in a letter dated May 19, 2014 (Complaint [1], Exhibit P), this claim is deemed exhausted pursuant to Directive 4040.

Because the September 10, 2013 and October 22, 2013 incidents preceded the revision of Directive 4040, plaintiff was required to exhaust the typical inmate grievance process with respect to those incidents. [9] Plaintiff makes no attempt to argue that he exhausted the inmate grievance process with respect to his September 10, 2013 claim. That claim against defendant Dunford should be dismissed with prejudice. [10] In his motion to amend the complaint [31], plaintiff asserts that he did, in fact, exhaust the inmate grievance process with respect to his claim relating to the October 22, 2013 involving defendant Hoinski. As discussed below, the plaintiff will be allowed to amend the complaint to assert the exhaustion of that claim.

### E. Failure to Exhaust as to Defendants Annucci, Fonda, Bradt and Hughes

Defendants also seek to dismiss the claims against defendants Annucci, Fonda, Bradt and Hughes because plaintiff has not exhausted administrative remedies by naming those defendants in any grievance relating to the "credit card check" incidents. Defendants' Reply in Support of Motion to Dismiss [28], p.8-10. These claims survived the initial screening only to the extent that they alleged that the defendants "were made aware of the sexually assaultive pat-frisks but failed to remedy them or take any corrective action". November 17, 2014 Decision & Order [7], pp. 10, 22. [11]

**\*7**  The plaintiff does not argue that he has exhausted his claims against defendants Annucci, Fonda, Bradt or Hughes by naming them in any grievance. In response to the motion to dismiss, plaintiff asserts generally that, because the revisions to Directive 4040 stated that a "sexual abuse or sexual harassment complaint may be submitted at any time", he can cure any failure to exhaust by now filing a complaint under Directive 4040. Plaintiff's Opposition to Motion to Dismiss [27], p. 11. Initially, it is not clear that the revised procedure set forth in Directive 4040, which eliminates the need to follow the typical inmate grievance procedure with respect to sexual assault and sexual harassment claims, applies to claims against supervisory officials for failing to remedy or take corrective action regarding such a claim.

In any event, as noted above, plaintiff has not cited, and I have not found, any authority supporting the retroactive application of a revised DOCCS directive. Instead, although not discussed in depth, the courts in Smith and Goodson expressly applied the version of Directive 4040 which was in effect at the time of the incidents in question in those cases.

As a general rule, a new statutory provision does not apply retroactively to conduct that occurred prior to the provision's enactment. As the Supreme Court has noted, "the presumption against retroactive legislation is deeply rooted in our jurisprudence" Landgraf v. USI Film Products, 511 U.S. 244, 265, (1994). For example, the revision of § 1997e(a) which instituted the mandatory exhaustion requirement of the PLRA, was not applied retroactively. Shariff v. Coombe, 2002 WL 1392164, \*3 (S.D.N.Y. 2002).

This is not a case where the revision of Directive 4040 merely clarified ambiguous language of the prior regulation. See Leshinsky v. Telvent GIT, S.A., 873 F. Supp.2d 582 (S.D.N.Y. 2012). Instead, the revision of Directive 4040 sets forth a new procedure relating to the reporting and processing of sexual abuse and sexual harassment claims. The new procedure bypasses the previously required inmate grievance procedure altogether and institutes an expedited process for the lodging and investigation of a sexual abuse or sexual harassment claim. The revised language does not expressly or indirectly suggest that it is to be applied in a retroactive manner to incidents predating the revision. The parties have submitted no authority suggesting that DOCCS intended the revision to apply retroactively to conduct occurring years earlier.

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 62 of 125

2016 WL 3039687

Since the record does not reflect any intention that the revision of Directive 4040 be applied retroactively, I find that it does not apply to incidents predating the date of the revision. With respect to the post-revision "credit card check" incident of May 16, 2014, the plaintiff's letters dated May 19, 2014 and May 20, 2014 (Complaint [1], Exhibits P and Q) relating to this incident do not name or discuss the conduct of defendants Annucci, Fonda, Bradt or Hughes. Thus, even if the procedure set forth in Directive 4040, as revised, applied to claims against supervisory officials, it was not utilized by plaintiff to complain of conduct by these defendants.

Because plaintiff has failed to exhaust his administrative remedies with respect to defendants Annucci, Fonda, Bradt and Hughes, the claims against these defendants should be dismissed with prejudice.

### F. Motion to Amend Complaint

Plaintiff moves to amend his complaint, principally to modify the assertion in his original complaint that he did not exhaust his administrative remedies. Plaintiff's Motion to Amend [31], p. 3. He states that because he had been transferred between facilities and or prison cells several times since the underlying incidents, he misplaced or lost various legal documents. Id. at p. 4. Further, he asserts that because he was reprocessed at one point and provided with a new inmate number, some of the documentation related to these claims was filed under a previous inmate number. Id. Thus, plaintiff seeks to amend the complaint to assert that he has administratively exhausted the grievance process with respect to the October 22, 2013 incident and his claim against Hoinski. Id. at pp. 3-4. Attached as exhibits to plaintiff's motion are documents supporting plaintiff's utilization of the inmate grievance process with respect to the October 22, 2013 incident. Id., Exhibits A-D.

 **\*8** Plaintiff's proposed amended complaint is substantively identical to his original complaint except that he has modified his allegations regarding the exhaustion of administrative remedies and has removed some of the allegations and claims previously dismissed by Judge Arcara. [12]

Rule 15(a) provides that leave to amend should be "freely given when justice so requires". New York State National Organization for Women v. Cuomo, 182 F.R.D. 30, 36

(S.D.N.Y. 1998); see also Forbes & Wallace, Inc. v. Chase Manhattan Bank, 79 F.R.D. 563, 565 (S.D.N.Y. 1978). It has long been "well-established that 'outright dismissal for reasons not going to the merits is viewed with disfavor in the federal courts.' " Harrison v. Enventure Capital Group, Inc., 666 F. Supp. 473, 479 (W.D.N.Y. 1987). For this reason, "dismissals for insufficient pleadings are ordinarily with leave to replead". Stern v. General Electric Co., 924 F.2d 472, 477 (2d Cir. 1991). Leave to amend a pleading need not be granted, however, if it would be futile to do so. See O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 69 (2d Cir. 2002).

Defendants oppose the motion to amend on several grounds. Defendants' Opposition to Motion to Amend [34]. First, defendants argue that plaintiff's motion should be denied because he failed to attach a proposed amended complaint to the motion papers. Defendant's Opposition to Motion to Amend [34] p., 2. "A movant's failure to submit a proposed amended complaint constitutes sufficient grounds to deny a motion to amend". Murray v. New York, 604 F.Supp.2d 581, 588 (W.D.N.Y. 2009) (citing LaBarbara v. Ferran Enterprises Inc., 2009 WL 367611, *3 (E.D.N.Y. 2009) ("In order to meet the requirements of particularity in a motion to amend, a complete copy of the proposed amended complaint must accompany the motion so that both the court and the opposing party can understand the exact changes sought.")). Where, however, "the movant's papers adequately explain the basis for, and nature of, the proposed amendment, ... the failure to attach a proposed amended complaint to the motion is not necessarily fatal". Murray, 604 F.Supp.2d at 588.

The determination whether to deny a motion to amend based upon such a failure the subject to the discretion of the court. Id. Here, plaintiff's motion papers sufficiently articulated the basis for his motion to amend such that the defendants were able to respond to the substance of the proposed changes. Moreover, plaintiff attached a proposed amended complaint to his Memorandum of Law in reply to defendant's opposition. See Proposed Amended Complaint attached to Plaintiff's Reply in Support of Motion to Amend [37-1]. Under these circumstances, plaintiff's failure to attach a proposed amended complaint to his initial motion papers is not fatal to the motion.

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 63 of 125

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

**\*9**  Defendants also argue that plaintiff's motion to amend the complaint should be denied based upon "futility, bad-faith, undue delay or undue prejudice to the opposing party". Defendants' Opposition to Motion to Amend [34], p. 3. [13] Defendants state that they made the motion to dismiss based upon plaintiff's affirmative statements in the complaint that he had not exhausted the inmate grievance process with respect to his claims. Defendants claim that they would not have filed a motion to dismiss "[h]ad plaintiff not made these affirmative statements in his complaint" and that allowing plaintiff to amend the complaint would prejudice the defendants because they would be required to bring another motion to dismiss. Id. Defendants allege that the "striking reversal" as to exhaustion by the plaintiff "suggests the possibility of bad-faith". Id.

The prejudice alleged by the defendants is insufficient to warrant denial of plaintiff's motion to amend the complaint. Initially, it should be noted that defendants had access to plaintiff's inmate grievance records, and could have checked those records prior to filing any motions regarding exhaustion in this case. The plaintiff has asserted that he had lost or misplaced much of the documentation relating to his claims due to a series of transfers between correctional facilities or jail cells. Defendants have not rebutted this contention, which plaintiff offers as his explanation as to why his original complaint contained an "erroneous statement" regarding exhaustion. Plaintiff's Motion to Amend [31], p. 3-4. Defendants have not articulated a sufficient basis to conclude that the plaintiff's allegations in the original complaint were made in bad faith. Finally, defendants' claim of prejudice is undermined by the fact that this motion to dismiss will result in my recommendation that several of plaintiff's claims be dismissed.

Defendants also argue that plaintiff's motion to amend should not be granted because plaintiff has not alleged that he has received a final decision from the Central Office Review Committee ("CORC") with respect to his grievance relating to the October 22, 2013 incident. Defendants Opposition to Motion to Amend [34], p. 4-5. This argument is also unpersuasive. Plaintiff has submitted documentation from the Director of the Inmate Grievance Program, dated January 24, 2014, stating that his grievance was still pending before CORC. Plaintiff's Motion to Amend [31], Exhibit D. This correspondence was in response to plaintiff's January 20, 2014 letter noting

that his grievance had already been pending before CORC for more than 60 days without a decision. Id., Exhibit C.

It appears by this documentation, the validity of which has not been challenged by the defendant, that plaintiff has been waiting for more than *two years* for a decision from CORC with respect to this grievance. Defendants cannot rely upon CORC's refusal to render a decision with respect to plaintiff's grievance for two years as support for an argument that plaintiff has failed to exhaust his administrative remedy because he has not been provided with a final decision. As discussed in Rossi v. Fishcer, 2015 WL 769551, *4-5 (S.D.N.Y. 2015):

> "A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative remedy unavailable for purposes of exhaustion.... While the Second Circuit has not directly addressed this issue, it has treated [cases holding that such a failure renders the administrative remedy unavailable] favorably. See [Hemphill v. New York],380 F.3d 680, 686 n. 6 (2004) (noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); Giano v. Goord, 380 F.3d 670, 677 (2d Cir. 2004) (citing favorably to [Underwood v. Wilson, 151 F.3d 292, 295 (5th Cir. 1998)] and [Foulk v. Carrier, 262 F.3d 687, 698 (8th Cir. 2001] with regard to availability of administrative remedies)). The Second Circuit in [Abney v. McGinnis, 380 F.3d 663, 668 (2nd Cir. 2004)] cited to Hemphill for the proposition that 'exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance'. 380 F.3d at 667."

**\*10**  See also Peoples v. Fischer, 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F.Supp.2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination"); Dimick v. Baruffo, 2003 WL 660826, *4 (S.D.N.Y. 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). [14]

Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October 22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA. Plaintiff's motion to amend the complaint is granted to the extent plaintiff seeks to assert allegations that he exhausted his administrative remedies with respect to the October 22, 2013 incident involving defendant Hoinski. Plaintiff's motion to amend is denied to the extent the amended complaint seeks to reassert claims against Dale Artus (or any other defendants) which were previously dismissed by Judge Arcara.

In light of the age of this case, and to expedite further proceedings in this matter, I direct that the Clerk of the Court separately file the Proposed Amended Complaint [37-1] as the Amended Complaint in this matter. The Amended Complaint does not add any new claims or parties. All of the defendants in this case are represented by counsel. By virtue of its attachment to the plaintiff's motion papers, and by the filing directed above, the defendants will have received a copy of the Amended Complaint. The defendants shall answer, or otherwise respond, to the Amended Complaint within 30 days of the date it is filed by the Clerk of the Court as directed above.

### G. Motion for Appointment of Counsel

 **\*11**  Plaintiff also moves for the appointment of counsel [32]. There is no constitutional right to appointed counsel in civil cases. However, under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants. *See Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.,* 865 F.2d 22, 23 (2d Cir. 1988). Assignment of counsel in this matter is clearly within the judge's discretion. In re Martin-Trigona, 737 F.2d 1254 (2d Cir. 1984).

The factors to be considered in deciding whether or not to assign counsel include the following: (1) whether the indigent's claims seem likely to be of substance; (2) whether the indigent is able to investigate the crucial facts concerning his claim; (3) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (4) whether the legal issues involved are complex; and (5) whether there are any special reasons why appointment of counsel would be more likely to lead to a just determination. Hendricks v. Coughlin, 114 F.3d 390, 392 (2d Cir. 1997).

In considering a motion for the appointment of counsel, the court may also consider the merits of the plaintiff's claim. The Second Circuit has held that "every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989). Therefore, the court must first look to the "likelihood of merit" of the underlying dispute, Cooper, 877 F.2d at 174, and "even though a claim may not be characterized as frivolous, counsel should not be appointed in a case where the merits of the ... claim are thin and his chances of prevailing are therefore poor." Carmona v. United States Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001) (denying counsel on appeal where petitioner's appeal was not frivolous but nevertheless appeared to have little merit). See also Smolen v. Corcoran, 2013 WL 4054596 (W.D.N.Y.,2013) (In deciding whether to grant a request to appoint pro bono counsel, district courts should evaluate several factors, including the merits of the claim, the factual issues and complexity of the case, plaintiff's ability to present the case, and the plaintiff's inability to obtain counsel.).

I have reviewed the facts presented herein in light of the factors required by law as discussed above. At this time, it does not appear the legal issues presented are unduly complex. Plaintiff's filings in this case reflect that he understands the issues presented and can adequately articulate his factual and legal arguments. Plaintiff's motion for appointment of counsel is denied at this time without prejudice, subject to renewal at a later date. It is plaintiff's responsibility to retain an attorney or press forward with this lawsuit *pro se.* 28 U.S.C. § 1654.

### CONCLUSION

For these reasons, I recommend that defendant's motion to dismiss [22] be granted in part and denied in part as follows: the motion should be granted as to plaintiff's claim against defendant Dunford relating to the September 10, 2013 incident, and plaintiff's supervisory claims against defendants Annucci, Fonda, Bradt and Hughes, but denied as to plaintiff's claims against defendants Nabb and Hoinski. Also, plaintiff's motion [31] to amend the complaint is granted in part and denied in part such that plaintiff may amend the complaint to assert that he has exhausted administrative remedies

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 65 of 125

2016 WL 3039687

with respect to the October 22, 2013 incident involving defendant Hoinski, but may not reassert previously dismissed claims and is otherwise denied. Plaintiff's motion for appointment of counsel [32] is denied.

**\*12** Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by March 31, 2016 (applying the time frames set forth in Rules 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3039687

### Footnotes

1    Bracketed references are to the CM/ECF docket entries.

2    The allegations in the plaintiff's original complaint attribute this conduct to "John Doe Number 1". Id. at 13. John Doe Number 1 was later identified as Officer Hoinski. See Decision & Order of Hon. Elizabeth A. Wolford dated December 29, 2014 [11].

3    Plaintiff's original complaint asserted various other claims against numerous defendants which did not survive the initial screening in this case. Plaintiff's claims that defendants failed to comply with the requirements of the Prison Rape Elimination Act of 2003 ("PREA") were dismissed because PREA does not create a private right of action. Decision and Order of Hon. Richard J. Arcara filed November 17, 2014 ("November 17, 2014 Decision & Order") [7], p. 7. Also, plaintiff's claims based upon a failure to investigate, failure to intercede, harassment, retaliation, and failure to provide medical treatment against defendants Superintendent Dale Artus, Capt. Brown Lieut.Kaczmarek, Sgt.Olles, Sgt. Brown, Sgt.Diehl, Officer Higgins, Officer Andrews, Officer Sippel, and Nurse Kekich were all dismissed. Id. at pp. 11-19.

4    The plaintiff in Omaro was an Attica inmate Derrick R. Omaro, 92A0608. Omaro, 68 F. Supp. 3d. at 359. Henderson, identifies inmate Omaro as one of his witnesses in this case. Complaint [1], p. 19.

5    Plaintiff argues that because claims of sexual abuse are sensitive and should be dealt with confidentially, he should be excused from the exhaustion requirement. Plaintiff's Memorandum of Law [27], pp. 4-6. He provides no authority in support of this proposition. While the interests of confidentiality may have motivated the revision of Directive 4040, as discussed in Omaro, prior to the May 15, 2014 revision the plaintiff was required to utilize the inmate grievance process. Omaro, 68 F. Supp. 3d. at p. 367.

6    With respect to the plaintiff's pat-frisk claims, Judge Arcara dismissed the claims to the extent that they were asserted under PREA, but allowed them to proceed as asserted under the Fourth and Eighth Amendments. November 17, 2014 Decision & Order [7], p. 7. The defendants are free to file a motion to dismiss or for summary judgment challenging the sufficiency of the plaintiff's allegations with respect to any surviving Fourth and Eighth Amendment claims.

7    Although the revised language in Directive 4040 refers to PREA, assuming notice was provided as set forth in the directive, Directive 4040 states that "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy [the PLRA] exhaustion requirement ... before bringing a lawsuit regarding an allegation of sexual abuse". Plaintiff's Opposition to Motion to Dismiss [27], Exhibit B. Thus, this language applies to sexual assault claims brought by an inmate under the Fourth and Eighth Amendments.

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 66 of 125

Henderson v. Annucci, Not Reported in Fed. Supp. (2016)

2016 WL 3039687

**8**  It is likely that by the time there was a resolution, either administrative or judicial, as to whether the plaintiff's claims qualify as a "sexual assault" under PREA, an inmate's time to commence the typical grievance process would have passed.

**9**  The plaintiff argues that the revision of Directive 4040 eliminated the deadline for reporting sexual abuse, and therefore, he can cure the failure to exhaust his claims by reporting the incidents now under the terms of the directive. Plaintiff's Opposition to Motion to Dismiss [27], p.11. As discussed more fully below, plaintiff has presented no authority suggesting that the revisions in Directive 4040 apply retroactively to incidents prior to the effective date. To the contrary, the case law suggests that Directive 4040 is applied as it was in effect at the time of the incident at issue. *See* Smith v. Kelly, 985 F. Supp. 2d 275, 285 (N.D.N.Y. 2013) (referring to the version of Directive 4040 that was in effect at the time in question); Goodson v. Silver, 2012 WL 4449937, *8 (N.D.N.Y. 2012) (court decision based upon the version of DOCCS' Directive 4040 in effect during the time in question).

**10**  Plaintiff asserts, generally, that his failure to exhaust any of his claims can be cured. Plaintiff's Reply in Support of Motion to Amend [37], p. 9. However, plaintiff's time to file a grievance relating to the September 10, 2013 incident has long passed. Although plaintiff cites to Bridgeforth v. Barlett, 686 F. Supp.2d 238 (W.D.N.Y. 2010) in support of his right to cure, that case actually supports the dismissal of plaintiff's claim with prejudice. Bridgeforth, 686 F. Supp.2d, at 240 ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him, as a result of his own inaction. This case, then, is precisely the kind of case that the PLRA was intended to foreclose. It is therefore dismissed with prejudice").

**11**  Judge Arcara cited Colon v. Coughlin, 58 F.3d 865, 873 (2nd Cir. 1995) for the proposition that a prison official who is made aware of a violation but fails to remedy the wrong may be determined to be "personally involved" and subject to § 1983 liability. However, he noted that "[r]eceiving *post hoc* notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member". November 17, 2014 Decision & Order [7], p.10 *citing* Rahman v. Fisher, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009). Given the preliminary stage of the litigation, Judge Arcara allowed these claims to proceed to service. Id. at p. 11. The plaintiff's exhaustion of these claims was not addressed in that decision.

**12**  Plaintiff's proposed amended complaint is type-written, as opposed to the original hand written complaint. Proposed Amended Complaint [37-1]. Under the heading "Defendant's Information", plaintiff did not include information relating to the previously dismissed defendants with the exception of Dale Artus., Id., p.2. The proposed amended complaint eliminated ¶5 of the original complaint, making the paragraph numbers of the proposed amended complaint one off from those in the original complaint. Paragraph numbers between the two documents re-synchronized at ¶42 after plaintiff split the substance of the original ¶40 into two paragraphs (¶¶40-41) of the proposed amended complaint. Plaintiff's amended complaint identified the "John Doe" defendant as Hoinski (¶¶ 10-14, 20, 24, 29, 30, 35-36). Plaintiff's amended complaint also occasionally included expanded or enhanced allegations without changing the substance of his claims (*see* i.e. ¶ 30).

**13**  Although defendants mention "futility" in their opposition, they do not assert the insufficiency of the plaintiff's allegations of sexual assault as a basis to deny the proposed amended complaint. Defendants' Opposition to Motion to Amend [34].

**14**  *But see* Bennett v. Wesley, 2013 WL 1798001, *6 (S.D.N.Y. 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability.") (*quoting* Mateo v. O'Connor., 2012 WL 1075830, *7 (S.D.N.Y. 2012)); Rivera v. Anna M. Kross Ctr., 2012 WL 383941, *4–5 (S.D.N.Y. 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.) Also, some courts have questioned whether the equitable exclusions from exhaustion set forth in Hemphill remain viable after the Supreme Court's decision in Woodford. The Second Circuit has declined to address this question. *See* Amador et al. v. Andrews et al., 655 F.3d 89, 102-03 (2nd Cir. 2011). In Woodford, plaintiff's grievance was administratively rejected because it was filed beyond the 15-day limitations period. The district court granted summary judgement on the grounds that plaintiff failed to exhaust his administrative remedies. The Ninth Circuit reversed finding that plaintiff had exhausted his remedies because no such remedies remained available to him. The Supreme Court vacated that decision, holding that "proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings". Woodford, 548 U.S. at 90-91. Here, unlike Woodford, the failure to achieve complete exhaustion is due to the inaction by the prison grievance officials, not because of any failure on the part of plaintiff. In any event, I do not believe that Woodford stands for the proposition

2016 WL 3039687

that CORC can frustrate or unduly delay an inmate's ability to bring a federal claim to address an alleged constitutional violation by refusing to issue a final decision for several years so as to preclude exhaustion under the PLRA.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3736794
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Javon HIGH, Plaintiff,
v.
P.A. SWITZ, Defendant.

Civ. No. 9:17-CV-1067 (LEK/DJS)
|
Signed 07/09/2018

**Attorneys and Law Firms**

JAVON HIGH, 16-R-2525, Queensboro Correctional
Facility, 47-04 Van Dam Street, Long Island City, NY
11101, pro se.

HON. BARBARA D. UNDERWOOD, Attorney
General of the State of New York, OF COUNSEL: ERIK
BOULE PINSONNAULT, ESQ., The Capitol, Albany,
NY 12224, Attorney for Defendant.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**\*1** On September 25, 2017, *pro se* Plaintiff Javon High
commenced this action pursuant to 42 U.S.C. § 1983,
asserting claims arising from his confinement at both
Wyoming Correctional Facility and Ulster Correctional
Facility, while in the custody of the Department of
Corrections and Community Supervision ("DOCCS").
Dkt. No. 1, Compl. In his Complaint, Plaintiff alleges that
he suffers from chronic, severe pain, for which he was
prescribed certain medications. Compl. at p. 3. [1] Plaintiff
alleges that while at Ulster, he was seen by P.A. Switz,
who told Plaintiff that he would not be getting the physical
therapy or prescribed medications at Ulster, and that he
could attempt to when he got to his designated facility,
which would not be for a month or two. *Id.* at pp. 4-5.
Plaintiff then went thirty-five days with severe pain. *Id.* at
p. 6. Plaintiff alleges continuing issues related to his pain
and treatment after he was transferred to Wyoming. [2] *Id.*
at pp. 6-19. Remaining in this District are Plaintiff's claims
arising out of his confinement at Ulster, which are only
those against Defendant Genevieve Switz.

Presently before the Court is Defendant's Motion to
Dismiss Plaintiff's Complaint on the basis that Plaintiff
failed to exhaust his administrative remedies before
filing this action. Dkt. No. 13, Def.'s Mot. to Dismiss.
Plaintiff has opposed the Motion. Dkt. No. 17, Pl.'s Opp.
Defendant has filed a reply. Dkt. No. 18, Def.'s Reply.
Plaintiff has filed an additional submission in opposition.
Dkt. No. 19, Pl.'s Supp. Opp. [3]

The Court finds that Plaintiff failed to exhaust
his administrative remedies, but that Plaintiff has
demonstrated that the lack of exhaustion should
be excused. The Court therefore recommends that
Defendant's Motion be **denied**.

**I. LEGAL STANDARD**

**\*2** On a motion to dismiss, the allegations of the
complaint must be accepted as true. *See Cruz v. Beto*,
405 U.S. 319, 322 (1972). The trial court's function "is
merely to assess the legal feasibility of the complaint, not
to assay the weight of the evidence which might be offered
in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639
(2d Cir. 1980). "The issue is not whether a plaintiff will
ultimately prevail but whether the claimant is entitled to
offer evidence to support the claims." *Scheuer v. Rhodes*,
416 U.S. 232, 236 (1974) (*overruled on other grounds by
Davis v. Scherer*, 468 U.S. 183 (1984) ).

The court is bound to give the plaintiff the benefit of
every reasonable inference to be drawn from the "well-
pleaded" allegations of the complaint. *See Retail Clerks
Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373
U.S. 746, n.6 (1963). Nevertheless, "the tenet that a court
must accept as true all of the allegations contained in a
complaint is inapplicable to legal conclusions." *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009). Therefore, "[t]hreadbare
recitals of the elements of a cause of action, supported by
mere conclusory statements, do not suffice." *Id.* (citation
omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not
be granted so long as the plaintiff's complaint includes
"enough facts to state a claim to relief that is plausible on
its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570
(2007); *Ashcroft v. Iqbal*, 556 U.S. at 697. "A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation omitted). In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged, or that the defendants have violated ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. at 679-80.

Where, as here, the complaint was filed *pro se*, it must be construed liberally with "special solicitude" and interpreted "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks omitted) (citation omitted). Nonetheless, a *pro se* complaint must state a "plausible claim for relief." *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice[,]" as well as documents incorporated by reference in the complaint. *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) ); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (citing FED. R. CIV. P. 10(c) ).

## II. EXHAUSTION

### A. Exhaustion Procedure

**\*3** The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia, Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116,

121 (2d Cir. 2001), *overruled on other grounds by* Porter v. Nussle, 534 U.S. 516.

## B. Plaintiff's Failure to Exhaust Administrative Remedies

In this case, Plaintiff admits that the grievance procedure was not complete when he filed the Complaint because he had not received a response from CORC. Compl. at pp. 20-21. Plaintiff filed his initial grievance on January 20, 2017. Id. at p. 20. He received a response from IGRC on January 24, 2017, and forwarded his appeal to the Superintendent. *Id.* The Superintendent then issued a response on January 31, 2017. *Id.* On February 6, 2017, Plaintiff filed his appeal to CORC. *Id.* Per the regulations, CORC had thirty days to respond to the appeal. *Id.* On August 25, 2017, after not hearing from CORC, Plaintiff sent CORC a letter asserting that CORC had exceeded the timeline and that he had therefore exhausted his administrative remedies, and would be filing a claim in Court. *Id.* at pp. 20-21. When Plaintiff prepared his Complaint, on September 12, 2017, he had still not received any response from CORC. *Id.* Only after filing the Complaint did Plaintiff receive a final response from CORC. Pl.'s Supp. Opp. at p. 3 & Def.'s Reply at pp. 1-2 (indicating response from CORC was received in February 2018).

It is clear from the face of Plaintiff's Complaint that he did not exhaust his administrative remedies. The fact that his CORC appeal was decided after the filing of his Complaint is insufficient to cure Plaintiff's failure to exhaust; filing an Amended Complaint at this time would also not correct this fundamental deficiency. Gizewski v. New York State Dep't of Corr. & Cmty. Supervision, 2016 WL 3661434, at *13 ("It is well established that [r]eceiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice.") (internal quotation marks omitted) (citations omitted).

**\*4** The Court will discuss below whether Plaintiff's contentions may state a valid excuse for his failure to exhaust his administrative remedies.

## C. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. Ross v. Blake, 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1859-60.

In his Complaint and opposition papers, Plaintiff's main contention is that administrative remedies were unavailable to him because he did not receive a response from CORC for over seven months, and that there are no instructions on how to proceed with a grievance if no response is received from CORC. Pl.'s Opp. at p. 9 ("DOCCS policy has no re[c]ourse, does not inform nor direct what the next step would be if CORC does not render a decision. Leaving inmates to bel[ie]ve that if they receive no decision after the (30) thirty day period allowed in th[eir] own policy then they have exhausted remedies. Fac[t]ually and evident[i]ally, DOCCS simply does not state what we are to do after the thirty day timeline has expired. Certainly they cannot just leave the door open...."); *see also* Compl. at pp. 20-21; Pl.'s Supp. Opp. Defendant contends that an inmate must receive a response from CORC before filing a suit, and that a delay in receipt of a CORC decision beyond the thirty days proscribed by statute does not excuse an inmate's failure to exhaust his administrative remedies. Def.'s Reply.

Courts within the Second Circuit are split regarding whether a failure to respond by CORC constitutes unavailability excusing a plaintiff's failure to exhaust. *Compare* Ford v. Smith, 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (finding plaintiff's failure to exhaust was not excused where CORC failed to issue a determination for six months) *and* Lewis v. Hanson, 2017 WL 4326084,

at *3 (N.D.N.Y. Sept. 28, 2017) with *Rossi v. Fishcer*, 2015 WL 769551 (S.D.N.Y. Feb. 24, 2015) (collecting cases deeming administrative remedies unavailable when officials failed to timely respond to a grievance), *Peoples v. Fisher*, 2012 WL 1575302, at *6 (S.D.N.Y. May 3, 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in Federal Court simply because the final administrative decision maker has ... neglected ... to issue a final administrative determination."), *and Rodriguez v. Reppert*, 2016 WL 6993383 (W.D.N.Y. Nov. 30, 2016).

**\*5** Here, Plaintiff filed his grievance with the IGRC; upon receiving an unfavorable determination, he appealed it to the Superintendent, and then appealed the Superintendent's determination to CORC. Compl. at pp. 20-21. The final step of the grievance procedure provides that CORC shall review the appeal and render a determination within 30 days from the time the appeal was received. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(d)(2). At the preliminary stages of the procedure, the regulations provide an avenue for a grievant to further pursue a grievance that is not timely decided: "Absent [an] extension [on a time limit], matters not decided within the time limits may be appealed to the next step." *Id.* at § 701.6(g). However, the third and final step in the grievance procedure is "appeal to the central office review committee." *Id.* at § 701.5(d). At this level, there is no instruction on what a grievant is to do if he or she has appealed to the CORC, the final step, and has not received a response. *Id.* at § 701.6(g)(1)(b)(ii). As such, these regulations "do not describe a mechanism" for appealing or advancing a grievance when a grievant does not receive a response from CORC, as there is no next step to which a grievant may appeal. *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 124 (2d Cir. 2016).

In the case of *Williams v. Corr. Officer Priatno*, the plaintiff had submitted a grievance but never received a response; he then filed a lawsuit without taking any further formal action regarding his grievance, believing it had never actually been filed by the special housing unit correction officer. 829 F.3d at 120-21. The Second Circuit found the grievance procedure was unavailable under *Ross*, meaning that the "administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 123. The Court found that, even though the plaintiff could have "technically" appealed his

grievance, "[t]he regulations simply do not contemplate the situation in which [the plaintiff] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Id.* at 124. As such, the Second Circuit found that, under *Ross*, "the grievance procedures that were technically available to [plaintiff] are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Id.* at 126 (quoting *Ross v. Blake*, 136 S. Ct. at 1859).

Similarly, here, while the regulations at the preliminary stages contemplate a next step for a grievant to take in the event he does not receive a response, there is no direction on any action a grievant may take if he does not receive a response from CORC. Indeed, "the regulations give no guidance whatsoever" regarding what a grievant should do in this circumstance. *Id.*

Defendant cites to *Gizewski* for the proposition that even if a grievant does not receive a response to a grievance from CORC, the failure to exhaust is not excusable. In *Gizewski*, however, there was an administrative error in filing the grievant's appeal with CORC and Plaintiff never received a receipt from filing with CORC; the regulations explicitly provide a mechanism for confirming that an appeal has been properly filed if a grievant does not receive a receipt. As such, there was specific direction in the procedures for the grievant to follow. *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 2016 WL 3661434, (N.D.N.Y July 5, 2016). As the Court there summarized:

> Although the Court is sympathetic to the fact that it was the inmate grievance office that failed to transmit Plaintiff's appeal to CORC until five months after he had filed it, Plaintiff is also at fault for not taking any further action during this time period. More specifically, 7 N.Y.C.R.R. § 701.5(d)(3)(i) states that "[i]f a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC."

*Id.* at *13.

The Second Circuit Court of Appeals affirmed Chief Judge Suddaby's dismissal of Gizewski's Complaint. *Gizewski v. New York State Dep't of Corr. & Cmty. Supervision*, 692 Fed. Appx. 668 (2d Cir. 2017). In doing

so, however, the Circuit noted that, "even if we assume arguendo that the long delay occasioned in part by clerical error constituted constructive denial," there was no genuine issue of material fact because the issues raised on that final administrative appeal to CORC pertained to requests for items that had already been provided to the plaintiff as part of a reasonable accommodation. *Id.* at 670. Therefore, the Second Circuit did not and has not decided the precise issue raised on this Motion—a claim of failure to exhaust where the plaintiff had taken all steps he could to fulfill the last step of the appeal process; where CORC had neglected to respond, not just during the thirty day time limit, but for a period of numerous months thereafter; where CORC had further neglected to respond when Plaintiff wrote to CORC regarding the status of his appeal; and where CORC had only ultimately decided the appeal a year later, after the present Motion to Dismiss had been filed. In the Court's view, and under the hopefully unique facts of this case, Plaintiff's failure to exhaust aligns more with *Williams* than with *Gizewski*. "[A]fter the CORC neglected to decide [the appeal], administrative remedies were no longer available" to Plaintiff. *Rodriguez v. Reppert*, 2016 WL 6993383, at *1.

**\*6** Accordingly, for the foregoing reasons, the Court recommends that Defendant's Motion be **denied** based upon a finding that Plaintiff's failure to exhaust is excused.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion to Dismiss (Dkt. No. 13) be **denied**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [4] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2018 WL 3736794

---

Footnotes

1   When referring to Plaintiff's submissions, the Court will cite to the page numbers automatically assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System because they are often unnumbered or not numbered sequentially.

2   The claims regarding Plaintiff's treatment at Wyoming were severed and transferred to the Western District of New York upon initial review of the Complaint. Dkt. No. 8.

3   In his opposition filings, Plaintiff has included allegations that were not included in his Complaint. *See* Pl.'s Opp. at pp. 5-6. Federal Rule of Civil Procedure 12(d) provides that if "matters outside the pleadings are presented to and not excluded by the court" on a motion to dismiss, "the motion must be treated as one for summary judgment under Rule 56." FED. R.CIV. P. 12(d). The Court agrees with Defendant that Plaintiff's allegations that he was prevented from filing grievances should not be considered on a motion to dismiss as they are outside the pleadings. *See* Def.'s Reply at p. 2. Because a determination as to exhaustion can be made based on the face of the Complaint, the Court declines to convert the Motion to one for summary judgment, and will exclude and not consider the extrinsic evidence submitted by the parties.

4   If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R.CIV. P. 6(a)(1)(C).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 6066799
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

William R. JACKSON, Plaintiff,
v.
Anthony Q. BOUCAUD, et al., Defendants.

Civil Action No. 9:08-CV-1373 (TJM/DEP).
|
Dec. 31, 2009.

**Attorneys and Law Firms**

William R. Jackson, Long Island City, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Justin C. Levin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff William R. Jackson, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against the Commissioner of the New York State Department of Correctional Services ("DOCS") and two other DOCS employees, alleging violations of his civil rights. In his complaint, plaintiff alleges that the senior librarian of the correctional facility in which he was housed at the relevant times denied him access to a book entitled "The Bible Code", which he requested through the DOCS interlibrary loan program, thus violating his right to exercise his chosen religion. As relief, plaintiff's complaint seeks recovery of money damages in the sum of $2 million.

In response to plaintiff's complaint, defendants have moved for its dismissal as facially lacking in merit, additionally asserting their entitlement to qualified immunity. For the reasons set forth below, I recommend

that defendants' motion be granted, but that plaintiff be given leave to amend his complaint.

I. *BACKGROUND* [1]

Plaintiff is a New York State prison inmate entrusted to the care and custody of the DOCS. *See generally* Complaint (Dkt. No. 1). At the times relevant to his claims in this action, plaintiff was designated to the Altona Correctional Facility ("Altona"), located in Altona, New York. *Id.*

On June 23, 2008, while confined at Altona, Jackson submitted a library request for "The Bible Code," a book that he had begun reading while confined at the Barehill Correctional Facility before his transfer out of that prison. Complaint (Dkt. No. 1) § 6 ¶ 1 and Attachment p. 7. By memorandum dated July 24, 2008 from C. Paulson, identified as the Senior Librarian at Altona, plaintiff was advised that his application, which was apparently treated as an interlibrary loan request, had been forwarded to the Facility Media Review Committee ("FMRC"), and that upon review of the publication in accordance with DOCS Directive No. 4572, entitled "Media Review", the FMRC found it to be unacceptable for loan. [2], [3] *Id.,* Attachment p. 7. Plaintiff was further advised that the book was therefore returned by officials at Altona to the originating facility from which it was borrowed.

Despite having been told that his interlibrary loan request was forwarded to and reviewed by the FM RC at Altona, Jackson was later informed by memorandum dated July 31, 2008 from FMRC Chairman Stanley, that this was not the case, and instead "the decision to deny the literature was solely at the discretion of the librarian and his supervisor." Complaint (Dkt. No. 1) Attachment p. 4. In that memorandum plaintiff was also advised that while the provisions of the DOCS Directive No. 4572 did no provide for appeal of the decision of the FMRC, "the Inmate Grievance Procedure [could] be utilized to challenge the denial." *Id.*

Plaintiff filed two grievances addressing the denial of his request for the publication. The first, dated July 28, 2008 but filed on July 30, 2008-and thus predating the July 31, 2008 memorandum-included plaintiff's assertion that his First Amendment rights had been violated based upon the denial of his book request. Complaint (Dkt. No. 1) § 6 ¶ 2 and Attachment pp. 8-9. Following his receipt of the July

31, 2008 memorandum, Jackson filed a second grievance, dated August 3, 2008. *Id.* § 6 ¶ 4 and Attachment p. 3-4. In that grievance, plaintiff complained of the fact that his book request was not reviewed by the facility FMRC but instead was denied by the librarian and his supervisor. *See id.*

**\*2** Plaintiff's first grievance was denied by the facility superintendent on August 11, 2008 in a written determination which stated, in pertinent part,

> [p]ursuant to direction from ... Central Office, any books that are sent to the Altona C.F. library via the Inter-Library Loan Service, are not subject to the Media Review procedure outlined in Directive 4572, since the books are the property of the sending library and no redaction of objectionable material can be done. Thus, the books in question were not allowed for security reasons and returned to the sending library.

Complaint (Dkt. No. 1) ¶ 5 and Attachment p. 2. That determination was upheld on appeal by the plaintiff to the DOCS Central Office Review Committee ("CORC"). *Id.* § 6, ¶¶ 6, 7 and Attachment p. 1. In rejecting plaintiff's appeal, the CORC noted that "there is no provision in Directive # 4470 or # 4572 to refer books received from Inter Library Loan (ILL) to the Facility Media Review Committee (FMRC). However, the Librarian may access FMRC resources when determining the acceptability of such books." [4] *Id.,* Attachment p. 1.

## II. *PROCEDURAL HISTORY*
Plaintiff commenced this action on December 29, 2008. Dkt. No. 1. Named as defendants in plaintiff's complaint are Anthony Q. Boucaud, the Superintendent at Altona; Brian Fischer, the Commissioner of the DOCS; and, C. Paulson, the Senior Librarian at the facility. *Id.* Plaintiff's complaint alleges a single cause of action principally alleging a free religious exercise violation under the First Amendment, although also referencing in passing an alleged denial of due process. *Id.* § 7.

On April 2, 2009, in lieu of answering, the defendants moved for dismissal of plaintiff's claims against them, asserting 1) failure to state a cause of action upon which relief may be granted, 2) lack of personal involvement with respect to defendant Fischer, and 3) qualified immunity as grounds for their motion. [5] Dkt. No. 12. Despite an extension of the deadline to respond, at his request, *see* Dkt. No. 14, Jackson has failed to submit any opposition to defendants' motions. [6]

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and North District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*
A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007)). The relevant pleading requirements are set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its mandates, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

**\*3** To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does

2009 WL 6066799

require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (other quotations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94, 127 S.Ct. at 2200 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B. *Personal Involvement*

In their motion, defendants challenge the sufficiency of plaintiff's allegations regarding defendant Fischer's role in the constitutional deprivations alleged. Personal involvement of a defendant in alleged constitutional deprivations is a prerequisite to an award of damages

under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*4** Plaintiff's claim against defendant Fischer is apparently premised exclusively upon his role as a Commissioner of the DOCS; nowhere in plaintiff's complaint is there an allegation that defendant Fischer was an active participant in the conduct giving rise to Jackson's claims, or that he was even aware of the relevant events. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where it] lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.") (citations omitted).

That is not to say that a supervisory official may never be held liable for a civil rights violation. Culpability on the part of a supervisory official can be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *overruled on other grounds sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868; *see also Richardson,* 347 F.3d

at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

A thorough review of plaintiff's complaint and the attached documents fails to disclose any personal involvement of defendant Fischer in the conduct giving rise to Jackson's claims. The only reference in plaintiff's complaint to defendant Fischer is in that portion wherein the defendants are named; there, defendant Fischer's position is listed as "Commissioner". *See* Complaint (Dkt. No. 1) § 3(b). Plaintiff's complaint is devoid of any allegations that defendant Fischer, as the DOCS Commissioner, was involved in the alleged constitutional violations, that he allowed an unconstitutional policy to occur, that he was negligent in the management of a subordinate, or that he failed to act on information indicating that unconstitutional acts were occurring. *See generally id.*

In sum, plaintiff's complaint does not disclose any basis on which to conclude that defendant Fischer was personally involved in any of the constitutional deprivations alleged to a sufficient degree to support a finding of liability on his part. Accordingly, I recommend dismissal of plaintiff's claims as against defendant Fischer, with leave to replead. *See Anderson v. Duke,* No. 9:04-CV-0030, 2006 WL 2792735, at *5 (N.D.N.Y. Sept.27, 2006) (Mordue, C.J. and Peebles, M.J.) (dismissing plaintiff's claim against a prison Superintendent defendant with leave to replead where plaintiff alleged the defendant merely overheard a conversation relating to the claims in his complaint) [7] ; *see also Orraca v. McCreery,* No. 9:04-CV-1183, 2006 WL 1133254, at *6 (N.D.N.Y. Apr.25, 2006) (Hurd, D.J. and Peebles, M.J.) (dismissing plaintiff's claim against a defendant with leave to replead where defendant was named in caption but not described in body of complaint); *Hucks v. Artuz,* No. 99 Civ. 10420, 2001 WL 210238, at *5-*6 (S.D.N.Y. Feb.27, 2001) (granting a defendant who was named in the caption but not described in the body of an amended complaint motion to dismiss).

C. *First Amendment* [8]

**\*5** In their motion defendants argue that the plaintiff does not specifically allege that he sincerely believes that "The Bible Code" is necessary for him to practice religion, nor does he elaborate as to how the book fits into his scheme of sincerely-held religious beliefs; as a result,

defendants assert, Jackson has failed to state how his religious beliefs were burdened by the defendants' actions.

The First Amendment guarantees the right to free exercise of religion. [9] *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). The free exercise clause, as is true with regard to the First Amendment generally, applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGuinnis,* 352 F.3d 582, 588 (2d Cir.2003) ( "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974)). The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but is instead subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz,* 483 U.S. 342, 328, 107 S.Ct. 2400, 2404 (1987); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life. *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Courts in this circuit and elsewhere have addressed whether denial of religious materials can support a cognizable free exercise claim. *See, e.g., Amaker v. Hakes,* No. 00-0152, 2001 WL 258063, *1 (2d Cir. March 14, 2001) (cited in accordance with Fed. R.App. Proc. 32.1(a)) (discussing whether confiscation of certain prohibited religious materials within the prison can serve as the basis of a free exercise claim); *Kay v. Bemis,* 500 F.3d 1214 (10th Cir.2007) (discussing whether deprivation of tarot cards could support a plaintiff's free exercise claim). Whether the religious subject is literature, or more commonly meals (*see Ford,* 352 F.3d at 597; *see also Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992); *Johnson v. Guiffere,* No. 9:04-CV-57, 2007 WL 3046703 (N.D.N.Y., Oct.17, 2007) (Hurd, D.J. and Peebles, M.J.), a free exercise claim often brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand. *See Benjamin v. Coughlin,* 905 F.2d, 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990).

Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes upon his or her sincerely-held religious beliefs. [10] *Salahuddin v. Goord,* 467 F.3d at 274-75; *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar.30, 2007). Importantly, in evaluating this factor the court must be wary of "question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds [,]" *McEachin v. McGuinnis,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49, 104 L.Ed.2d 766 (1989)), and instead may only consider whether the particular plaintiff holds a belief which is religious in nature. *Ford,* 352 F.3d at 590; *King,* 2007 WL 1017102, at *4. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny. [11] *Salahuddin v. Goord,* 467 F.3d at 474-75; *Evans v. Albany County Corr. Facility,* No. 9:05-CV-1400, 2009 WL 1401645, at *6 (N.D.N.Y., May 14, 2009) (Suddaby, J.). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *See Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995); *Evans,* 2009 WL 1401645, at *6.

*6 Under *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 1882, 104 L.Ed.2d 459 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 417, 109 S.Ct. at 1884. Lastly, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418, 109 S.Ct. 1884. Decisions rendered since *Turner* have clarified that when applying this test, a court should examine "the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Evans,* 2009 WL 1401645, at *6 (citing *Salahuddin,* 467 F.3d at 274).

In this instance, as defendants point out in their motion, the plaintiff has not set forth facts demonstrating that the disputed conduct infringed upon his sincerely-held religious beliefs. Plaintiff's complaint alleges in conclusory fashion that defendants denied him religious freedom when refusing to permit access to the material at issue, described by him as an interpretation of sections of the Bible, without any further clarification of what his religion is, or what sincerely-held beliefs are attached to its practice. [12] Plaintiff refers to the book, "The Bible Code," as a "religious interpretation of the Bible," but does not expand upon that claim to explain why denial of this interpretative book constituted a deprivation that imposed anything more than a *de minimis* burden upon his religious practice. Complaint (Dkt. No. 1), Facts ¶ 1; *see Evans,* 2009 WL 1401645, at *8.

Even when liberally construed, plaintiff's complaint simply cannot be read as satisfying his initial burden to sufficiently allege that the disputed conduct infringes on his sincerely-held religious beliefs. [13] *See Salahuddin v. Goord,* 467 F.3d at 274-75. Plaintiff has thus failed to meet his initial burden to allege sufficient facts showing that defendants' conduct violated his right to freely exercise his chosen religion. Accordingly, I recommend a finding that plaintiff has failed to state a plausible claim for violation of the his First Amendment rights.

In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not ordinarily order its dismissal without granting leave to amend at least once provided there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"). I therefore recommend that the plaintiff be afforded leave to amend his complaint in order to develop his First Amendment free exercise claim to identify his religion and to allege with specificity what religious beliefs defendants have infringed upon.

*7 I note that if plaintiff's complaint were deemed sufficient to meet his initial burden under the controlling test, the focus would then turn to assessment of whether the defendants have articulated a palpably legitimate penological concern to justify the denial of the requested book, in apparent reliance, at least in part, on the DOCS Directive No. 4572. *See Salahuddin v. Goord,* 467 F.3d at 474-75; *see also Guiffere,* 2007 WL 3046703 at *6.

Defendants appear to be arguing that internal safety and security concerns, leading to the prohibition of inmate access to publications written in code, served as the basis for denying plaintiff access to "The Bible Code". With the articulation of this justification, the focus of the analysis would again shift, and the burden would then return to the plaintiff, under the governing test, to establish that the policy is not reasonably related to legitimate penological interests. *See Ford,* 352 F.3d at 595-96. Such an inquiry is particularly fact-ladden and often ill-suited for resolution on motion for summary judgment, let alone a motion to dismiss. [14] *See generally, Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (holding that fact issues existed as to whether the DOCS' ban on literature and assembly of religious group was reasonably related to legitimate penological interests); *see also McEachin v. McGuinnis,* 357 F.3d at 201 ("Dismissing [the plaintiff's First Amendment claim] without requiring an answer from defendants, or permitting further discovery to determine, for example, whether denying the plaintiff access to ["The Bible Code"] significantly impeded his religious observance, makes it impossible to evaluate the validity of his claim.")

In sum, I recommend that plaintiff's First Amendment free exercise claim be dismissed as lacking in merit, though with leave to replead. [15]

### D. *Due Process*

Potentially embedded within the plaintiff's complaint, when liberally read, is an alleged due process deprivation. It is not entirely clear, however, whether plaintiff is in fact advancing such a claim, and if so whether it is a substantive or procedural due process cause of action. The Due Process Clause of the Fourteenth Amendment contains both a substantive and a procedural component. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary and wrongful government action regardless of the fairness of the procedures used to implement them." *Id.* at 125, 110 S.Ct. at 983 (internal quotations and citation omitted). While it appears that the gravamen of plaintiff's due process claim is procedural in nature, even if the court were to construe his complaint as attempting to allege a violation of his right to substantive due process, I would conclude that plaintiff has failed to adequately allege such a right.

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotations and citations omitted) (citing cases). "The first step in a substantive due process analysis is to identify the constitutional right at stake." *Excell v. Woods,* No. 9:07-CV-0305, 2009 WL 3124424, at *23 (N.D.N.Y. Sept.29, 2009) (Suddaby, J. and Lowe, M.J.) (citing *Lowrance,* 20 F.3d at 537). There are few circumstances arising in the context of prison life that ascend to the level of shocking and suffice to state a substantive due process violation. *Shuler v. Brown,* No. 07-CV-0937, 2009 WL 790973, at *9 (N.D.N.Y. Mar.23, 2009) (McAvoy, S.J. and Lowe, M. J.). [16]

*\*8 At the outset, I find the denial of access to reading material, while potentially within the protection of the First Amendment, is not the kind of condition of prison life that implicates substantive due process and also that DOCS Directive No. 4572 did not create a substantive right to FMRC review of inmate reading material. *See Barnes v. Craft,* No. 9:04-CV-1269, 2008 WL 3884369, at *5 (N.D.N.Y. Aug.18, 2008) (Mordue, C.J. and Lowe, M.J.) (finding that the DOCS beard exemption policy did not create a substantive due process right). Moreover, even if I were to find that the DOCS Directive No. 4572 did create a substantive due process right, any attempt to allege a substantive due process violation still must fail. At best, defendants' failure to follow DOCS Directive No. 4572 amounts to incorrect or ill-advised conduct and falls far short of the type of conscience-shocking behavior that would support a substantive due process claim. *See Lowrance,* 20 F.3d at 537.

Plaintiff's due process claim appears to hinge on defendants' alleged failure to comply with the procedures outlined in DOCS Directive No. 4572. *See* Complaint (Dkt. No. 1), § 6 ¶¶ 3, 5, 7. Plaintiff complains that he was originally informed by defendant Boucaud that the FMRC at Altona had decided to deny him access to the book "The Bible Code," but was later told by Gregg Stanley that the FMRC in fact was not consulted, although the standards set forth in DOCS Directive No. 4572 were utilized by the librarian and his supervisor in making the decision, within their sole discretion. *See* Complaint (Dkt. No. 1), Attachment at pp. 5, 6. Plaintiff appears to take issue with the fact that despite being

told otherwise, the FMRC did not review his request. Additionally, he claims that the book does not violate any of the standards enunciated in the DOCS Directive No. 4572, and alleges that the interference with access to this publication constitutes a violation of his right to practice his religion as well as harassment.

When construed as procedural in nature, plaintiff's due process claim is similarly destined to fail. As an initial matter, it is well established that the failure of prison officials to follow internal prison regulations does not give rise to a federal constitutional claim. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citing *Hyman v. Holder,* No. 96 Civ. 7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar.15, 2001)). Accordingly, to the extent that plaintiff relies solely upon defendants' alleged failure to follow the DOCS Directive No. 4572 to support a constitutional claim for violation of the right to procedural due process, his claim is legally insufficient.

To successfully state a claim under section 1983 for denial of due process, a plaintiff must show that he or she 1) possessed an actual liberty or property interest, and 2) was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004); *see also Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The first inquiry in the analysis of an alleged procedural due process violation is whether there exists a protected liberty or property interest at stake in the case. *Shakur,* 391 F.3d at 118; *see also Barna v. Travis,* No. CIV97CV1146 (FJS/RWS), 1999 WL 305515, at *1 (N.D.N.Y. Apr.22, 1999) (Smith, M.J.) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989)). Here, plaintiff has alleged neither.

**\*9** Plaintiff did not own the publication in question. By his own admission, Jackson began reading the book in question while housed at Bare Hill and upon transfer to Altona requested that the publication be made available to him via the DOCS inter-library loan service. It thus appears that "The Bible Code" is owned by the DOCS, not the plaintiff. As a result, plaintiff has not stated a property interest of which he was deprived without due process of law.

Turning to the issue of whether plaintiff has sufficiently alleged a liberty interest, "in 1995, the United States Supreme Court shifted a court's focus, when conducting a procedural due process analysis, from language of the particular authority allegedly giving rise to the protected liberty interest alleged (*e .g.* a state law or regulation) to the nature of the of the deprivation alleged." *Barnes,* 2008 WL 3884369, at *5 (citing *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). In *Sandin,* the Supreme Court held that, although "States may under certain circumstances create liberty interests which are protected by the Due Process Clause, these interests will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. at 483-484, 115 S.Ct. 2300. Applying this well established principle of law here dictates the conclusion that Directive No. 4572 simply does not create a cognizable liberty interest.

It is worth noting that the directive at issue does not include mandatory language, but clearly affords prison officials broad discretion in deciding what materials are suitable within a DOCS facility. From this it is clear that the State has not conferred a liberty interest upon prison inmates guarantying their unfettered access to written materials of their choice, and plaintiff thus cannot base his Due Process claim on the deprivation of such an intent. *See Shakur,* 391 F.3d at 118-119

More importantly, as a matter of law, failing to allow plaintiff access to reading material of his choice in violation of that directive did not rise to a constitutionally cognizable level and result in an atypical and significant hardship upon the plaintiff in relation to the ordinary incidents of prison life. *See id.* (finding that the plaintiff's allegation that defendants deviated from Media Review Committee procedures in denying him access to a publication did not support a procedural due process claim); *see also Barnes,* 2008 WL 3884369, at *5 (finding that a DOCS-issued beard exemption did not create a liberty interest for purposes of procedural due process); *cf. Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (finding that a DOCS regulation requiring every DOCS employee present at an incident of misbehavior to either submit an incident report or endorse a report prepared by another employee did not created a protected liberty interest).

**\*10** Even if plaintiff had sufficiently alleged the existence of a constitutionally significant liberty or property interest and the deprivation of that interest, to prevail he would additionally be required to show that he was denied minimal due process with respect to such deprivation. *See Tellier,* 280 F.3d 69, 79-80. On the face of the complaint, however, the facts alleged demonstrate that the plaintiff was afforded sufficient procedural safeguards to challenge the deprivation. The procedure outlined in Directive No. 4572 states that if the FMRC disapproves a publication request, "such decision shall be in the form provided in Exhibit B, and include a brief statement of reasons explaining why the publication is deemed to violate one or more of the media review guidelines and identifying by page number, article title, and location on the page, the contents objected to." 7 N.Y.C.R.R. § 712.3(c)(4). While initially plaintiff was not offered a "brief statement" as to why "The Bible Code" was unacceptable for loan under Directive No. 4572 by defendant Paulson, he was ultimately given the opportunity to grieve the denial through resort to the DOCS inmate grievance process ("IGP"). [17] *See* Complaint (Dkt. No. 1), Attachment p. 7.

After the Altona FMRC Chairman clarified that the book requested by Jackson had not been reviewed by the FMRC, he informed the plaintiff that he could resort to the inmate grievance process to challenge the denial an avenue of which plaintiff availed himself. Plaintiff's grievance was reviewed by the facility superintendent, and his denial of plaintiff's grievance was in turn reviewed by the CORC.

In view if these facts, even if the plaintiff was deprived of a property or liberty interest when denied access to "The Bible Code," that deprivation did not occur without constitutionally adequate, minimal due process. *See Shakur,* 391 F.3d at 118-19. Accordingly, I find that the plaintiff has failed to allege a plausible due process claim.

### D. *Protective Order*

Defendants also move order pursuant to Federal Rules of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of defendants' motion to dismiss. Rule 26(c) (1) of the Federal Rules of Civil Procedure provides, in relevant part, that

[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed.R.Civ.P. 26(c)(1). In light of my recommendation that the court dismiss plaintiff's complaint, with leave to amend, I find the existence of good cause to issue an order protecting the defendants from the burden of engaging in discovery until after the plaintiff files an amended complaint, if any, and issue is properly joined by the defendants' filing of an answer.

### III. *SUMMARY AND RECOMMENDATION*

**\*11** Having carefully considered defendants' motion in view of the formative stage of the proceedings at which it is made and the relatively lax standard against which such motions are gauged, I nonetheless find that defendants are entitled to dismissal of plaintiff's claims. Plaintiff's complaint in this action asserts claims of unconstitutional deprivation of the right to religious exercise and the denial of procedural due process. Because plaintiff has failed to sufficiently allege how the denial of his book request interfered with the free exercise of his sincerely-held religious beliefs, his First Amendment claim is subject to dismissal, though with leave to amend to cure this fatal deficiency. As to his suggestion that his right to due process was also violated, however, it is clear from the face of the complaint that the plaintiff cannot state a colorable claim for deprivation of substantive or procedural due process and that claim is subject to dismissal as a matter of law, without leave to amend. In addition, plaintiff's claims against defendant Fischer are likewise subject to dismissal based upon the lack of any showing of his personal involvement, although with leave to amend. [18] Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion to dismiss (Dkt. No. 12) be GRANTED; that plaintiff's First Amendment claims, and all claims against defendant Fischer, be DISMISSED, with leave to amend; and that plaintiff's claim for deprivation of due process be DISMISSED as a matter of law, without leave to replead; and it is further

ORDERED that discovery be and is hereby STAYED pending a final determination of defendants' motion to dismiss; and it is further

ORDERED that the clerk serve a copy of this report and recommendation upon the parties in accordance with the local rules.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 6066799

Footnotes

1    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). Portions of the background description which follows have been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Samuels v. Air Trans. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

2    Under that Directive, it is the policy of DOCS to

encourage inmates to read publications from varied sources if such material does not encourage them to engage in behavior that might be disruptive to orderly facility operations. Accordingly, inmates shall be allowed to subscribe to and possess a wide range of printed matter such as books, magazines and newspapers, subject to the provisions of this directive, because these items may prompt constructive individual development.

In the event that the Superintendent, or his designee, believes that printed material addressed to an inmate represents a possible threat to orderly facility operations, that material will be referred to the Facility Media Review Committee (FMRC) for its assessment and disposition.

7 N.Y.C.R.R. § 712.1(a). The DOCS standard with respect to evaluation of literature provides, in pertinent part, that "[t]he publication should not .. [c]ontain information which appears to be written in code ..." *Id.* § 712.2(h)(1).

3    Plaintiff's request was the subject of e-mail communications aimed at determining the appropriate avenue to be followed in addressing the matter. In apparent response to plaintiff's request Gregg Stanley, the FMRC Chairman at Altona, elicited guidance from the DOCS central office, specifically inquiring whether an interlibrary loan request was subject to review under the DOCS Directive No. 4572. Complaint (Dkt. No. 1) Attachment p. 6. In response, it was noted that

[i]t's a gray area. If the publication is not specifically adressed [sic] to a particular inmate, the media review guidelines can be applied but not the process. If you were to look at it and determine that it shouldn't come into the facility then you could just return it to the sending library. If the publication is coming in for a specific inmate, then the Media Review process would apply. If you denied it the inmate could appeal it but there would be no redaction because the book is the property of the sending library.

Complaint (Dkt. No. 1) Attachment at p. 6.

4    There is no indication in either plaintiff's complaint or its attachments reflecting the ultimate disposition, if any, of plaintiff's second grievance.

5    Defendants have also moved pursuant to Rule 26(c)(1) Federal Rules of Civil Procedure for a protective order staying discovery pending the resolution of their dismissal motion.

6    Plaintiff's failure to respond to the pending dismissal motion does not preclude me from recommending its disposition without the benefit of his submission. *See, e.g., Cicio v. Graham,* No. 9:08-CV-534, 2009 WL 537534, at *9 n. 5 (Mar.

3, 2009) (Mordue, C.J. and Peebles, M.J.). Such a motion tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir.2000).

It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance. Under this court's local rules, a party's failure to respond to a properly filed motion can constitute consent to the granting of that motion, so long as the court determines that the moving party has met its burden demonstrating entitlement to the relief requested. N .D.N.Y.L.R. 7.1(b)(3); *see also McCall,* 232 F.3d at 322-23 (holding that plaintiff's failure to respond to motion to dismiss in and of itself could not constitute basis for dismissal of plaintiff's complaint stated a claim for relief); *White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 n. 2 (E.D.N.Y. Jan.18, 2001) (citing *McCall* ).

7    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: The unreported decisions, which appear on Westlaw, have been deleted for purpose of Westlaw display.]

8    Although his complaint does not allege such a cause of action, plaintiff's factual allegations could also implicate the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). The Act provides, in pertinent part, that

[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Similar principles inform the analysis of plaintiff's free exercise claim as well as any potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks. *See Salhuddin v. Goord,* 467 F.3d 263, 264 (2d Cir.2006).

9    That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

10    Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test. 352 F.3d 582, 592-93 (2d Cir.2003). Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision in *Salahuddin* by subscribing to the substantial burden test. *See, e.g., Livingston v. Griffin,* No. 9:04-CV-00607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007) (Singleton, J.); *King,* 2007 WL1017102, at *4. While harboring some doubt that the Second Circuit has in fact laid the matter to rest, I find it unnecessary to now take a stance regarding the issue.

11    While this framework is particularly well-suited for analysis of a systematic or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which may impact only a single inmate. *Salahuddin,* 467 F.3d at 274 n. 4.

12    In his complaint, plaintiff does not specify his religion or the religious beliefs that he claims were interfered with through defendants' conduct. In the damages portion of his complaint, plaintiff merely states that the damages now sought are "to compensate [him] for the blatant violation of the United States Constitutionally protected First Amendment guarantee to practice [*his* ] religion." Complaint (Dkt. No. 1) § 9 (emphasis added). If plaintiff exercises his option to amend his complaint, he must include facts identifying his religion and the religious practices with which he alleges the defendants have interfered.

13    Plaintiff's First Cause of Action reads "I was denied the right to access religous [sic] meterial [sic] ... in violation of the First Amendment ..." Complaint (Dkt. No. 1) § 7. Plaintiff does not allege that the religious material involved was necessary to his sincerely-held religious beliefs.

14    Broadly construing his complaint as asserting a more general First Amendment right to reading material of his choice, notwithstanding the fact that the book in question is allegedly religious in nature, would lead to the same result. Prison officials enjoy wide discretion in regulating the relations between prisoners and the outside world, including the written word. *Thornburgh,* 490 U.S. at 407, 109 S.Ct. at 1878; *Procunier v. Martinez,* 416 U.S. 396, 404-405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Similar to regulations that might abridge an inmate's religious practices, regulations that restrict access reading material, such as those in the DOCS Directive No. 4372, must be analyzed under the standards mentioned above and as set forth by the Supreme Court in *Turner. See generally Turner,* 428 U.S. 78, 107 S.Ct. 2254. Additionally, the Supreme Court has noted that in "[a]cknowledging the expertise of these officials ... [the Supreme] Court has afforded considerable deference to the determinations of prison administrators." *Thornburgh,* 490 U.S. at 407-08, 109 S.Ct. at 1878-79 (citing *Procunier,* 416 U.S. at 404-405, 94 S.Ct. at 1807). Overall, the validity of prison regulations relating to

incoming materials turns on whether they are "reasonably related to legitimate penological interests." *Id.* (quoting *Turner,* 482 U.S. at 89, 107 S.Ct. at 2261). Accordingly, the test of whether the regulations set forth in the DOCS Directive No. 4372 are related to legitimate penological interests in the context of a more general First Amendment claim is very similar to the test that would be used to assess the regulation's validity in the free exercise context. *See Thornburgh,* 490 U.S. 406-20, 109 S.Ct. at 1878-85; *see also Turner,* 482 U.S. at 89, 107 S.Ct. at 2261. As a result, that analysis would likewise normally be ill-suited for determination on a motion to dismiss.

15   The plaintiff has alleged that "The Bible Code" is "a religious interpretation," and attempts to distinguish the word "code" as utilized in the title of the book from the type of code prohibited by Directive No. 4572. Complaint (Dkt. No. 1), § 6 and Attachment pp. 12-13, 17-18. Contrary to defendants' assertion, plaintiff has not acknowledged that the book contains material which "appears to be written in code." *See* Defendants' Memorandum (Dkt. No. 12-2) at p. 11. Whether the book is written in a code, justifying its prohibition at Altona, may ultimately present a material question of fact, providing an additional reason why dismissal of the plaintiff's complaint without leave to amend would be inappropriate at this early procedural juncture.

16   There is yet another reason why a substantive due process claim would fail. The Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision ... it must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219 n. 7, 137 L.Ed.2d 432 (1997) (citing *Graham v. Conner,* 490 U.S. 386, 394, 109 S.Ct. 1870, 1871 (1989)); *see also, Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005). As previously discussed, plaintiff's claim relating to the denial of access to reading material is more appropriately analyzed under the First Amendment.

17   The requisite procedural protections that must be provided to an individual vary according to "time, place and circumstances." *Ruggia v. Kozak,* 9:05-CV-0217, 2008 WL 541290, at *16 (N.D.N.Y. Feb.25, 2008) (Kahn, D.J. and Lowe, M.J.) (citations omitted). In the context of prison life, "[t]he primary mechanism made available to New York state prison inmates for presenting grievances concerning prison conditions is the [IGP] established by the DOCS ...." *Orraca v. McCreery,* 9:04-CV-1183, 2008 WL 4279509, at *6 (Sept. 15, 2008) (Hurd, D.J. and Peebles, M.J.) (citations omitted). The IGP has consistently been held by courts to meet the constitutional minimum and provide adequate procedures for challenging a liberty or property interest deprivation. *See, e.g., Zimmerman v. Burge,* No. 06-cv-0176, 2008 WL 850677, at *13 (N.D.N.Y.Mr. 28, 2008) (Sharpe, D.J. and Lowe, M.J.) (finding that plaintiff was provided with adequate due process even thought his "several grievances challenging the ... restriction of his visiting privileges ha[d] all been denied (and those denials [were] repeatedly been affirmed on appeal) ....").

18   In light of my findings, I recommend that consideration of defendants' argument that they are entitled to qualified immunity be deferred pending plaintiff's submission of an amended complaint, if he opts to pursue that avenue. *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); *Harhay v. Town of Ellington Bd. of Ed.,* 323 F.3d 206, 211 (2d Cir.2003); *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)).

---

**End of Document**                                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 409366
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard H. LIVINGSTON, Plaintiff,

v.

William HOFFNAGLE, Dustin
Hollenbeck, and Chris King, Defendants.

9:17-CV-1158 (MAD/DEP)
|
Signed 02/01/2019

**Attorneys and Law Firms**

RICHARD H. LIVINGSTON, 14-B-3634, Great
Meadow Correctional Facility, Box 51, Comstock, New
York 12821, Plaintiff pro se.

HON. BARBARA UNDERWOOD, OF COUNSEL:
ERIK BOULE PINSONNAULT, A.A.G., New York
State Attorney General, The Capitol, Albany, New York
12224, Attorney for Defendants.

### MEMORANDUM-DECISION AND ORDER

Mae A. D'Agostino, U.S. District Judge:

### I. INTRODUCTION

*1 Plaintiff, an inmate currently in the custody of
the New York State Department of Corrections and
Community Supervision ("DOCCS"), commenced this
civil rights action *pro se* on October 18, 2017. *See* Dkt.
No. 1. Plaintiff's claims arose on August 1, 2017, shortly
after he was transferred to Upstate Correctional Facility
("Upstate") in Malone, New York, where he was to be
housed in disciplinary confinement for six months. *See*
Dkt. No. 28 at 3. Plaintiff alleges that on that day,
Defendants ignored his requests to be placed in protective
custody and punished him for those requests by "locking
him in a holding cell, handcuffed and chained tight,"
depriving him of food, water, and the use of a bathroom
from 1:00pm to 6:00pm, ignoring his pleas to loosen
the handcuffs and chains, threatening to issue a false
misbehavior report, and placing him in a cell with "a
violent gang banger." *See id.* at 3-4. According to Plaintiff,

this caused him "misery, anguish, psychological pain,"
and loss of sleep for several days. *See* Dkt. No. 1 at 20-21.

Plaintiff filed two grievances with Upstate about the
events from August 1, 2017. *See* Dkt. No. 16 at
3. On September 26, 2017, the superintendent denied
Plaintiff's grievances and Plaintiff appealed to the Central
Office Review Committee ("CORC"). *See id.* Before
the CORC had a chance to issue an opinion, on
October 18, 2017, Plaintiff filed a Complaint with this
Court. *See* Dkt. No. 1. In his Complaint, Plaintiff
alleges Eighth Amendment claims of excessive force,
failure-to-protect, and conditions-of-confinement, a First
Amendment retaliation claim, a Section 1983 conspiracy
claim, and pendent state law claims of gross negligence,
negligent infliction of emotional distress, and intentional
infliction of emotional distress. *See* Dkt. No. 28 at 6.

On March 16, 2018, Defendants filed a Motion to
Dismiss on the grounds that Plaintiff failed to exhaust
the administrative remedies available to him before
commencing this lawsuit. *See* Dkt. No. 14-1 at 4. Plaintiff
filed his Opposition on April 2, 2018. *See* Dkt. No. 16.
On November 2, 2018, Magistrate Judge David E. Peebles
issued a Report and Recommendation recommending
that the case be dismissed because Plaintiff did not exhaust
all administrative remedies before filing the Complaint.
*See* Dkt. No. 28 at 22-23. Additionally, Magistrate Judge
Peebles found that the state law claims are barred by
Section 24 of the New York Correction Law. *See id.*

Plaintiff filed three objection letters to the Report and
Recommendation (together, the "Objections"). [1] In the
first Objection, filed on November 21, 2018, Plaintiff
argues that special circumstances excuse his failure to
wait for a CORC decision before commencing this action.
*See* Dkt. No. 31 at 1-2. Plaintiff claims that although
he repeatedly requested video evidence of the incident
on August 1, 2017, he "was met by an outrageous
charge of over three hundred dollars, which is contrary
to the DOCC[S] directive," and he was "bound by time
constraints" because the video evidence is preserved for
only one year. *See id.* Plaintiff argues that he was "forced
to immediately file suit in good faith in order to get the
courts [sic] intervention in securing the evidence." *See
id.* Additionally, Plaintiff states that the CORC has still
not rendered a decision, and this "stalling" was "done to
impede the prosecution of plaintiff's claims." *See id.* at 3.

**\*2** In a Supplemental Objection, filed on December 7, 2018, Plaintiff alleges that Defendants obstructed justice by preventing him from obtaining the video evidence from the incident, thereby causing the electronic spoliation of evidence. *See* Dkt. No. 32 at 1-2. Now that the video evidence is lost, Plaintiff asks the Court to find that his administrative remedies have been exhausted since he "will not have a fair and impartial appeal determination." *See id.* Plaintiff also requests that the Court impose sanctions on Defendants. *See id.*

Finally, on December 13, 2018, Plaintiff filed a Second Supplemental Objection, which largely repeated his earlier objections. *See* Dkt. No. 33 at 1-2. Plaintiff again claims that he was "forced to file a complaint immediately" because he was charged a fee of $311.35 for the video, and that the CORC's "delay in rendering a decision was used as a ploy" to prevent him from obtaining the video before it was destroyed. *See id.* Additionally, Plaintiff calls the fee "arbitrary and capricious." *See id.*

After carefully reviewing Plaintiff's Objections, the Court finds that Magistrate Judge Peebles did not err in his determination that the Complaint should be dismissed. Accordingly, the Court adopts the Report and Recommendation in its entirety.

## II. DISCUSSION

### A. Standard of Review

When a party files specific objections to a magistrate judge's report and recommendation, the district court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Plaintiff's Objections to the Report and Recommendation merely recite the same arguments that he presented to

Magistrate Judge Peebles. First, Plaintiff claims that his failure to wait for a CORC decision was excused by the need to acquire video evidence of the incident before it was erased. *See* Dkt. No. 31 at 1-2; Dkt. No. 32 at 1-2; Dkt. No. 33 at 1-2. Plaintiff made this same argument in his Opposition to the Motion to Dismiss, *see* Dkt. No. 16 at 4, which Magistrate Judge Peebles addressed in the Report and Recommendation, *see* Dkt. No. 28 at 5 n.3. Similarly, Plaintiff's argument that the fee charged for the video was arbitrary and capricious is a mere recitation of his earlier argument that a FOIL officer overcharged him for the video, which he believes should have been free. *See* Dkt. No. 16 at 5. Finally, Plaintiff's argument that Defendants have obstructed justice by allowing for the electronic spoliation of evidence is an argument that he has raised numerous times, and Magistrate Judge Peebles addressed each time. *See* Dkt. No. 20 (denying Plaintiff's request for an order to preserve the video since the footage was no longer available, but specifically noting that the decision did not prejudice "plaintiff's right to argue entitlement to a spoliation jury instruction at the time of trial"); Dkt. No. 23 (denying Plaintiff's request for sanctions for spoliation of evidence).[2] Although these Objections "merely recite the same arguments" that Plaintiff presented to Magistrate Judge Peebles, in light of Plaintiff's *pro se* status, the Court will review the Report and Recommendation de novo.

### B. Analysis of Report and Recommendation

**\*3** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations

must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible," the complaint must be dismissed, *id.* at 570.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972) ) (other citations omitted). The Second Circuit has opined that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) ).

### 1. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates about prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004), *abrogated on other grounds by Ross v. Blake*, 136 S. Ct. 1850 (2016). The failure to exhaust is an affirmative defense and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

**\*4** The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *See Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81, 88-94 (2006) ). New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). Second, if the IGRC decision is appealed, the superintendent of the facility issues a decision after reviewing the IGRC's determination. *See id.* at § 701.5(c). Third, if the superintendent's decision is appealed, the final administrative decision is made by the CORC. *See id.* at § 701.5(d). After all three of these levels of review are exhausted, the prisoner may seek relief in federal court pursuant to Section 1983. *See Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002) ) (other citation omitted).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by CORC, must be completed before a civil action asserting that claim may be filed. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed") (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds, Porter v. Nussle*, 534 U.S. 516 (2002) ). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

Although administrative remedies generally must be exhausted, a prisoner need not exhaust remedies if they are not "available." *Ross*, 136 S. Ct. at 1854-55. As the Second Circuit held in *Williams v. Priatno*, there are several ways in which administrative remedies may be unavailable:

First, an administrative remedy may be unavailable when "it operates as a simple dead end - with officers

unable or consistently unwilling to provide any relief to aggrieved inmates." Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

829 F.3d 118, 123-24 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court rejected the Second Circuit's "extra-textual" exception to the PLRA's exhaustion requirement which allowed the taking into account of "special circumstances" to justify a prisoner's failure to comply with administrative procedural requirements. 136 S. Ct. at 1856-57. Rather, it held that the only limit to the PLRA's exhaustion requirement "is the one baked into its text: [a]n inmate need exhaust only such administrative remedies as are 'available.' " *Id.* at 1862; *see also Williams*, 829 F.3d at 123 (recognizing that *Giano* and *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), which provided a "special circumstances" exception to the PLRA's exhaustion requirement, were abrogated in part by *Ross* ). As such, the Supreme Court found that an inmate's mistaken belief that he has exhausted his administrative remedies, even where that belief seems reasonable, does not make the administrative remedies unavailable. *Ross*, 136 S. Ct. at 1858.

**\*5** In the present matter, the Court finds that Magistrate Judge Peebles correctly determined that Plaintiff did not exhaust the administrative remedies before filing his Complaint. As Magistrate Judge Peebles properly noted, the Court may consider the exhaustion issue on a Rule 12(b)(6) motion when it is clear from the face of the complaint that the plaintiff has failed to exhaust. *See* Dkt. No. 28 at 15; *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74-75 (2d Cir. 1998); *Lewis v. Havernack*, No. 12-CV-0031, 2013 WL 1294606, \*4 (N.D.N.Y. Mar. 28, 2013). Plaintiff mailed the Complaint in this action only five days after his appeal was acknowledged by the CORC. *See* Dkt. No. 28 at 9-10. Plaintiff "seemingly acknowledges that he rushed to file this action, apparently in an attempt to ensure that the relevant audio and video recordings were preserved by the DOCCS." *See id.* at 16. However, as Magistrate Judge

Peebles concluded, by prematurely filing the Complaint, Plaintiff "effectively truncated the [Inmate Grievance Program] and deprived the CORC of its opportunity to review the matter." *See id.* The Court agrees with Magistrate Judge Peebles and finds that the Complaint must be dismissed for failure to exhaust.

Plaintiff argues that special circumstances excuse his failure to exhaust because he needed to acquire the video evidence before it was erased. *See* Dkt. No. 16 at 5; Dkt. No. 31 at 1-2; Dkt. No. 32 at 1-2; Dkt. No. 33 at 1-2. Plaintiff made this argument in his Opposition to the Motion to Dismiss, and Magistrate Judge Peebles considered it in the Report and Recommendation. *See* Dkt. No. 16 at 4-5 (claiming that he was forced to commence this litigation to preserve the video after he was "stonewalled" in his attempts to obtain the video footage); Dkt. No. 28 at 5 n.3 (acknowledging that Plaintiff "repeatedly" requested the video recording). The Supreme Court has rejected the notion that "special circumstances" may justify a prisoner's failure to comply with administrative procedural requirements. *See Ross*, 136 S. Ct. at 1856-57. Therefore, Magistrate Judge Peebles did not err in finding that no special circumstances excused the exhaustion requirement here. *See* Dkt. No. 28 at 10-18.

Likewise, Magistrate Judge Peebles properly rejected Plaintiff's claim that his failure to exhaust was excused by the CORC's "stalling." *See id.* at 17 n.10 (stating that "Plaintiff's frustration with the CORC's failure to comply with its thirty-day obligation under the regulatory scheme, while understandable, does not compel a different result given the chronology of the relevant events"). This Court agrees that the CORC's delay does not excuse Plaintiff's failure to exhaust the administrative remedies. *See Cohen v. Welch*, No. 16-CV-593, 2017 WL 3311244, \*6 (N.D.N.Y. July 11, 2017), report and recommendation adopted, 2017 WL 3309713 (N.D.N.Y. Aug. 2, 2017) (holding that the fact that "grievances were never answered does not excuse [a plaintiff's] failure to exhaust").

Finally, Magistrate Judge Peebles concluded that since Plaintiff "did not allow the time period prescribed by the regulatory scheme to elapse prior to commencement, I am unable to conclude that administrative remedies were unavailable to him." *See* Dkt. No. 28 at 18. Although, as Magistrate Judge Peebles noted, "the outcome could very well have been different if plaintiff had, in fact, permitted

the thirty-day period to elapse prior to commencing this suit," *see id.* at 18 n.1, we have routinely dismissed cases where the plaintiff prematurely files suit and attempts to correct that error later. *See Scott v. Miller*, No. 17-CV-520, 2018 WL 3951339, *4 (N.D.N.Y. Aug. 13, 2018) (dismissing a case where an inmate failed to complete the appeals review process prior to filing the complaint); *Neal, 267 F.3d at 122* (finding that "[s]ubsequent exhaustion after suit is filed ... is insufficient"). Thus, the Court agrees that Plaintiff has not shown that administrative remedies were unavailable to him. *See* Dkt. No. 28 at 18-19.

In light of the foregoing, the Court adopts Magistrate Judge Peebles's recommendation that Plaintiff's civil rights claims should be dismissed.

### 2. State Law Claims

**\*6** In addition to the civil rights claims, Plaintiff brings state law claims of gross negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. *See id.* at 6. Defendants argue that (1) the Court should not exercise supplemental jurisdiction over the state law claims and (2) those claims should be dismissed based upon New York Correction Law § 24. *See* Dkt. No. 14-1 at 9-12. Magistrate Judge Peebles found that Section 24 precludes Plaintiff from bringing common law causes of action against Defendants and recommended that Plaintiff's state law claims be dismissed with prejudice. *See* Dkt. No. 28 at 19-20.

District courts have supplemental jurisdiction over all state-law claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. 28 U.S.C. § 1367(a). Application of supplemental jurisdiction is discretionary, and "it requires a balancing of the considerations of comity, fairness to the litigants, judicial economy, and the avoidance of needless decisions of state law." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 809 (2d Cir. 1979) (citation omitted). When a court lacks subject matter jurisdiction, dismissal is mandatory. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). Therefore, although courts "construe a *pro se* plaintiff's complaint liberally, a plaintiff attempting to bring a case in federal court must still comply with the relevant rules of procedural and substantive law, including establishing that the court has subject matter jurisdiction over the action." *Ally v. Sukkar*, 128 Fed. Appx. 194, 195 (2d Cir. 2005) (internal citation omitted).

It is well settled that when this Court exercises pendent jurisdiction over a state cause of action, it must apply the substantive state law. *See Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996) (citations omitted) (explaining that the plaintiff's state law claims must be dismissed because "a federal court acts essentially as a state court in addressing pendent state law claims"); *Parris v. New York State Dep't of Corr. Servs.*, 947 F. Supp. 2d 354, 365 (S.D.N.Y. 2013); *Joy v. New York*, No. 5:09-CV-841, 2010 WL 3909694, *4 (N.D.N.Y. Sept. 30, 2010). In pertinent part, Section 24 of New York Correction Law provides that:

> 1. No civil action shall be brought in any court of the state ... against any officer or employee of the department ... in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of the department shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correction Law § 24. Section 24 governs substantive rights; it is not procedural. *See Baker*, 77 F.3d at 15 (holding that "by its plain terms, § 24 governs the substantive rights of corrections officers by conferring upon them an immunity from liability for activities that fall within the scope of the statute").

Magistrate Judge Peebles correctly found that Section 24 applies because Defendants are employed by DOCCS and the alleged conduct fell within the scope of their employment. *See* Dkt. No. 28 at 20. For purposes of Section 24, courts have looked to the following factors to determine whether actions fall within the actor's scope of employment:

> **\*7** the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly

done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997) (quoting *Riviello v. Waldron*, 47 N.Y.2d 297, 303 (1979) ). Here, the alleged conduct occurred while Defendants were at work performing their job duties. *See* Dkt. No. 1 at 10-13; Dkt. No. 16 at 6. Since Defendants were clearly acting within the scope of their employment, Magistrate Judge Peebles was correct to conclude that Section 24 applies. Therefore, the Court adopts Magistrate Judge Peebles's recommendation that the state law claims are barred by New York Correction Law § 24.

#### *3. No Opportunity to Amend*

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted). Thus, "[w]here granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (collecting cases).

Here, Magistrate Judge Peebles found that the exhaustion error would not be cured by permitting Plaintiff leave

to amend. *See* Dkt. No. 28 at 21-22. The Court agrees that amendment will not cure this deficiency. *See e.g., Gayot v. Perez*, No. 16-CV-8871, 2018 WL 6725331, *7 (S.D.N.Y. Dec. 21, 2018) (finding that filing an amended complaint four months after an appeal to the CORC did not cure the fact that the initial complaint was filed before the plaintiff had exhausted all administrative remedies). Therefore, the Court agrees with Magistrate Judge Peebles's recommendation to deny leave to amend.

### III. CONCLUSION

Having carefully reviewed the Report and Recommendation, Plaintiff's Objections and the applicable law, the Court finds that Magistrate Judge Peebles employed the proper legal standards, accurately recited the facts, and correctly applied the law to those facts. As such, the Court hereby

**ORDERS** that the November 2, 2018 Report and Recommendation (Dkt. No. 28) is **ADOPTED in its entirety**; and the Court further

**ORDERS** that Plaintiff's Complaint is **DISMISSED WITHOUT LEAVE TO AMEND**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 409366

---

Footnotes

1    Contrary to Plaintiff's assertion that he was "well within [his] rights to file" the supplemental objections, *see* Dkt. No. 33 at 1, in this District, a party must get the court's permission before filing supplemental papers. *See Pro Se/Self Representation: Before Submitting Papers to the Court*, https://www.nynd.uscourts.gov/submitting-papers-court ("Supplemental papers, even if they relate to your complaint, petition, or motion, may NOT be filed without prior Court approval"). Nevertheless, in light of Plaintiff's *pro se* status, this Court will exercise its discretion to consider the arguments raised in all three objections. *See Snyder v. Graham*, No. 09-CV-10307, 2012 WL 983536, *4 (S.D.N.Y. Mar. 22, 2012) (citing *Ruggiero v. WarnerLambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005) ) (other citation omitted) (finding that courts have discretion to consider documents filed in violation of procedural rules).

2019 WL 409366

2   Plaintiff cites to *Treppel v. Biovail Corp.,* 249 F.R.D. 111, 121 (S.D.N.Y. 2008) to support his request for sanctions against Defendants. *See* Dkt. No. 32 at 2. However, as the court held in *Treppel,* sanctions require that the party be at least negligently culpable in the destruction of the evidence. *See id.* Nothing in the record suggests the Defendants destroyed the videotapes. *See* Dkt. No. 28 at 5 n.3 (discussing how the company that operates the video cameras at Upstate lost this video "due to equipment failure and loss of data in the hard drive"). As such, the Court will not issue sanctions against Defendants due to spoliation of evidence. *See Livingston v. Kelly,* 423 Fed. Appx. 37, 42 n.5 (2d Cir. 2011) (finding no error in a district court's failure to factor a spoliation sanction into its consideration of a summary judgment motion, particularly because "there is no evidence that he is the party responsible for the destruction").

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (*See id.* at 4.)

Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

Case 9:17-cv-00899-BKS-TWD   Document 37   Filed 05/20/19   Page 92 of 125

staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court

Case 9:17-cv-00899-BKS-TWD   Document 37   Filed 05/20/19   Page 93 of 125

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

### III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's

effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

*4 At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly

Case 9:17-cv-00899-BKS-TWD   Document 37   Filed 05/20/19   Page 94 of 125

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, ____, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 95 of 125

2016 WL 3948100

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6993383
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Juan RODRIGUEZ, Plaintiff,
v.
C.O. REPPERT, C.O. Osbourne,
and C.O. Testani, Defendants.

14-CV-671-RJA-MJR
|
Signed 11/30/2016

**Attorneys and Law Firms**

Juan Rodriguez, Dannemora, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

HONORABLE RICHARD J. ARCARA, UNITED STATES DISTRICT JUDGE

**\*1** Magistrate Judge Roemer, to whom the Court referred this case for all pre-trial proceedings, filed a Report and Recommendation (Docket No. 19) recommending that the Court deny the Defendants' motion for summary judgment. *See* Docket No. 10. The Defendants have filed objections to that recommendation. Docket No. 20. Pursuant to 28 U.S.C. § 636(b)(1), the Court must review the Report and Recommendation *de novo*. Upon *de novo* review, and for the reasons stated below, the Court overrules the Defendants' objections and adopts the Report and Recommendation in its entirety.

### BACKGROUND

The Defendants argue that they are entitled to summary judgment because, they claim, the Plaintiff failed to exhaust his administrative remedies before bringing this case. It is undisputed that the New York State Department of Corrections and Community Supervision's (DOCCS) Central Office Review Committee (CORC)—the final level of review in DOCCS' internal grievance program—did not decide the Plaintiff's appeals of his administrative

grievances within the thirty-day period required by DOCCS' regulations. *See* 7 N.Y.C.R.R. § 701.5(d)(2)(ii). It is also undisputed that the Plaintiff filed his complaint in this case *before* the CORC decided his appeals. The CORC ultimately decided the Plaintiff's appeals two weeks after the Plaintiff filed his complaint in this case, but nearly two *months* after DOCCS' own regulations required the CORC to do so.

Relying primarily on the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), as well as the Second Circuit's decision in *Williams v. Priatno*, 829 F.3d 118, Judge Roemer concluded that the CORC's failure to timely decide the Plaintiff's appeals, combined with the absence of any "mechanism to request the CORC to issue a decision after thirty days have elapsed," Docket No. 19 at 7, meant that the Plaintiff's administrative remedies were not "available" within the meaning of the Prison Litigation Reform Act (PLRA). *See* 42 U.S.C. § 1997e(a). Thus, Judge Roemer concluded, the Plaintiff did exhaust his administrative remedies.

### DISCUSSION

The PLRA's exhaustion "edict contains one significant qualifier: the [administrative] remedies" a prisoner is required to exhaust "must ... be 'available' to the prisoner." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). The Supreme Court has identified several scenarios in which an administrative remedy might be "[un]available" within the meaning of the PLRA. *See id.* at 1859-60. Judge Roemer concluded that one of those scenarios applies in this case: the Plaintiff here encountered "an administrative scheme" that is "so opaque that it becomes, practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859.

The Second Circuit recently explained that this "opaqueness" exception to the PLRA's exhaustion requirement applies when "[t]he regulations simply do not contemplate the situation in which [the prisoner] found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams v. Priatno*, 829 F.3d 118, 124 (2d Cir. 2016). That is the case here: As Judge Roemer noted, "after the CORC neglected to decide Rodriguez's appeals within thirty days, administrative remedies were no longer available to him, and his only option was to file this action." Docket No. 19 at 7. In other words, there was simply nothing the Plaintiff

2016 WL 6993383

could do force the CORC to follow its own deadline for deciding the Plaintiff's appeals.

**\*2** The Defendants now argue that the Plaintiff "could have contacted the IGP Supervisor in writing if he did not receive a written notice of receipt from CORC within 45 days of his appeal." Docket No. 27 at 2. Specifically, the Defendants point to DOCCS Directive 4040(d)(3)(i) (codified at 7 N.Y.C.R.R. § 701.5(d)(2)(i)), which provides that, "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to the CORC." *Id.* (citations omitted).

This argument, however, was made for the first time in the Defendants' reply brief before this Court; the Defendants did not raise the argument before Judge Roemer, nor did they raise it in their objections. [1] The Defendants have therefore waived the argument that § 701.5(d)(2)(i) provides a mechanism by which the Plaintiff could have prompted the CORC to decide his appeals. "The Court does not and will not make a practice of addressing the merits of issues first raised in a reply, as the opposing party is not afforded any opportunity to respond to new issues raised in a reply, which is ordinarily the last document submitted prior to the Court's ruling on a motion. Such sapience appears all the more prudent" where, as here, "the opposing party is proceeding *pro se. Peca v. Delta Air Lines, Inc.*, No. 97-CV-0882E(M), 2000 WL 914112, at \*2 (W.D.N.Y. July 7, 2000) (citations and quotation marks omitted). The Court will therefore not consider the Defendants' argument that § 701.5(d)(2)(i) makes Plaintiff's administrative remedies "available" within the meaning of the PLRA.

The Defendants also identify several other reasons why they believe Judge Roemer's Report and Recommendation was incorrect. The Court addresses each argument each in turn.

First, the Defendants argue that the Plaintiff's conduct in a case in the New York Court of Claims shows that he "could not ... argue that the grievance process was unavailable to him, unknowable, incapable of use, inaccessible, or practically impossible to navigate." Docket No. 20 at 5. But this argument misinterprets the PLRA's opaqueness exception as interpreted by the Second Circuit in *Williams*: the question, according

to the Second Circuit, is whether "[t]he regulations ... contemplate the situation in which [the prisoner] f[inds] himself." *Williams*, 829 F.3d at 124. This is an objective question: the regulations either provide an inmate with a procedural route to obtain administrative relief, or they do not. To be sure, an inmate's subjective understanding of the grievance procedure is one aspect of the opaqueness question; a procedural scheme that *does* provide a route to administrative relief is little better than *no* route if the administrative path the prisoner must follow is "so confusing that no reasonable prisoner can use them." *Ross*, 136 S. Ct. at 1869 (quotations and ellipsis omitted). *See also Williams*, 829 F.3d at 126 ("[T]he purported options for relief provided by defendants, to the extent they are even available to an inmate in [the plaintiff's] situation, only increase confusion regarding the avenues available to pursue an appeal.") Nothing in *Williams*, however, suggests that the opaqueness exception is categorically unavailable simply because, as here, the prisoner was familiar with his prison's grievance process.

**\*3** Second, the Defendants point to the Supreme Court's statement in *Ross* that, "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Ross*, 139 S. Ct. at 1859. Again, however, after *Williams*, the question in this case is whether an administrative option was even available to the Plaintiff in the first place—not whether the Plaintiff misunderstood a DOCCS regulation.

Third, the Defendants argue that Judge Roemer "chose ... to apply the minority [ ]view" on the question whether an untimely administrative decision renders the administrative process unavailable. But as Judge Roemer noted, the Defendants do not identify "any cases from the Second Circuit or the Western District of New York" supporting their position. Docket No. 19 at 8. To the contrary, the most recent Second Circuit case on point—*Williams*—states that administrative remedies are opaque—and, therefore, unavailable—when those remedies do not address the situation in which a prisoner finds himself. That is the case here.

Fourth, the Defendants rely heavily on the Supreme Court's statement in *Ross* that the unavailability of administrative remedies "will not often arise." But in context, the Supreme Court's statement says something less forceful than the Defendants suggest: *Ross* states that,

Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 98 of 125

Rodriguez v. Reppert, Not Reported in Fed. Supp. (2016)

2016 WL 6993383

"[g]iven prisons' own incentives to maintain functioning remedial processes, we expect that these circumstances will not often arise." *Ross*, 136 S. Ct. at 1859. This suggests that remedies will typically not be unavailable under the PLRA because prisons have an obvious interest in resolving administrative grievances internally. This interest is best served by maintaining a grievance scheme that actually provides a route to administrative relief. *Ross*, in other words, assumes that administrative remedies will "not often" be unavailable because *Ross* also assumes that prisons will maintain remedial processes that provide prisoners with a path for obtaining administrative relief.

Finally, the Defendants argue that, "if Magistrate Judge Roemer's decision is adopted, inmates can file suit anytime the IGP, a Superintendent, or the CORC is late in rendering a decision. In fact, if adopted, inmates could wait until one day after the time periods stated in the NYCRR and file suit." Docket No. 20 at 15. This overstates Judge Roemer's conclusion. Nothing in Judge Roemer's Report and Recommendation suggests that a failure to timely decide an inmate grievance at a *lower level* of the grievance review process would permit a prisoner to immediately file a federal lawsuit. This is because DOCCS' regulations expressly contemplate such a situation: they provide that, absent an extension of time, "matters not decided within the time limits may be appealed to the next step." 7 N.Y.C.R.R. § 701.6(g)(2). In other words, a failure to render a timely decision at a lower level in the grievance process gives a prisoner the option of appealing that inaction to the next level. A prisoner who does not avail himself of that option will almost certainly find his lawsuit dismissed for failure to exhaust. *See, e.g.*, *Morrison v. Stroman*, 12-CV-542(A)(M), 2014 WL 6685510, at *4 (W.D.N.Y. Nov. 26, 2014). But the CORC's failure to timely decide an appeal is fundamentally different than, for instance, a superintendent's failure to timely decide an appeal, because the CORC is the final step in DOCCS' internal grievance program. A prisoner whose CORC appeal was not timely decided has no other administrative body to which he can appeal. Thus, the "regulations simply do not contemplate" what the prisoner should do to ensure his appeal is timely decided, "making it practically impossible for him to ascertain whether and how he could pursue his grievance." *Williams*, 829 F.3d at 124.[2]

**\*4** Thus, upon *de novo* review, the Court overrules the Defendants' objections to Judge Roemer's Report and Recommendation.

Lastly, the Plaintiff objects to Judge Roemer's decision to "stay defendants' time to answer the complaint until the District Judge renders a decision" on the Defendants' motion for summary judgment. Docket No. 19 at 9. This non-dispositive order is neither clearly erroneous nor contrary to law. *See* 28 U.S.C. § 636(b)(1)(A). The Court therefore overrules the Plaintiff's objections.

### CONCLUSION

For the reasons stated above, the Court overrules both the Plaintiff's and the Defendants' objections to Judge Roemer's Report and Recommendation. As directed by Judge Roemer, the Defendants shall answer the complaint within 21 days of this Decision and Order. This case is remanded to Judge Roemer for further proceedings.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6993383

---

Footnotes

1    The Defendants state that they made this argument for the first time in their reply brief because "[i]n response to defendants' objections to the R&R, plaintiff—for the first time—argues that the grievance process was 'opaque' and 'incapable of use.' " Docket No. 27 at 2. The Defendants overlook that *Judge Roemer* concluded that the grievance process was opaque and incapable of use. Thus, the Defendants could—and should—have made this argument in their objections to Judge Roemer's Report and Recommendation.

2    Because the Defendants have waived the argument, the Court does not address whether § 701.5(d)(2)(i) provides a mechanism for a prisoner to continue pursuing his grievance, thereby making his administrative remedies "available" under the PLRA. The Court notes, however, that this provision does not appear to address the situation in which the Plaintiff found himself. The Plaintiff does not suggest that he failed to exhaust because he was unsure whether the CORC

received his appeal. Rather, he failed to exhaust because the CORC did not timely decide the Plaintiffs' appeals. Nothing in the record suggests that the CORC failed to comply with the receipt-and-notice provisions of § 701.5(d)(2)(i).

---

**End of Document**                                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2729259
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Roosevelt ROSE, Plaintiff,

v.

Anthony J. ANNUCCI, et al., Defendants.

9:16-CV-787 (BKS/ATB)
|
Signed 04/19/2018

**Attorneys and Law Firms**

ROOSEVELT ROSE, pro se.

JOHN F. MOORE, Asst. Attorney General for
Defendants.

## REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation by the Honorable Brenda K. Sannes,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In his
civil rights complaint, plaintiff, a practicing Muslim,
alleges that defendants violated his First Amendment
right to practice his religion and his rights under the
Religious Land Use and Institutionalized Persons Act,
("RLUIPA"), 42 U.S.C. § 2000cc-1(a) by interfering with
his observance of religious holidays in 2014, 2015, and
2016, while he was incarcerated at Franklin Correctional
Facility ("Franklin"). (Dkt. No. 1, Compl. at CM/
ECF pp. 5-9). Plaintiff seeks significant monetary relief.
(Compl. at CM/ECF p. 11).

Presently before the court is the defendants' motion for
summary judgment pursuant to Fed. R. Civ. P. 56.
(Dkt. No. 53). Plaintiff has responded in opposition
to the motion. (Dkt. No. 59). Defendants replied, and
plaintiff filed a surreply. (Dkt. Nos. 61, 67). For the
following reasons, this court agrees with defendants and
will recommend dismissal of the complaint.

## DISCUSSION

### I. Facts and Contentions

As required under Local Rule 7.1, defendants have filed
a statement of material facts and notice to plaintiff of
the requirement to file a response in accordance with the
local rules. (Dkt. No. 53-10, "Def. Statement of Material
Facts"). Plaintiff filed a counter-statement of material
facts, but did not respond in the manner required by Local
Rule 7.1(a)(3). (Dkt. No. 59, "Pl.'s Statement of Material
Facts"). Therefore, the court may accept the facts in
defendants' statement as true to the extent that they are
supported by evidence in the record. *See Champion v.
Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, in
deference to plaintiff's pro se status, this court has opted to
review the entire summary judgment record to determine
the relevant facts.

Plaintiff was incarcerated at Franklin between January
17, 2014 and October 31, 2016. (Dkt. No. 53-10,
"Def. Statement of Material Facts" ¶ 2). In his
complaint, plaintiff alleges that various officials violated
his civil rights by interfering with his celebration of
the religious holidays of Eid-Ul-Adha [1] and Ramadan
by imposing unnecessary and discriminatory registration
requirements. (Compl. at CM/ECF p. 5-10). Plaintiff
expanded on these allegations in a June 13, 2017
deposition. (Dkt. No. 53-1, at CM/ECF pp. 131-181,
("Dep.") [2]).

#### A. Eid-Ul-Adha Festival in 2014

**\*2** In October 2014, the Muslim chaplain at Franklin
retired, and the facility had not yet hired his replacement.
(Dep. at 32). On October 10, 2014, defendant Smith, a
Protestant chaplain at Franklin, advised Muslim inmates,
including plaintiff, that they would need to sign a
"Religious Meal Form" in order to attend the Eid-Ul-
Adha festival, to be held on October 18, 2014. (Dep. at 27).
Plaintiff was one of several inmates who refused to sign
the form. (Dkt. No. 53-8, "Smith Decl." ¶¶ 2-3).

On October 15, 2014, defendant Wilder, a Catholic
chaplain at Franklin who held the position of Facility
Coordinating Chaplain, met with plaintiff individually.
(Dkt. No. 53-7, "Wilder Decl." ¶ 2). During this meeting,
defendant Wilder explained that DOCCS policy required
that any inmate who wished to participate in a religious

meal was required to sign the Religious Meal Form. (*Id.*) Because the Eid-Ul-Adha festival included a meal component, plaintiff was required to sign the form in order to attend. (Wilder Decl. ¶ 2).

Plaintiff again refused to sign the Religious Meal Form, and provided several reasons why he deemed the form incompatible with his Muslim faith. (Dep. at 33, 45). He noted that one version of the form referenced a "Kosher diet," and a different version of the form referenced a "Cold Alternative Diet." (Dep. at 30, 80; Wilder Decl. Ex. F; Dkt. No. 53-1, at 91). Neither of these diets was a mandatory part of his Muslim faith. (Dep. at 80). In addition, plaintiff argued that DOCCS did not provide any regular "diet" for practicing Muslims, so there was no need for him to sign the form for a single festival, where much of the food was purchased with inmate funds. (Dep. at 46-48). At his deposition, plaintiff also insisted that DOCCS already had a list of Muslim inmates who would attend, and that the previous imam had not used the Religious Meal Form. (Dep. at 30-32).

Defendants contend that the Religious Meal Form was used for all faith groups, and that any inmate who refused to sign the form was prohibited from attending religious events that included a meal, regardless of their particular religious affiliation. (Wilder Decl. ¶ 4). This contention is consistent with the language of the form itself. Despite some potentially confusing references to Kosher meals and the Cold Alternative Diet, the forms submitted with the record herein are not limited to specific religious affiliations. For example, both Religious Meal Forms state that "You are requesting permission to participate in a religious meal for your registered religion of record." (Dkt. No. 53-1, at CM/ECF pp. 58, 91). At the bottom of the form, the inmate is instructed to confirm that "I have read and understand the requirements for participation in the Religious Diet/ Menu program. I would like to participate as indicated by checking the appropriate line below." (*Id.*) The first option allows registration for either the Kosher Diet or the Cold Alternative Diet, depending on the form. (*Id.*) The second option, on both versions of the form, is for

> ALL other Department approved religious diets/menus that are available for my religion of record. I have notified the Coordinating

> Chaplain or their designee of my desire to participate in accordance with local facility policies. Since I have requested this menu/diet, if I fail to comply with the terms, I may be subject to removal.

(*Id.*) (emphasis in original).

Citing plaintiff's refusal to sign the Religious Meal Form, defendant Wilder decided that plaintiff could not attend the Eid-Ul-Adha festival. (Wilder Decl. ¶¶ 2-3). On the day of the festival, plaintiff attempted to attend, but was refused entry because he had not signed the Religious Meal Form. (Dkt. No. 53-2 at CM/ECF p. 9, "LaClair Decl.," Ex A; Dep. at 31).

**B. Ramadan 2015**

**\*3** At the end of 2014, defendant Qusay Qubaisy, an Imam, became the Muslim Chaplain at Franklin. (Dkt. No. 53-4, "Qubaisy Decl." ¶ 1). He held that position until November 10, 2016, when he was reassigned to a different facility. (*Id.*) In 2015, the Muslim holy month of Ramadan commenced on June 18, 2015. (Dkt. No. 53-1, at CM/ECF p. 5, Qubaisy Decl., Ex. A). Beginning on or about January 2015, defendant Qubaisy made regular announcements at Franklin that all Muslim inmates interested in participating in Ramadan had to sign up by May 4, 2015. (Quabaisy Decl. ¶ 4). This announcement was consistent with a DOCCS policy requiring 45 days notice to allow for adequate preparation of group religious activities, as outlined in a January 14, 2015 memorandum that was allegedly posted in each housing unit at Franklin. (LaClair Decl. ¶ 12). Plaintiff denies that the memorandum was ever posted in his housing unit, but does not dispute that he was aware of defendant Qubaisy's announcement. (Dkt. No. 59, "Pl.'s Statement of Material Facts" ¶ 43-47).

On June 15, 2015, plaintiff submitted a letter to defendant Qubaisy, asking to be placed on the list of Ramadan participants. (Qubaisy Decl. ¶ 4; Dep. at 70). That same day, defendant Wilder denied plaintiff's request to participate in Ramadan, because he had missed the May 4, 2015 registration deadline. (Dep. at 70; Dkt. No. 53-1 at CM/ECF p. 36).

**C. Ramadan 2016**

On March 26, 2016, plaintiff signed a Religious Meal Form, and initialed the section confirming his request to participate in "All other Department approved religious diets/menus that are available for my religion of record." (Dkt. No. 1-1, at CM/ECF p. 41; Dkt No. 53-1. at CM/ECF p. 58). This same section warns that an inmate who fails to comply with the applicable requirements may be removed from participation. (*Id.*) Plaintiff also made a timely request to participate in Ramadan activities.[3]

In 2016, the holy month of Ramadan began on June 6. (Dkt. No. 1-1, at CM/ECF p. 49; Dkt. No. 53-1, at CM/ECF p. 66). Plaintiff attended group activities for the first ten days of Ramadan, but testified that some other inmates did not take the holy month seriously, and they distracted from what was "supposed to be a religious atmosphere." (Dep. at 116). He chose to stay in his housing unit, and he did not participate in the Ramadan meals on several days. (*Id.*) Instead, plaintiff fasted on his own, and prepared his own meals. (Dep. at 116-17). After plaintiff missed the group meal on June 16, 2016, he was called to defendant Wilder's office for counseling. (Dep. at 117). Defendant Wilder reminded plaintiff of his obligation to attend and the potential consequences of not attending the meals. (Wilder Decl. at 7). He was also advised that if he missed a religious meal "through no fault of [his] own," he should "submit a written notice to the Food Service Administrator and the Coordinating Chaplain immediately outlining the reason the meal(s) was missed." (Dkt. No. 53-7, at CM/ECF p. 37, Wilder Decl., Ex. G). Plaintiff refused to sign the form acknowledging that he had received this counseling. (Dep. at 118).

Plaintiff also missed Ramadan meals held between June 19 and 22, 2016. (Dep. at 116). Each missed meal subjected plaintiff to an increasing scale of penalties, which ultimately resulted in "removal" from religious meals for sixty days as of June 28, 2016. (Dkt. No. 53-7, at CM/ECF p. 39; Wilder Decl., Ex. H). Defendant Wilder prepared a memorandum advising plaintiff of this removal, which also advised that "[t]his does not remove you from participation in Ramadan, but excludes you from receiving the Ramadan Meal." (*Id.*) This removal prevented plaintiff from receiving Ramadan meals for the remainder of the holy month. He was permitted to reapply for permission on August 26, 2016, but did not do so.

(Dep. at 123). He was subsequently transferred to other DOCCS facilities, before being released from DOCCS custody on January 9, 2018. (Dkt. Nos. 46, 52, 68).

## II. Summary Judgment

**\*4** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56*; *Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006)*. "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)*.

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord, 467 F.3d at 273*. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*. However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)*; *Salahuddin v. Goord, 467 F.3d at 272*.

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), *42 U.S.C. § 1997e(a)*, requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano*

*v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) ). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint*, 660 F.Supp.2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8. Complaints of harassment are handled by an expedited procedure which provides that such grievances are forwarded directly to the superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

*5 Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004) ). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, —— U.S. ——, 136 S.Ct. 1850, 1857, 195 L.Ed.2d 117 (June 6, 2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, 656 Fed.Appx. 577, 580 (2d Cir. 2016) (quoting *Ross*, —— U.S. ——, 136 S.Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill*—availability and estoppel—are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, —— U.S. ——, 136 S.Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See also Riles*, 2016 WL 4572321 at *2, 656 Fed.Appx. 577. Defendants bear the burden of proving the affirmative defense of failure to exhaust. *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016).

### B. Application

The parties agree that plaintiff exhausted his administrative remedies with respect to the Eid-Ul-Adha Festival in 2014, and the observance of Ramadan in 2015. (Def. Statement of Material Facts ¶¶ 27-42, 62-70; Pl.'s Statement of Material Facts ¶¶ 27-42, 62-70). Plaintiff concedes that he did not file a grievance related to Ramadan 2016, but argues that no grievance was necessary, or would be futile, because he had already raised concerns about the Religious Meal Form in his 2014 and 2015 grievances. (Pl.'s Statement of Material Facts ¶ 83; Dep. at 130) This court finds plaintiff's argument unpersuasive, and recommends that defendants be granted summary judgment as to plaintiff's claims

arising from the alleged unconstitutional interference with his observance of Ramadan 2016.

The Second Circuit has held that an earlier grievance may be sufficient to exhaust an inmate's administrative remedies with respect to the continuing infringement of his rights, but that exception "is necessarily limited to cases in which a prior grievance identifies a specific and continuing complaint that ultimately becomes the basis for a lawsuit." *Johnson v. Killian*, 680 F.3d 234, 239 (2d Cir. 2012). In *Johnson*, the Second Circuit held that an inmate plaintiff had exhausted his administrative remedies when he filed, and exhausted, a grievance in 2005 challenging the facility's prayer policies. *Id.* at 236-237. After the grievance was filed, the facility ceased enforcing the relevant policy. *Id.* at 237. In 2007, a new warden was appointed, and the challenged policy was reimplemented and consistently enforced. *Id.* The *Johnson* plaintiff filed a complaint without exhausting his administrative remedies regarding the re-implementation of the challenged policy. *Id.* The Second Circuit held that plaintiff sufficiently complied with the exhaustion requirement by challenging the identical policy in 2005, notwithstanding a "different set of circumstances" in 2007. *Id.* at 238-39. The court held that "the issue that Johnson would have raised in 2007—the inadequacy of the spaces and times allotted for congregational prayer—was *identical* to the issue he exhausted in 2005." *Id.* at 239.

**\*6**  In this case, plaintiff filed a 2014 grievance claiming that the Religious Meal Form was an unconstitutional procedural requirement for his attendance at the Eid-Ul-Adha festival. (Dkt. No. 53-1, at CM/ECF pp. 80-85). In 2015, he filed a grievance regarding the registration deadline for Ramadan, and expressed his belief that he was being penalized for refusing to sign the Religious Meal Form. (Dkt. No. 53-1, at CM/ECF p. 113). In 2016, he signed the Religious Meal Form, but was penalized when he stopped attending group Ramadan meals and refused to take part in counseling. (Dkt. No. 53-7, at CM/ECF p. 39; Wilder Decl., Ex. H) Although hypothetical enforcement concerns may have been part of plaintiff's motivation at the time that he filed his 2014 and 2015 grievances, he has not demonstrated that the issues raised are identical with the claims that arose in 2016. *See White v. Velie*, 709 Fed.Appx. 35, 36 (2d Cir. 2017) (plaintiff's contention that he had previously filed "similar" grievances did not excuse his failure to exhaust). Therefore, plaintiff does not qualify for the

narrow exception described in *Johnson*, and failed to exhaust his administrative remedies. Accordingly, this court recommends that defendants' motion for summary judgment be granted as to all of plaintiff's claims related to Ramadan 2016.

## IV. Personal Involvement

### A. Legal Standard

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds, Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk*, 859 F.Supp.2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F.Supp.2d 803, 815 (S.D.N.Y. 2011) ).

**B. Application**

Defendants have argued that most of the named defendants lack personal involvement with either of plaintiff's two remaining claims, related to the Eid-Ul-Adha festival in 2014 and the observance of Ramadan in 2015. This court will address each of those claims separately.

### 1. Eid-Ul-Adha Festival in 2014

Both parties agree that defendant Wilder made the determinations that plaintiff was prohibited from attending the Eid-Ul-Adha festival in 2014. (Def. Statement of Material Facts ¶ 23; Pl.'s Statement of Material Facts ¶ 23). The parties also agree that defendant Quabaisy was not employed at Franklin in October 2014, when the Eid-Ul-Adha festival took place, and therefore had no personal involvement in the alleged constitutional violations. (Quabaisy Decl. ¶ 2; Dep. at 140). In his response to defendants' motion, plaintiff also apparently concedes that many of the remaining defendants lacked personal involvement with the 2014 determination, stating:

> *7  Plaintiff never stated anywhere in plaintiff's claims that defendants Max Patnode, Deputy Superintendent of Programs, Ronald Foster, Deputy Sup. of Security, Jamie Pellerin,[4] Food Administer [sic], Acting Commissioner Anthony J. Annucci, Imam Quibasy, and Chaplin [sic] Stephen Smith had any involvement in not allowing plaintiff to attend the Eid-Ul-Adha festival that was held on 10-18-14.

(Pl.'s Statement of Material Facts ¶ 25).

In his contemporaneously filed responsive memorandum of law, plaintiff narrows this concession. He agrees that defendants Foster and Annucci should be dismissed from the matter, even though they may have been "aware of the situation." (Dkt. No. 59-1, "Pl.'s Br." at CM/

ECF p. 35). However, plaintiff argues that the remaining defendants had adequate personal involvement in the 2014 determination. (*Id.* at CM/ECF pp. 35-38). Plaintiff described defendant Patnode as the "defendant who has the final say over everything related to the plaintiff's claims ..." (*Id.* at CM/ECF p. 37). He also described defendant Pellerin as "the record keeper" who was involved in "behind the scene" paperwork related to religious meals, and alleges that defendant Smith had adequate personal involvement because he was the first chaplain to request that plaintiff sign the Religious Meal Form. (Dep. at 142; Pl.'s Br. at CM/ECF p. 36). Plaintiff's claim against defendant LaClair is based upon his denial of the October 2014 grievance. (Dep. at 136-37).

Personal involvement requires that the individual who is, or becomes, aware of the violation, have the ability to take action to correct the problem. *See Conklin v. County of Suffolk*, 859 F.Supp.2d at 441-42 (personal involvement requires knowledge and the ability to take action). Plaintiff has alleged that defendants Patnode had a supervisory role and should have been aware of the alleged First Amendment violations, but "mere linkage in the prison chain of command" is insufficient to impose § 1983 liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). Likewise, defendant LaClair's denial of plaintiff's grievance after an investigation, without more, does not give rise to § 1983 liability. *See McClenton v. Menifee*, No. 05 Civ. 2844, 2006 WL 2474872, at *10 (S.D.N.Y. Aug. 22, 2006) ("a supervisor's mere denial of a grievance is insufficient to establish personal involvement; otherwise, senior administrative officials could generally be named as defendants in prison condition cases").

Plaintiff's allegations do not suggest that defendant Pellerin, who coordinated food orders for religious meals, had any role in determining which inmates were eligible to attend those meals. (Pellerin Decl. ¶ 3). Likewise, plaintiff has not alleged that defendant Smith, who provided plaintiff with the Religious Meal Form at defendant Wilder's request, had any role in the decision on whether plaintiff could attend the Eid-Ul-Adha festival. (Smith Decl. ¶¶ 2-3).

Based upon this court's review of the record, plaintiff has adequately alleged personal involvement of defendant Wilder in the 2014 determination. This court recommends that all claims arising from the 2014 Eid-Ul-Adha festival against defendants Annucci, LaClair, Patnode, Qubaisy,

Foster, Pellerin (formerly Stearns), and Smith should be dismissed, for lack of personal involvement.


### 2. Ramadan 2015

**\*8** Plaintiff's claims related to Ramadan 2015 confront a similar lack of personal involvement for most of the defendants. Again, both parties agree that defendant Wilder determined that plaintiff could not participate in Ramadan, because plaintiff had failed to meet the registration deadline. (Def. Statement of Material Facts ¶ 50; Pl.'s Statement of Material Facts ¶ 50). Defendants have not disputed that defendant Qubaisy, who prepared a memorandum advising inmates of the registration requirement and made regular announcements regarding the deadline for Ramadan participation, was involved in the implementation of the policy. (Qubaisy Decl. ¶ 4-5).

As with his prior claim, Plaintiff concedes in his response to this motion that certain defendants played only a supervisory or limited role in the 2015 events:

> Plaintiff never stated anywhere in any of plaintiff's claims that Max Patnode, Deputy Superintendent of Programs, Ronald Foster, Deputy Sup. of Security, Jamie Pellerin, Food Service Administrator, or Acting Commissioner Anthony J. Annucci and Chaplain Stephen Smith denied plaintiff the right to attend the Ramadan Services or put my name on the Ramadan List.

(Pl.'s Statement of Material Facts ¶ 52).

Again, plaintiff retreated from this broad concession in his memorandum of law, but his arguments regarding the 2015 Ramadan observance suffer from similar defects as those related to his 2014 claims. Plaintiff has only alleged respondeat superior liability for defendants Annucci, Foster, Patnode, and LeClair. (Pl.'s Br. at CM/ECF pp. 35-38). Plaintiff has not alleged any actions by defendant Smith with regard to his exclusion from Ramadan in 2015, and only asserts a "record-keeping role" by defendant Pellerin (Pl.'s Br. at 36). As described above,

these allegations are insufficient to support a § 1983 claim against those defendants. Therefore, this court recommends that defendants Annucci, Foster, Patnode, LeClair, Pellerin (formerly Stearns), and Smith be granted summary judgment as to plaintiff's 2015 Ramadan claims. Plaintiff has alleged sufficient personal involvement by defendants Wilder and Qubaisy for the court to consider the substance of the claims against those defendants.


## V. First Amendment Claims [5]

### A. Legal Standards

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) ). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

**\*9** In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349, 107 S.Ct. 2400 (quoting *Turner*, 482 U.S. at 89, 107 S.Ct. 2254). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted). In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-22 (2d Cir. 2014). In *Holland*,

the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The court noted that it has not been decided in this Circuit whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* (citing *Salahuddin, supra* at 274-75,; *Ford, supra* at 592, (where the court assumed without deciding that the substantial burden test applies) ). The court in *Holland* did not decide the issue, rather the court assumed the continued validity of the substantial burden test and analyzed the case accordingly. [6] *Id.* This court will follow the analysis in *Holland* and proceed to consider the First Amendment analysis, assuming that the substantial burden test is still valid. *See also Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016) (discussing the unsettled status of the substantial burden test).

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiffs to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

## B. Application

### 1. Eid-Ul-Adha Festival in 2014

For purposes of this motion only, defendants have not disputed that plaintiff has a sincerely held religious belief in his Islamic faith, and in the observance of religious holidays. (Dkt. No. 53-11, Def. Br. at CM/ECF p. 12). Rather, defendants contend that the requirement that plaintiff sign a Religious Meal Form prior to participating in the Eid-Ul-Adha festival was not a substantial burden on his religion. Defendants note that plaintiff was able to pray on his own even though he was excluded from the festival. (Wilder Decl. ¶ 2; Dep. at 69).

This court agrees with defendants that the Religious Meal Form did not impose a substantial burden on plaintiff's religion, even if Franklin officials had previously not required inmates to sign the form to attend previous religious festivals. Construing all of plaintiff's submissions liberally and drawing all reasonable inferences in plaintiff's favor, plaintiff has alleged that he was excluded from the festival solely because he refused to sign the Religious Meal Form. In short, plaintiff's refusal to register for meals associated with his religious faith resulted in his exclusion.

**\*10** The Second Circuit has held that similar registration requirements before an inmate is eligible to fully practice their religious faith "entail[ ] only a modest act of commitment...." *See Jackson–Bey v. Hansimaier*, 115 F.3d 1091, 1096-97 (2d Cir. 1997). Plaintiff's contention that the limited references on the Religious Meal Form to a Kosher meal or the Cold Alternative Diet force him to agree to meal restrictions that violate his religion are unfounded. Although the Religious Meal Form is not a model of clarity, [7] it only requires an inmate to register "to participate in a religious meal for your registered religion of record." Indeed, plaintiff has not alleged any facts that would suggest that he was forced to alter or abandon his religious affiliation or practices as a result of the form. The Religious Meal Form "is, at best, an inconvenience, but does not rise to the level of a burden" on plaintiff's First Amendment rights. *See Spavone v. City of New York*, 420 F.Supp.2d 236, 240 (S.D.N.Y. 2005) (plaintiff was not substantially burdened by policy that permitted inmates to only participate in one religion); *see also Jones v. Annucci*, No. 16-CV-3516 (KMK), 2018 WL 910594 (S.D.N.Y. February 14, 2018) (plaintiff's First Amendment rights were not substantially burdened when Muslim inmate was required to register as "Shia" in order to attend certain religious festivals).

Plaintiff's exclusion from the religious festival was a result of his own decision not to sign the Religious Meal Form, rather than an arbitrary decision by defendant Wilder. *See Jean Laurent v. Los*, No. 12-CV-132S(F), 2015 WL 1045383, at *7 (W.D.N.Y. March 9, 2015) (finding no substantial burden when inmate was not allowed to re-enter Ramadan service after voluntarily leaving to visit prison law library). Therefore, this court recommends that defendant Wilder be granted summary judgment as to plaintiff's First Amendment claim that

plaintiff's exclusion from the Eid-Ul-Adha festival for refusing to sign the Religious Meal Form violated his First Amendment rights.

Even if plaintiff had demonstrated a substantial burden, summary judgment in favor of defendants would still be appropriate. Registration requirements such as the Religious Meal Form have a valid penological purpose. In upholding the requirement that an inmate formally declare his religious affiliation, the Second Circuit explained:

> Registration eliminates speculation and guesswork on the part of prison officials and makes it less likely that a prisoner will manipulate the system by asserting various religions at different times. Registration also allows prison officials to gauge the interest in any particular religion on the part of the inmate population and thus decide whether a "congregation" should be allowed. Registration puts the institution on notice that certain religious accommodations will likely be sought and thereby provides the institution with time to consider if and how to implement them. This, in turn, makes such accommodations more likely and thereby reduces the circumstances in which judicial intervention will be needed. In short, registration places, at most, a slight burden on an inmate's right to religious freedom while serving as an important and beneficial "bright line" that enables prison officials to ascertain the seriousness of the inmate's religious commitment and respond accordingly.

*Jackson–Bey*, 115 F.3d at 1097.

Defendants have offered a similar justification in this case. Defendant Wilder justified the need for the Religious Meal Form as a means "to confirm the number of participants in the meal portion of any holiday, holy day, event, or festival, which is necessary to confirm the proper amount of food is ordered and prepared." (Wilder Decl. ¶ 4). Defendant Pellerin, the Food Service Administrator at Franklin, explained that she relied upon the list of participants "to order and/or prepare the number of meals for any particular special event, holy day, celebration or religious holiday for any faith, as applicable." (Pellerin Decl. ¶ 4). Plaintiff has not demonstrated that these justifications are irrational. Therefore, even if plaintiff had shown that the Religious Meal Form imposed a substantial burden, summary judgment for defendant Wilder would still be appropriate.

### 2. Ramadan 2015

**\*11** DOCCS policy states that "Chaplains shall notify each religious community of upcoming celebrations along with a deadline to sign up to participate." (LaClair Decl. ¶ 12; LaClair Decl., Ex. B). In accordance with that policy, defendant Qubaisy notified inmates interested in participating in Ramadan that they must register no later than 45 days in advance of the holy month. (Qubaisy Decl. ¶ 4). Therefore, inmate requests to participate in Ramadan had to be submitted by May 4, 2015. (*Id.*) Plaintiff contends that he sent a letter to defendant Qubaisy on May 7, 2015, and again on June 15, 2015, requesting to participate in Ramadan services. (Compl. at CM/ECF pp. 5-6; Dep. at 74). Both of these requests came after the deadline had expired.

The "modest act of commitment" imposed by the forty-five day registration period does not rise to the level of a substantial burden on plaintiff's free exercise of his religion. *See Jackson Bey*, 115 F.3d at 1096. Plaintiff has not alleged that defendants Wilder or Qubaisy prevented him from submitting a timely request to attend. Instead, he argues that the 45 day deadline did not apply to the Muslim faith, and that Muslim inmates only had to register "for Ramadan about two to three weeks before Ramadan starts." (Pl.'s Statement of Material Facts ¶ 43). These assertions are contradicted by the record. Plaintiff also asserts that defendant Wilder only prohibited him from participating in Ramadan 2015 because plaintiff had refused to sign the Religious Meal Form. He offers no support for this assertion.

Even if enforcement of the established forty-five day deadline imposed a substantial burden on plaintiff's religious exercise rights, summary judgment would be appropriate. *See Rush v. Malin*, No. 15-CV-3103, 2017 WL 2817080, at *3 (S.D.N.Y. June 29, 2017) (requirement that request to hold religious event be submitted forty-five days prior to event was reasonably related to legitimate penological interests, and did not violate the constitution). Defendants have offered a variety of valid penological interests for imposing the forty-five day registration requirement. The advance notice generally allows the facility to designate sufficient space for events, to ascertain the correct number of security personnel to be present, and, when applicable, to determine the amount of food to be ordered and prepared. (Wilder Decl. ¶ 9; Qubaisy Decl. ¶ 4; Pellerin Decl. ¶ 7). The record shows that Franklin officials must coordinate a wide variety of different religious celebrations throughout the calendar year, with varying logistical requirements. (Dkt. No. 53-1, at CM/ECF pp. 94, 116-117). In the case of Ramadan, the advance notice allows the facility to prepare and deliver the correct number of pre-dawn Sahoor meal bags for Muslim inmates who are breaking their daily fast. (Wilder Decl. ¶ 9; Pellerin Decl. ¶ 7). Plaintiff's speculative conclusion that the advance notice is not actually necessary for Ramadan is unsupported by the record. (Dep. at 98). Therefore, this court recommends that defendants Wilder and Qubaisy be granted summary judgment as to plaintiff's First Amendment claim that plaintiff's exclusion from Ramadan 2015 violated his First Amendment rights.

## VI. Religious Land Use and Institutionalized Persons Act

### A. Legal Standard
RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

**\*12** 42 U.S.C. § 2000cc-1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial. [8] *Marria v. Broaddus*, 200 F.Supp.2d 280, 297 (S.D.N.Y. 2002) (citing 42 U.S.C. § 2000cc-2(b) ). The burden then shifts to the government to show that the burden furthers a compelling governmental interest *and* that it is the *least restrictive* means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh v. Goord*, 520 F.Supp.2d 487, 498 (S.D.N.Y. 2007) (citing, *inter alia, Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ). Inconvenience alone is insufficient to establish a substantial burden. *Id.* (citing *Westchester Day School v. Village of Mamaroneck*, 379 F.Supp.2d 550, 557 (S.D.N.Y. 2005) ). Furthermore, the substantial burden test presupposes that some inconveniences may be so minor that they do not amount to a violation. *See McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004) (discussing in a footnote the applicability of the "time-honored maxim '*de minimis non curat lex*' "). However, the court should not attempt to engage in resolving disputes as to whether a particular practice is "central" or "mandatory" to a particular religion in determining whether a burden was substantial. *See Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (discussing First Amendment protections).

### B. Application
To the extent that plaintiff asserts RLUIPA claims against defendants Wilder or Qubaisy in either their individual or official capacities, the claims should also be dismissed. Plaintiff only seeks monetary relief in his complaint. (Dkt. No. 1, at CM/ECF p. 11). RLUIPA does not authorize claims for money damages against state officers in either their individual or official capacities. *Holland*, 758 F.3d at 224. Even if plaintiff had sought injunctive relief against the defendants in their official capacities, plaintiff is no longer incarcerated at Franklin, and is currently released on parole. (Dkt. No. 46, 52, 68). His transfer to another facility mooted claims for declaratory or injunctive relief against Franklin officials. *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011) (citing *Salahuddin v. Goord*, 467

F.3d 263, 272 (2d Cir. 2006) ); *see also Wright v. New York State DOCCS,* 568 Fed.Appx. 53, 55 (2d Cir. 2014); *Wood v. Captain Colon,* No. 3:13-CV-1467, 2016 WL 2930882, at *3 (D. Conn. May 18, 2016). Further, because plaintiff is no longer incarcerated, any injunctive relief related to broader DOCCS policy would also be moot. *See Pugh v. Goord,* 571 F.Supp.2d 477, 499 (S.D.N.Y. 2008) ("[w]here a prisoner has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot") (citations omitted). Thus, the entire complaint may be dismissed.[9]

**\*13 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 53) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2018 WL 2729259

Footnotes

1    The pleadings include alternate spellings for this holiday of "Eidul Adha" and "Eid-Ul Adha." but this court will adopt the spelling used by plaintiff in his complaint. (Compl. at CM/ECF p. 5). Despite the various spellings, all of the parties are referring to the same Muslim festival commemorating Abraham's willingness to obey God's command to sacrifice his son.

2    The deposition transcript is attached as Exhibit 17 to the September 29, 2017 Declaration of John F. Moore. Subsequent references will be to the original pagination of the deposition transcript. (Dkt. No. 53-1).

3    Plaintiff testified that he notified defendant Qubaisy to add his name to the list of Ramadan participants. (Dep. at 110).

4    Defendant Pellerin is identified in the docket as "J. Stearns," which was her last name in 2014 and 2015. (Dkt. No. 53-6, Pellerin Decl. ¶ 2).

5    Plaintiff briefly referenced Eighth Amendment deliberate indifference and Fourteenth Amendment due process claims in his complaint. (Compl. at 11). At his deposition, plaintiff testified that his Eighth Amendment claim arose "when they denied me the right to participate in my festival, of 2014 and they denied me the right to participate in the whole Ramadan of 2015." (Dep. at 145). He also testified that "[t]he due process right is to participate in ... my festivals, without the stress that they put me through." (Dep. at 146). These are duplicative of his religious exercise claims. Therefore, this court will address only plaintiff's First Amendment and RLUIPA claims in this report. To the extent that plaintiff has alluded to any other constitutional or statutory claims, this court recommends dismissal of those claims.

6    This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland,* 758 F.3d at 221.

7    In its October 28, 2014 denial of plaintiff's grievance, the IGRC recommended that the Religious Meal Form be revised to clarify the distinction between religious meals and the daily CAD diet. (Dkt. No. 53-1, at 87).

8    RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

9    Defendants also argued that summary judgment was appropriate on qualified immunity grounds. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because this court has found that the defendants have not violated the plaintiff's rights in the first instance, it need not reach the issue of whether a reasonable person would have known of the violation.

2015 WL 769551
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Randolph ROSSI, Plaintiff,
v.
Brian FISHCER, et al., Defendants.

No. 13–cv–3167 (PKC)(DF).
|
Signed Feb. 24, 2015.

*MEMORANDUM AND ORDER*

CASTEL, District Judge.

**\*1** Plaintiff Randolph Rossi, proceeding *pro se,* brings this action against officials of the New York State Department of Corrections and Community Supervision ("DOCCS"). In his Amended Complaint, plaintiff alleges that defendants violated, and continue to violate, his constitutional rights by denying him the right to freely practice his Rastafarian faith while incarcerated. He brings an action asserting violations of the First and Fourteenth Amendments and affirmatively disaffirms any claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Defendants move to dismiss the Amended Complaint for failure to exhaust claims under the Prisoner Litigation Reform Act ("PLRA"), failure to state a claim under the Free Exercise Clause, failure to meet the standards for injunctive relief, lack of personal involvement of certain defendants, and qualified immunity.

For the reasons stated below, the motion to dismiss is granted in part and denied in part. Plaintiff exhausted his administrative remedies as to certain claims and exhaustion is excused as to others. Certain allegations state a claim for relief, but plaintiff fails to plausibly allege a violation under the Free Exercise Clause, Establishment Clause, or Equal Protection Clause with regard to other claims. Defendants' motion to dismiss for lack of personal involvement fails. Finally, defendants have not demonstrated entitlement to qualified immunity at the pleading stage.

**BACKGROUND**

Plaintiff Rossi is a practicing Nyahbinghi Rastafarian currently incarcerated at the Woodbourne Correctional Facility, maintained by DOCCS. (*See* Amended Complaint ("Am.Compl."), ¶ 3.) He brings this action against the following employees of DOCCS: Brian Fischer, [1] Commissioner of DOCCS; Catherine Jacobsen, Acting Deputy Commissioner for Program Services; Jeff McKoy, [2] Deputy Commissioner for Program Services; Cheryl Morris, Director for Ministerial, Family, and Volunteer Services; Mark Leonard, Director of Ministerial Family and Volunteer Services; Robert Cunningham, Superintendent for the Woodbourne Correctional Facility; Moses Santiago, Coordinating Chaplain; and Dorothy Davis, Drug Counselor at Woodbourne. (*Id.* ¶¶ 4–11.) Plaintiff asserts that defendants Fischer, Jacobsen, McKoy, Morris, Leonard, and Cunningham "are responsible for all rules, policies, regulations, and directives governing the religious rights of prisoners under their care and custody." (*Id* ¶ 13.) He claims that "[d]efendants have denied plaintiff his right to practice his faith in accordance with the traditions, customs, and tenets of Rastafari." (*Id.*)

First, plaintiff claims that he has been denied his right to celebrate, in a manner consistent with his faith, the holy days of April 21, May 25, August 17, and October 7. (*Id.* ¶¶ 15–18.) Specifically, plaintiff requests that these four Rastafari holy days be added to the religious calendar with designations that permit plaintiff to (a) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. [3] (*Id.;* Hearing before Magistrate Judge Debra Freeman, July 8–9, 2014 ("July Tr."), pp. 82–83.) Plaintiff further requests that April 21 and August 17 be designated as "family events." [4] (Am. Compl., ¶ 16; July Tr., p. 82.) During the pendency of plaintiff's motion, DOCCS added all of the holy days at issue to its "Religious Holy Day Calendar," with varying limitations regarding how each day may be observed. (Religious Holy Day Calendar, Revised July 29, 2014 ("Revised Calendar"), p. 25 (Dkt.82–1).) The revised DOCCS calendar, which was submitted to Magistrate Judge Freeman on the preliminary injunction motion, allows members of the Rastafari faith to be exempt from work and programming, attend a worship service, and share a holy day meal on August 17 and October 7. (*Id.*) For April 21, DOCCS only permits a congregate worship

2015 WL 769551

service and for May 25, DOCCS does not authorize any of these three designations. (*Id.*) The revised calendar does not designate any of the four holy days at issue as "family events." (*Id.*)

**\*2** Second, plaintiff claims that defendants have denied him the right to add food items to the holy day meal menu, giving the "Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community," in violation of the First and Fourteenth Amendments. (*Id.* ¶¶ 27, A.9.)

Third, plaintiff alleges that Rastafarians at Woodbourne are forced to hold congregate worship services on Wednesdays instead of Fridays, the day of worship Rastafarians traditionally observe. (*Id.* ¶ 26.) Defendant Cunningham denied plaintiff's grievance on the basis that "there was no room available for Rastafarians to conduct congregate worship on Fridays." (*Id.*)

Fourth, plaintiff claims that defendants have denied him the right to wear the Rastafarian religious turban brought to him by his wife. [5] (*Id.* ¶¶ 20–22.) After wearing the turban his wife sent him for two months, a correction sergeant told plaintiff that he was no longer permitted to wear the headgear. (*Id.* ¶ 20.) The sergeant told plaintiff that according to defendant Santiago, the Coordinating Chaplain, the only religious headgear for Rastafarians was a Tsalot Kob. (*Id.* ¶ 21.) Plaintiff asserts that the Tsalot Kob is "restricted to members of the Ba Beta Kristiyan Church of Haile Selassie I (a Christianized House or Mansion within Rastafari)," and does not apply to the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion." (*Id.* ¶¶ 3; 20–21.) At no time did defendant Santiago speak to plaintiff to determine the religious significance of his turban. (*Id.* ¶ 22.) Plaintiff complied with the sergeant's order to mail home his turban, and subsequently filed a grievance that was denied by defendant Cunningham. (*Id.* ¶¶ 21–22.)

Fifth, plaintiff challenges Directive 4760, which requires religious groups engaging in fundraising activities to apply for Special Purpose Organization ("SPO") status. (*Id.* ¶ 23.) He explains that SPO status subjects religious groups to the same mandates as non-religious inmate organizations, including the requirement that each organization surrender half of the funds it raises to the Inmate Occupational Therapy Fund ("IOTF") for the benefit of the general inmate population. (*Id.*) Plaintiff challenges this requirement, as it applies to Rastafarians, because he claims it has "the effect of a tax on religion" and burdens the Rastafarians' ability to purchase necessary materials for congregate services, religious classes, and holy day celebrations. (*Id.* ¶ 24.)

Sixth, plaintiff claims that defendants violated his First and Fourteenth Amendment rights when they denied his request to gain access to spiritual and religious advisers (*Id.* ¶¶ 19, A(7) .) Defendant Morris denied plaintiff's request for advisers on security grounds, and defendant McKoy upheld Morris's determination after plaintiff sent McKoy a letter seeking intervention. (*Id.* ¶ 19.) Plaintiff claims that "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (*Id.*)

**\*3** Finally, plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (*Id.* ¶ 28.) Davis asked plaintiff in an interview about the "ritual use of marijuana within the Rastafarian faith." (*Id.*) "When plaintiff responded to defendant's request, defendant Davis put in her report that plaintiff admitted using marijuana for religious rituals only," despite the fact that plaintiff claims he "denied ever using substances whatsoever," including marijuana. (*Id.*)

Plaintiff seeks declaratory, injunctive, and monetary relief, including compensatory and punitive damages. (*Id.* ¶¶ A–C.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on May 8, 2013 (Dkt.2), and filed an Amended Complaint on November 19, 2013. (Dkt.11.) Plaintiff moved for a preliminary injunction to enjoin defendants "from continuing to enforce the policies being challenged in this proceeding." (Dkt.17.) Magistrate Judge Debra Freeman, to whom the preliminary injunction motion was referred to hear and report, bifurcated plaintiff's motion on the basis of the temporal proximity of the relief sought. Magistrate Judge Freeman issued a Report and Recommendation ("R & R") as to plaintiff's ability to celebrate April 21 as a holy day (Dkt.27), and a Supplemental R & R, reexamining some

of the issues regarding April 21 and addressing the remaining claims raised by plaintiff's motion. (Dkt.89.) The Court adopted both the R & R (Dkt.37) and the Supplemental R & R. (Dkt.103.) Plaintiff's motion was granted, to the extent that defendants were mandatorily enjoined, pending judgment on the merits, to: (1) permit plaintiff to wear a Rastafari religious turban; (2) allow plaintiff to observe all four of the Rastafari holy days at issue in his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafarian inmates; and (3) provide space for Rastafari Sabbath worship services on Friday afternoons, or, at least, pending the final resolution of the case on its merits, to provide an alternative accommodation for such services on Friday evenings. (Order Adopting Supp. R & R.)

Defendants now move to dismiss plaintiff's Amended Complaint in its entirety. (Dkt.56.)

## LEGAL STANDARD FOR MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555). In considering a Rule 12(b) (6) motion to dismiss, all non-conclusory factual allegations are accepted as true, *see id.* at 678–79, and all reasonable inferences are drawn in favor of the plaintiff. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, plaintiff's *pro se* pleadings are given a liberal and generous construction and are read "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

## DISCUSSION

### I. Exhaustion of Administrative Remedies

**\*4** The exhaustion requirement of the Prison Litigation Reform Act ("PLRA") "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is mandatory before an action is commenced. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter,* 534 U.S. at 532. The Second Circuit indicated in *Neal,* that "[s]ubsequent exhaustion after suit is filed ... is insufficient" to satisfy the PLRA. *Id.*

While the PLRA's exhaustion requirement is "mandatory," *Woodford v. Ngo,* 548 U.S. 81, 85 (2006), certain caveats apply. *See Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir.2004). A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not available; (2) defendants forfeited their affirmative defense of non-exhaustion by failing to raise or preserve it or are estopped from raising non-exhaustion because their own actions inhibited the inmate from exhausting his claims; or (3) "special circumstances" have been plausibly alleged that justify the prisoner's failure to comply with the exhaustion requirements.[6] *Id.*

"A court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (alterations omitted) (quoting *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999)). Courts must look at the applicable set of grievance procedures when determining the availability of an administrative remedy. *Id.* Plaintiff, as an inmates of a New York State correctional facility, is subject to a three-step, administrative procedure for inmate grievances called the Inmate Grievance Program ("IGP"). *See* 7 N.Y.Codes R. & Reg. ("N.Y.C .R.R.") § 701.5. The first step in the IGP is to file a grievance with the Inmate Grievance Resolution Committee (the "IGRC"). *Id .* § 701.5(b). After receiving a response from the IGRC, an inmate has seven calendar days in which to appeal to the superintendent. *Id.* § 701.5(c). Within seven calendar days of receiving a response from the superintendent, the inmate then must appeal to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The CORC is required to render a decision on each appeal and transmit its decision within 30 calendar days from the time the appeal was received. *Id.*

A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative

remedy unavailable for purposes of exhaustion. *See Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998). While the Second Circuit has not directly addressed this issue, it has treated the decision cited above favorably. *See Hemphill,* 380 F.3d at 686 n. 6 (citing to the cases above and noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004) (citing favorably to *Underwood* and *Foulk* with regard to availability of administrative remedies). The Second Circuit in *Abney* cited to *Hemphill* for the proposition that "exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance ." 380 F.3d at 667.

**\*5** Judges in this district, including the undersigned, have also agreed with the proposition that administrative remedies may be deemed unavailable when the prison fails to timely respond to a grievance. *See Peoples v. Fischer,* 11–cv–2694 (SAS), 2012 WL 1575302, at \*6 (S.D.N.Y. May 3, 2012) *on reconsideration in part,* 898 F.Supp.2d 618 (S.D.N.Y.2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination." (alterations, internal quotation marks, and citation omitted)); *Manos v. Decker,* 03–cv–2370 (PKC), 2005 WL 545215, at \*4 (S.D.N.Y. Mar. 7, 2005) (asserting that *Abney* "held in part that administrative remedies are unavailable when prison officials fail to respond to grievances within the time period prescribed by regulation"); *Dimick v. Baruffo,* 02–cv–2151 (LMM), 2003 WL 660826, at \*4 (S.D.N.Y. Feb. 28, 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). *But see Bennett v. Wesley,* 11–cv–8715 (JMF), 2013 WL 1798001, at \*6 (S.D.N.Y. Apr. 29, 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability." (alterations omitted) (quoting *Mateo v. O'Connor,* 10–cv–8426 (LAP), 2012 WL 1075830, at \*7 (S.D.N.Y. Mar. 29, 2012)); *Rivera v. Anna M. Kross Ctr.,*

10–cv–8696 (RJH), 2012 WL 383941, at \*4–5 (S.D.N.Y. Feb. 7, 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.)

Here, defendants argue that some of plaintiff's claims were not exhausted before plaintiff brought this action. (Def. Memo in Support of Motion to Dismiss ("Def.MTD"), pp. 46.) Defendants show that CORC's decision regarding plaintiff's appeal of his May 2013 grievance was issued after the filing of both the original Compliant and the Amended Complaint. (*Id.* at 5.) The original Complaint was filed on May 8, 2013, the Amended Complaint was filed on November 19, 2013, and CORC's decision regarding plaintiff's appeal was not issued until December 18, 2013. (*Id.*) Defendants, however, overlook two important points. First, plaintiff exhausted some of his claims through grievances filed prior to his May 2013 grievance. Second, in regard to the May 2013 grievance, the CORC failed to issue a decision within the 30 day limit set by the IGP, rendering the administrative remedies unavailable to plaintiff.

Plaintiff's original Complaint sought to enjoin defendants from (1) prohibiting the wearing of his religious turban, (2) prohibiting his celebration of certain religious holy days in a manner consistent with his beliefs, and (3) collecting half of the funds raised by the Rastafari inmate organization. Each of these claims was properly raised and exhausted through grievances filed on June 17, 2009, September 12, 2011, and March 14, 2012. (*See* Hehenberger Decl. Ex. B & D (Dkt.58.)) The CORC issued a decision regarding the June 2009 grievance on August 5, 2009, ruled on the September 2011 grievance on January 4, 2012, and rendered a decision on the March 2012 grievance on September 5, 2012. (*Id.*) The original Complaint was filed eight months after the resolution of the lattermost grievance at issue.

**\*6** Plaintiff's Amended Complaint, filed on November 19, 2013, seeks additional relief, including: (1) the addition of October 7 to the religious calendar with various designations; (2) that Rastafari congregate worship be moved to Fridays; (3) that defendants be prohibited from making the menu for holy day meals mandatory; (4) that defendants' failure to provide plaintiff with access to Rastafarian advisers be deemed a constitutional violation; and (5) for the removal of information

regarding marijuana use from plaintiff's institutional records. Plaintiff filed a grievance that included these additional claims on May 29, 2013. (*Id.* at Ex. C .) After receiving a response from both the IGRC and the superintendent, plaintiff appealed the superintendent's decision to CORC on July 26, 2013. (*Id.*) More than four months passed between the appeal and CORC's decision, issued on December 18, 2013, which is far longer than the 30 day deadline explicitly set forth in the IGP process. (*Id.*) Had the CORC provided a timely response to plaintiff's appeal, plaintiff would have received a response prior to filing the Amended Complaint. Plaintiff "should not be penalized for the CORC's failure to timely respond, especially where the eventual response denied the requested relief." [7] *Peoples,* 2012 WL 1575302, at *9 n. 125. Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate. Defendants' motion to dismiss on this ground is denied.

## II. The Free Exercise Clause

### 1. Legal Standard

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). A prisoner's right to exercise his religion is not absolute and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)). Accordingly, free exercise claims of prisoners are judged " 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests.' " *Salahuddin v. Goord,* 467 F .3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." [8] *Salahuddin,* 467 F.3d at 274–75. "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that

justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (alterations and internal quotation marks omitted).

**\*7** A substantial burden on religious exercise exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *4 (S.D.N.Y. Aug. 29, 2014) (quoting *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)) (alterations and internal quotation marks omitted). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important" to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at *4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Even if a challenged policy substantially burdens the plaintiff's sincerely held religious beliefs, it is nevertheless valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987); *see also Ford,* 352 F.3d at 595. When evaluating whether a regulation or official action is reasonable, courts are guided by four factors: (1) "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective;" (2) "whether prisoners have alternative means of exercising the burdened right;" (3) "the impact on guards, inmates, and prison resources of accommodating the right;" and (4) "the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274 (citing *Turner,* 482 U.S. at 89–91).

### 2. Analysis

### A. Substantial Burden

On this motion, defendants do not challenge that plaintiff has alleged sincerely held religious beliefs; rather defendants argue that plaintiff fails to allege facts that show that his religious beliefs were substantially burdened. (Def.MTD, pp. 6, 9.) The Court concludes that plaintiff has plausibly alleged that defendants have substantially burdened his right to freely exercise his religion as to some but not all of the religious practices he wishes to engage in.

#### i. Claims Involving the Religious Calendar

As noted above, DOCCS has added all of the holy days at issue to the religious calendar, but with varying limitations regarding how each day may be celebrated. (Revised Calendar, p. 25.) The requests that were accommodated are moot. The Court must address whether plaintiff states a claim with respect to those requests which have not been voluntarily accommodated, which include: (1) exemption from work and the provision of a shared meal on April 21 and May 25; (2) permission for a congregate worship service on May 25; and (3) the designation of April 21 and August 17 as "family events." Plaintiff has plausibly alleged a substantial burden on his free exercise of religion with regard to all of the contested holy day restrictions, with the exception that plaintiff cannot reach this threshold burden on his claim concerning "family events."

**\*8** Plaintiff has shown that celebrating the four holy days at issue by refraining from work and programming, attending a congregate worship service, and sharing a holy day meal is "central or important" to his faith. *See Ford,* 352 F.3d at 593–94. In the telephone conferences and hearings before Magistrate Judge Freeman, plaintiff explained why the holy days are sacred, stating that April 21 is "the day that Emperor Selassie came to Jamaica" (July Tr., p. 13), May 25 is African Liberation Day (Telephone Conference before Magistrate Judge Freeman, March 18, 2014 ("March Tr."), p. 19), August 17 is the birthday of the Rastafari prophet Marcus Mosiah Garvey, (July Tr., p. 24.) and October 7 "respects the day that Emperor Haile Selassie was named heir apparent prior to his coronation." [9] (March Tr., p. 19.) He testified that each holy day at issue should be celebrated in the same manner, by coming together with other Rastafari observers for a congregate service called a "reasoning" and a shared meal, and by refraining from work. (July Tr., pp. 13, 20, 25–26.) The Court concludes that plaintiff has plausibly alleged a substantial burden on his religious beliefs to the extent that plaintiff alleges defendants continue to deny him an exemption from work and provision of a shared meal on April 21 and May 25 and have failed to permit a congregate worship service on May 25. *See Ford,* 352 F.3d at 593–94 (asserting that being denied a holiday meal would be considered a substantial burden on the plaintiff's religious beliefs if participation in the meal was considered central or important to his

practice of religion); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services .").

Plaintiff fails, however, to plausibly allege that his free exercise rights are substantially burdened by the denial of his request to designate April 21 and August 17 as "family events." He asserts, "Rastafari family is the center of Rasta society," (Am. Compl., ¶ 16 n. 1) and that "[d]uring holy days' celebrations, it is necessary for the family to celebrate together, representing the unity established by Emperor Haile Selassie I, Empress Menen, and the Royal Children." (Pl. Objection to Magistrate Judge's R & R ("Pl.Objection"), p. 1.) These conclusory allegations fail to adequately explain the religious significance of the "family event." Nor does plaintiff explain why celebration with family carries religious significance for the holy days of April 21 and August 17, but not for the other holy days at issue. Plaintiff fails to show that celebration with family is "central or important" to his religious beliefs, and thus cannot state a claim under the Free Exercise Clause as to this request.

#### ii. Holy Day Menus

It has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975); *see also McEachin,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.")

**\*9** Plaintiff has failed to plausibly allege that DOCCS's policy prohibiting inmates from adding items to the holy day menu substantially burdens his religious exercise. (Am.Compl., ¶ 27.) He does not allege that the holy day meals are inconsistent with his religious beliefs nor does he explain how his ability to add certain items to the meals is "central or important" to his religion. *See Kahane,* 527 F.2d at 496 (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left to the prison's management which can provide from the food supplies available within budgetary limitations"). Accordingly, plaintiff does not plausibly allege a Free

Exercise Clause claim as to the so-called "mandatory menu" provided by DOCCS for holy day meals.

### iii. Friday Worship

Plaintiff asserts that he has "been forced to have congregate worship on Wednesdays instead of the traditional Fridays." (Am.Compl., ¶ 26.) Plaintiff has plausibly alleged that this restriction substantially burdens his right to free exercise. "It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d at 308; *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) ("Although we recognize that great deference should be accorded to prison officials as they undertake the difficult responsibility of maintaining order in prisons, we have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."). In *Lloyd v. City of New York,* 12–cv–03303 (CM), 2014 WL 4229936, at *5–6 (S.D.N.Y. Aug. 4, 2014), the court held that Muslim inmates plausibly alleged a substantial burden on their religious exercise where they were unable to conduct religious services in a manner that complied with their religious beliefs. The plaintiffs in *Lloyd,* for example, were forced to conduct religious services in a chapel where the pews prevented them from kneeling for prayer. *Id.* Here, plaintiff has plausibly alleged that defendants have substantially burdened his ability to participate in religious services in a manner consistent with the practices of his religion. Plaintiff alleges that he is forced to conduct services on Wednesdays, but he asserts that Friday is the traditional day of worship. (*See* Am. Compl., ¶ 26.) He explains that the appropriate day for Rastafari congregate worship is Friday because it "carries the Rastafarian Community into the Sabbath," which begins on Friday at sundown. (*Id.*) Plaintiff plausibly alleges that his inability to hold Friday Sabbath services substantially burdens his free exercise of religion.

### iv. Turban

Plaintiff has plausibly alleged that defendants substantially burden his right to free exercise by denying him the right to wear his religious turban. *See Singh v. Goord,* 520 F.Supp.2d 487, 502–03 (S.D.N.Y.2007) (holding that defendants substantially burdened plaintiff's religious exercise where plaintiff was prohibited from wearing the type of turban required by his religion); *Morgan v. City of New York.,* 12–cv–704 (WFK), 2014 WL 3407714, at *8 (E.D.N.Y. July 10, 2014) ("Plaintiff has shown that the removal of his turban substantially burdens his sincerely held religious beliefs.") Plaintiff has explained the significance of wearing a turban in the Rastafari religion, testifying that the "Nya[h]binghi Rastaman's head must be covered" and that wearing a turban represents "the complete discipline of the Rastaman in terms of a priestly life." [10] (July Tr., p. 37–39.) Plaintiff alleges that the only headgear Rastafari males are permitted to wear at Woodbourne is the Tsalot Kob, which is a type of headgear restricted to members of the Ba Beta Kristiyan Church and does not align with plaintiff's sincerely held religious beliefs. (*Id.* at 38–42; Am. Compl., ¶ ¶ 20–21.) Plaintiff does not provide a full explanation of the how the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion," is distinct from the Ba Beta Kristiyan Church, nor does he elaborate on why wearing a Tsalot Kob does not comport with his religious beliefs. Nevertheless, given the special solicitude afforded to *pro se* plaintiffs, the Court concludes that plaintiff has adequately pled that defendants' prohibition on the wearing of his religious turban substantially burdens his sincerely held religious beliefs. The issue may look different at the summary judgment stage.

### v. Fundraising Proceeds

**\*10** Plaintiff challenges defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds; however, he fails to adequately explain how this practice constitutes a substantial burden on his religious beliefs. Plaintiff explains that the collection of half of the organization's funds "creates a burden on [the Rastafari group's] ability to purchase necessary materials for congregate services, religious classes, and religious holy day celebrations." (Am.Compl., ¶ 24.) While forbidding or confiscating religious materials may in some instances support a free exercise claim, *see Breland v. Goord,* 94–cv–3696 (HB), 1997 WL 139533, at *5–6 (S.D.N.Y. Mar. 27, 1997) (holding a claim regarding the confiscation of a prisoner's religious literature survives summary judgment), plaintiff does not assert that defendants have prohibited him from obtaining religious materials. Nowhere does plaintiff claim he is restricted from either buying the religious materials he desires with the funds the Rastafari group retains or obtaining the materials from another source. Plaintiff does not show how the deprivation of half of the funds constitutes a substantial burden on his religious beliefs. As plaintiff has failed to

plausibly allege a substantial burden, his free exercise claim challenging defendants' collection of half of the funds raised by the Rastafari organization is dismissed.

### vi. Rastafarian advisers
Plaintiff alleges that defendants violated his rights when they denied his request to gain access to spiritual and religious advisers (Am.Compl., ¶ 19.) Plaintiff fails, however, to plausibly allege that defendants' actions substantially burden his free exercise of religion. He makes no showing regarding how contact with advisers is "central or important" to the practice of his faith. Thus, his free exercise claim based on lack of access to advisers is dismissed.

### vi. Reporting of Marijuana Use
Plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (Am.Compl., ¶ 28.) He claims that defendant's false reporting was a result of "unconstitutional stereotyping of plaintiff based on his religious beliefs" and the ritual use of marijuana within the Rastafari faith. (*Id.*) Plaintiff, however, fails to explain how defendant's purported stereotyping burdened his free exercise of religion, nor does he show how being recommended for a drug treatment program has any effect on his religious practice. Thus, plaintiff does not state a claim under the Free Exercise Clause as to the alleged false reporting of marijuana use.

### B. Penological Interest
With regard to the claims for which plaintiff has plausibly alleged a substantial burden, defendants contend that they have proffered a legitimate penological interest which justifies not allowing the practice in question. (Def.MTD, p. 6.) Defendants cite "safety and security" concerns for their prohibition of plaintiff's turban and identify "spatial restrictions" as the reason for requiring Rastafari Sabbath services to be held on Wednesdays rather than Fridays. (*Id.* at 11, 13–14.) Defendants do not to offer a justification for their policy regarding plaintiff's religious calendar claims. (*Id.* at 8–9.)

**\*11** Determining whether a challenged policy is reasonably related to a legitimate penological interest

is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. *See Ford,* 352 F.3d at 596 (refusing to determine whether defendants' conduct was reasonably related to legitimate penological interests because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court cannot assess whether there is a "valid, rational connection" between defendants' actions and their purported concerns. *See Turner,* 482 U.S. at 89. Defendants state in a conclusory manner that the ban on plaintiff's religious turban is due to safety and security concerns, but fail to explain how plaintiff's turban presents a security problem or why concerns exist with respect to plaintiff's turban but not with the other types of permitted headgear. (*See* Def. MTD, pp. 13–14.) Next, while defendants explain that there is a lack of available space for Rastafarians to conduct congregate worship on Fridays (*Id.* at 11), the Court is unable to assess, based on the limited record, the impact accommodation would have on the guards, other inmates, and prison resources and whether there is an "absence of ready alternatives." *See Turner,* 482 U.S. at 90. The Court will not, at this stage, dismiss any of plaintiff's claims based on defendants' stated penological interests. The Court acknowledges that the case may look very different at the summary judgment stage.

To recap, the following free exercise claims survive defendant's motion to dismiss: (1) the denial of plaintiff's ability to observe all four of the Rastafari holy days at issue on his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafari inmates; (2) the denial of Friday Sabbath services; and (3) the prohibition on plaintiff's religious turban.

### III. The Establishment Clause and the Equal Protection Clause
While plaintiff asserts violations of the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause, the parties only briefed the claims under the Free Exercise Clause. Where plaintiff has plausibly alleged a free exercise violation, the Court need not decide at this time whether plaintiff also states a claim under the Establishment Clause or the Equal Protection Clause. Because these claims have survived, the Court can make this determination at a later stage after the parties have briefed the issues. However, where plaintiff fails to

2015 WL 769551

state a claim under the Free Exercise Clause, the Court will determine whether the claim can nevertheless survive under the Establishment Clause or the Equal Protection Clause.

Plaintiff fails to plead any facts to support a claim under the Establishment Clause with respect to: (1) the designation of April 21 and August 17 as "family events;" (2) the denial of spiritual and religious advisers; and (3) the false reporting regarding plaintiff's marijuana use. Plaintiff fails to plead any facts to support an Equal Protection Clause claim as to: (1) the designation of "family events;" (2) the policy of collecting half of the Rastafari inmate organization's fundraising proceeds; and (3) the mandatory nature of holy day menus. As such, the claim regarding "family events" is dismissed, *see Iqbal, 556 U.S. at 678,* and the Court will analyze plaintiff's holy day menu and fundraising claims under the Establishment Clause and his religious adviser and false reporting claims under the Equal Protection Clause. For reasons to be explained, the Court dismisses each of these four claims.

### 1. The Establishment Clause

**\*12** The First Amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion." *U.S. Const. amend. I.* In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman, 403 U.S. 602 (1971). See Bronx Household of Faith v. Bd. of Educ. of City of New York, 650 F.3d 30, 40 n. 9 (2d Cir.2011)* ("Although the Lemon test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."); *see also Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 355 (2d Cir.2007); Kiryas Joel Alliance v. Vill. of Kiryas Joel, 495 F. App'x 183, 190 (2d Cir.2012).* Under *Lemon,* "government action which interacts with religion (1) must have a secular purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion." *Bronx Household of Faith, 650 F.3d at 40* (alterations and internal quotation marks omitted) (citing *Lemon, 403 U.S. at 612–13).* "Because plaintiff is a prisoner challenging a Department of Corrections directive, the *Lemon* test is tempered by the test laid out by the Supreme Court in *Turner* ... which found that a prison regulation that impinges on an inmate's constitutional rights is

nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh v. Goord, 571 F.Supp.2d 477, 494 (S.D.N.Y.2008)* (quoting *Salahuddin v. Perez,* 99–cv– 10431 (LTS), *2006 WL 266574, at \*9 (S.D.N.Y. Feb. 2, 2006)* (internal quotation marks omitted)).

First, plaintiff claims that by denying him the ability to supplement holy day meals with additional food items, defendants have given the "New York State Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community." (*Id.*) Defendants counter that "a perfect accommodation of each inmate's preferential meal choices" would be "prohibitively expensive." (Def.MTD, p. 13.)

Plaintiff fails to state a claim under the Establishment Clause pursuant to the *Lemon* analysis. *See* 403 U.S at 612–13. First, the prison's policy has the permissible purpose of attempting to reasonably accommodate the inmates' religious dietary practices without subjecting the prison "to prohibitively expensive accommodations of religious dietary meal requests." (*Id.*) *See Benjamin v. Coughlin, 905 F.2d 571, 579 (2d Cir.1990)* (asserting that prisoners have a right to receive diets consistent with their religious beliefs but that this right may be limited where accommodation is prohibitively expensive or administratively unfeasible). Second, plaintiff has failed to allege that DOCCS's policy regarding holy day menus has the primary effect of either advancing or inhibiting religion. Plaintiff does not claim that the holy day meals are inconsistent with his religious beliefs. Finally, DOCCS's policy does not foster excessive entanglement of government with religion. "In order to permit inmates to freely exercise their religion, *some* entanglement is necessary." *Muhammad v. City of New York Dep't of Corr., 904 F.Supp. 161, 198 (S.D.N.Y.1995)* (emphasis in original) ("[I]n the prison context, the [E]stablishment [C]lause has been interpreted in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." (internal quotation marks omitted)). DOCCS developed a menu for holy day celebrations in order to accommodate inmates' free exercise right to receive a diet consistent with their religious beliefs. This does not constitute excessive government entanglement with religion. As such, plaintiff's claim regarding the holy day menus is dismissed.

**\*13** Next, plaintiff asserts that "the policy of requiring the Rastafarians to surrender 50% of their fundrais[ing proceeds] had the effect of a tax on religion." (Am.Compl., ¶ 24.) This allegation fails to plausibly allege a violation under the Establishment Clause. First, as plaintiff acknowledges, the policy has the secular purpose of providing funds to the Inmate Occupational Therapy Fund ("IOTF"), which is "for the benefit of the general population's use." (*Id.* ¶ 23.) The policy does not have the primary effect of advancing or inhibiting religion. The fundraising requirement is applied equally to religious and non-religious groups, and plaintiff does not adequately allege how the policy inhibits or burdens his religion. (*Id.*) Finally, the policy does not foster excessive government entanglement with religion. Thus, plaintiff's claim as to defendants' policy regarding fundraising proceeds is dismissed.

### 2. The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a claim for an equal protection violation, a plaintiff must plausibly allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Courts in the Second Circuit have emphasized that "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently ." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994); *see also Bishop v. Best Buy, Co. Inc.,* 08–cv–8427 (LBS), 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010)* ("Well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of [an equal protection] claim." (internal quotation marks omitted)). "While the *Turner* ... standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting." *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, "the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests." (*Id.*)

Plaintiff's claim regarding defendant Davis's alleged false report fails to state a claim under the Equal Protection Clause because plaintiff fails to allege that he was treated differently than others. In *Bishop,* plaintiff's equal protection claim, alleging that he was discriminated against on the basis of his race, was dismissed because the plaintiff "failed 'to allege or identify a single similarly situated [individual] who was treated differently .' " 2010 WL 4159566, at *12 (quoting *Sweeney v. City of New York,* 03–cv–4410 (JSR)(RLE), 2004 WL 744198, at *5 (S.D.N.Y. Apr. 2, 2004) *subsequently aff'd, 186 F. App'x 84 (2d Cir.2006)); see also King v. New York State Div. of Parole,* 260 Fed. App'x. 375, 379–80 (2d Cir.2008)* (affirming dismissal of equal protection claim where petitioner "failed to identify a single individual with whom he can be compared for Equal Protection purposes"). Here, plaintiff makes no claim regarding how others were treated during their interviews for the drug treatment program. Thus, plaintiff's equal protection claim regarding religious stereotyping with regard to the alleged false report of his marijuana use is dismissed. As this is the only claim that implicates defendant Davis, she is dismissed from this case.

**\*14** Next, plaintiff alleges that being denied spiritual advisers for security reasons violates his equal protection rights because "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (Am.Compl., ¶ 19.) This allegation is conclusory and fails to identify any specific religious group that is being treated differently. *See Bishop,* 2010 WL 4159566, at *11* ("Conclusory allegations of selective treatment are insufficient to state an equal protection claim."). Plaintiff's equal protection claim regarding spiritual advisers is dismissed.

### IV. Injunctive Relief

Defendants seek to dismiss plaintiff's claims for injunctive relief for lack of merit and mootness. (Def.MTD, pp. 17–20.) Defendants have not established that all of plaintiff's holy day claims are moot. Injunctive relief, however, may not be premised upon claims that this Court has dismissed.

Plaintiff asserts six claims for injunctive relief. (Am.Compl., ¶ B) First, plaintiff seeks to enjoin defendants from "continuing to deny plaintiff and other Rastafarians their holy days." (*Id.* ¶ B(1).) Second, plaintiff seeks injunctive relief to allow him to wear his turban. (*Id.* ¶ B(2).) Third, plaintiff seeks to enjoin

defendants from enforcing the policy which mandates that the Rastafarian inmate organization surrender half of the funds it raises to the IOTF. (*Id.* ¶ B(3).) Fourth, plaintiff seeks an injunction enjoining defendants from retaliating against him. (*Id.* ¶ B(4).) Fifth, plaintiff seeks to direct defendant Davis to expunge the "stereotyped information from plaintiff's institutional records." (*Id.* ¶ B(5).) Sixth, plaintiff seeks to enjoin all defendants from "continuing to deny him his right to freely practice his faith." (*Id.* ¶ B(6).)

Defendants assert that none of plaintiff's claims for injunctive relief can be sustained as a matter of law. (Def.MTD, p. 17.) "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006) (internal quotation marks omitted). Defendants reason that because "Plaintiff is unable to succeed on the merits of his claims" permanent injunctive relief is not warranted. (Def.MTD, p. 18.) At the pleading stage, defendants are correct only with respect to some of plaintiff's claims. The Court has found that plaintiff has plausibly alleged a constitutional violation with respect to his claims regarding the observance of Rastafari holy days and the wearing of his turban. Accordingly, plaintiff's claims for injunctive relief regarding these rights may not properly be dismissed. However, the Court has determined that plaintiff's claims regarding the purported false report of plaintiff's marijuana use and defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds do not state a claim. Thus, plaintiff's claims to (1) to expunge references to marijuana use from his institutional records and (2) enjoin defendants from requiring the Rastafarian organization to surrender half of their funds, are dismissed because the underlying claims upon which they are premised are dismissed.

**\*15** Plaintiff's claim that seeks to prevent future retaliation is also dismissed, as plaintiff fails to plead any facts whatsoever to show that defendants have or would retaliate against plaintiff. *See Iqbal,* 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *see also Reiter v. Metro. Transp. Auth. of N.Y.,* 01–cv–2762 (JGK), 2003 WL 22271223, at \*15 (S.D.N.Y. Sept. 30, 2003) (denying plaintiff's request for a permanent injunction to prevent

retaliation because there was no showing that plaintiff would be retaliated against in the future).

Next, defendants argue that injunctive relief is not appropriate concerning the religious calendar because "it is quite possible that this litigation could continue after Plaintiff's particular sect of Rastafarianism ceases to have followers that are inmates under DOCCS' supervision or custody" and "[a]s such, Plaintiff's request for injunctive relief would be moot." (Def.MTD, p. 19.) This argument lacks merit, as plaintiff brings his claims individually and he is currently an inmate at Woodbourne. "In order for a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (internal quotation marks omitted). At this time, an actual controversy regarding the religious calendar exists as to the claims that defendants have not voluntarily accommodated. As such, not all of plaintiff's religious calendar claims are moot.

V. Personal Involvement

Defendants contend that plaintiff has failed to allege the personal involvement of defendants Fischer, Jacobson, and Leonard, and as such, they should be dismissed from this suit. (Def.MTD, pp. 15–17.) The Court holds that plaintiff has plausibly alleged the personal involvement of the three defendants at issue.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Individual liability under section 1983 may not be anchored in a theory of *respondeat superior. Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998) (per curiam). "The bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Further, "[c]onclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient." *Kee v. Hasty,* 01–cv–2123 (KMW)(DF), 2004 WL 807071, at \*12 (S.D.N.Y. Apr. 14, 2004).

In *Colon,* the Second Circuit held that the personal involvement of a supervisory defendant can be shown by evidence that:

**\*16** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The continuing vitality of the supervisory liability test established in *Colon* has come into question after the Supreme Court's 2009 decision in *Iqbal*. *See Reynolds v. Barrett*, 685 F.3d 193, 205 n. 14 (2d Cir.2012). There, the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Second Circuit has not yet definitively addressed how *Iqbal* affects the *Colon* factors, nor have the district courts within this Circuit reached a clear consensus. *See Aguilar v. Immigration & Customs Enforcement Div.*, 811 F.Supp.2d 803, 814 (S.D.N.Y.2011). Despite the lack of agreement regarding the *Colon* factors, courts agree that the third factor, that defendant created a policy or custom under which unconstitutional practices occurred, has survived *Iqbal*. *Compare Bellamy v. Mount Vernon Hosp.*, 07–cv–1801 (SAS), 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd sub nom. Bellamy v. Mount Vernon*

*Hosp.*, 387 F. App'x 55 (2d Cir.2010), *with Hodge v. Sidorowicz*, 10–cv–428 (PAC)(MHD), 2011 WL 6778524, at \*16 (S.D.N.Y. Dec. 20, 2011) ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in *Colon* should still apply."), *report and recommendation adopted sub nom. Hodge v. Wladyslaw*, 10–cv–428 (PAC)(MHD), 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012). It is under this factor that plaintiff claims defendants Fischer, Jacobson, and Leonard were personally involved.

Plaintiff alleges that Brian Fischer, as the Commissioner of DOCCS, "has the statutory authority to promulgate rules, regulations, and policies governing the religious rights of prisoners within the department." (Am.Compl., ¶ 4.) Similarly he alleges that Catherine Jacobsen as Acting Deputy Commissioner for Program Services "had the authority to approve policies governing the religious programs in [DOCCS]," (*Id.* ¶ 5), and that Mark Leonard, as the Director of Ministerial, Family, and Volunteer Services "was responsible for the promulgation of policies affecting the religious rights of all Rastafarian prisoners within [DOCCS]." (*Id.* ¶ 8.) Plaintiff attributes DOCCS's policies on holy days and headgear to Fischer, Jacobsen, and Leonard, along with other defendants. (*Id.* ¶ A(1).) A defendant that creates a policy is considered personally involved in any unconstitutional practices that occur under the policy. *See Colon*, 58 F.3d at 873. In *Pugh v. Goord*, 571 F.Supp.2d 477, 485–86 (S.D.N.Y.2008), the plaintiff argued that certain defendants, by creating and continuing policies regarding the accommodation of Shi'ite Muslims, were personally involved in the deprivation of his right as a Shi'ite inmate to have a separate prayer service from the Sunni Muslims. The court agreed with the plaintiff and found that because plaintiff showed that defendants made "certain contributions to formulation of policy," he had adequately established personal involvement with regard to these defendants. *Id.* at 513 (internal quotation marks omitted). Similarly, plaintiff has plausibly alleged that defendants Fischer, Jacobson, and Leonard were involved in creating policies under which his right to free exercise was substantially burdened. Thus, these defendants are not properly dismissed from this suit at this juncture.

**\*17** Plaintiff also alleges that defendant Fischer is personally involved in the alleged constitutional violations because he has written letters to defendant Fischer "complaining about the unconstitutional impediments to

plaintiff's ability to practice his faith," but Fischer has always referred plaintiff's complaints to subordinates. (Am.Compl., ¶ 25.) Defendants are correct in stating that this allegation cannot demonstrate the requisite personal involvement of Fischer. (*See* Def. MTD, p. 16.) "If the supervisor fails to respond to [a prisoner's] letter or passes the letter on to a subordinate to handle, the general rule is that the supervisor is not personally involved." *Lloyd,* 2014 WL 4229316, at \*9; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the inmate failed to produce sufficient evidence to establish personal involvement of the prison commissioner, where the commissioner referred plaintiff's appeal letter to a subordinate); *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) *on reconsideration in part,* 04–cv–8850 (RWS), 2008 WL 591230 (S.D.N.Y. Mar. 3, 2008) (stating that defendant "cannot be held liable on the sole basis that he did not act in response to letters of protest" sent by inmate). Nevertheless, because plaintiff has plausibly alleged Fischer's personal involvement in creating policies under which unconstitutional practices have occurred, Fischer is not dismissed from this suit.

## VI. Qualified Immunity

Defendants argue that qualified immunity shields them from money damages. (Def.MTD, pp. 20–25.) On this motion to dismiss, the Court cannot conclude that defendants are entitled to qualified immunity as a matter of law. The case may look very different at the summary judgment phase.

Qualified immunity protects public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001); *see also Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). In deciding whether defendants are entitled to qualified immunity, courts must look "to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were unlawful." *Ford v. McGinnis,* 352 F.3d 582, 59697 (2d Cir.2003) (quoting *Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003)) (per curiam)) (internal quotation marks omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Coollick v. Hughes,* 699 F.3d 211, 220 (2d Cir.2012) (alterations and citation omitted). While a defendant may assert a qualified immunity defense on a motion to dismiss, "the defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

**\*18** Defendants have failed to show that restricting plaintiff from celebrating certain holy days in a manner consistent with his religious beliefs, requiring Friday Sabbath services to be held on Wednesdays, and prohibiting him from wearing a religious turban do not violate clearly established law. An inmate has a "clearly established right to be free of unjustified burdens upon free exercise rights." *Salahuddin v. Dalsheim,* 94–cv–8730 (RWS), 1996 WL 384898, at \*12 (S.D.N.Y. July 9, 1996) (citations omitted); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987). In *Salahuddin v. Goord,* the Second Circuit held that because plaintiff's "free-exercise rights were substantially burdened by a joint-worship policy not justified by a legitimate penological interest," qualified immunity was not appropriate as "it was clearly established at the time of the alleged violation that prison officials may not substantially burden inmates' right to religious exercise without some justification." 467 F.3d 263, 275–76 (2d Cir.2006). Similarly here, because the Court holds that plaintiff has plausibly alleged that defendants substantially burdened his free exercise rights and, at this time, have not established a legitimate penological justification, defendants are not entitled to qualified immunity on the premise that their conduct did not violate clearly established law.

Whether defendants could have reasonably believed that they did not violate an established constitutional right depends, at this stage, "on whether, on the facts alleged in the Complaint, they had a reasonable basis to believe that that [sic] [their actions] served a legitimate penological interest." *Diggs v. Marikah,* 11–cv–6382 (PAE), 2012 WL 934523, at \*5 (S.D.N.Y. Mar. 20, 2012) (denying defendants' motion to dismiss on the basis of qualified immunity, where plaintiff's religious beliefs

were substantially burdened and the factual basis for whether defendants' actions were reasonably related to a legitimate penological interest was not yet developed). At this early stage, there is inadequate information to determine whether defendants were objectively reasonable in their beliefs regarding their proffered penological interests. *See Perez v. Westchester Cnty. Dep't of Corr.,* 05–cv–8120 (RMB), 2007 WL 1288579, at *6 (S.D.N.Y. Apr. 30, 2007). This determination is more appropriate for summary judgment. *See id.* at *6 ("It is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to Rule 12(b)(6)." (alterations and citations omitted)). Thus, defendants are not entitled to qualified immunity at this stage.

CONCLUSION

For the reasons outlined above, defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claims regarding (1) "family events," (2) holy day menus, (3) spiritual advisers, (4) fundraising proceeds, and (5) the reporting of plaintiff's marijuana use are dismissed in their entirety. Because the only claim plaintiff brought against defendant Davis is dismissed, Davis is also dismissed from this suit. Plaintiff's claims regarding (1) the religious calendar, excluding requests for "family events," (2) Friday worship, and (3) plaintiff's turban survive defendants' motion to dismiss.

**\*19** Counsel for defendants shall provide plaintiff with copies of all unreported decisions cited herein. This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and *in forma pauperis* status is denied. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

All Citations

Not Reported in F.Supp.3d, 2015 WL 769551

Footnotes

1    The defendant's last name is spelled "Fishcer" on the docket in this case.

2    The defendant's last name is spelled "McCoy" on the docket and in the parties' briefs.

3    Plaintiff's Amended Complaint requests that the holy days at issue be added to the calendar with the designations of "Off Work Program (OWP), Meal Consideration (MC), and Special Consideration (SC)." (Am.Compl., ¶ 16.) In the hearings before Magistrate Judge Debra Freeman, plaintiff clarified that these designations would allow him to (1) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. (July Tr., pp. 82–83.)

4    While the plaintiff in his Amended Complaint only requests that August 17 be designated as a "family event," he makes clear in the hearings before Magistrate Judge Freeman that he is asking for this designation to be added to both April 21 and August 17. (July Tr., p. 82.)

5    In the October 2014 declaration of Colonel Dennis W. Bradford, the DOCCS Director of Correction Emergency Response Team Operations, DOCCS consented to alter its policy regarding religious headgear. (Bradford Declaration (Dkt.98).) Colonel Bradford declared that plaintiff would be allowed to wear a turban that conforms to his religious beliefs as long as it complies with mandated color restrictions. (*Id.* ("[A]s long as plaintiff's turban is of an appropriate color DOCCS will accommodate his request to wear it within Woodbourne Correctional Facility.")) Thus, plaintiff's claim regarding the right to wear his turban may be moot. The Court will decide this question at a later stage after the parties have briefed the issue.

6    The Second Circuit had concluded that "special circumstances" may exist where the plaintiff reasonably misinterprets the prison's grievance regulations. *Hemphill,* 380 F.3d at 690. However, in *Woodford,* the Supreme Court held that untimely or otherwise procedurally defective grievances do not satisfy the PLRA's exhaustion requirement. 548 U.S. at 93. The Second Circuit has not yet determined whether the special circumstances exception to the exhaustion requirement survives *Woodford. See Chavis v. Goord,* 333 F. App'x 641, 643 (2d Cir.2009). The Court need not reach this issue in this case.

7    This case is distinguishable from cases where the CORC never renders a decision on the plaintiff's appeal. Under those circumstances, district courts in this Circuit have tended to hold that a motion to dismiss or for summary judgment for failure to exhaust should be granted without prejudice, allowing the plaintiff to refile his complaint once the CORC responds. *See Fuentes v. Furco,* 13–cv–6846 (AJN), 2014 WL 4792110, at *3 (S.D.N.Y. Sept. 25, 2014) (collecting cases). This approach "balance [s] the PLRA's goal of allowing institutions the first opportunity to address an inmate's grievances

**Rossi v. Fischer, Not Reported in F.Supp.3d (2015)**
Case 9:17-cv-00899-BKS-TWD    Document 37    Filed 05/20/19    Page 125 of 125
2015 WL 769551

against the inmate's right to a federal forum when he has complied with all of the procedural formalities expected of him." *Id.* This logic, however, does not extend to the case at bar because the CORC has denied plaintiff's appeal, and thus has already been given the first opportunity to consider the grievance. *See Peoples,* 2012 WL 1575302, at *9.

8    The Second Circuit has noted that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (internal quotation marks omitted). However, the Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise. *See Ford,* 352 F.3d at 592 (applying the substantial burden test where the parties did not brief the issue and the plaintiff did not argue otherwise); *see also Salahuddin,* 467 F.3d at 275 n. 5 (declining to decide whether the substantial burden test applied where resolution of the issue was unnecessary for purposes of the appeal); *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (applying the substantial burden test because plaintiff satisfied this threshold step). Here, the Court will apply the substantial burden test as neither party has argued against employing this standard.

9    In the Amended Complaint plaintiff identifies, but does not allege the significance of, certain holy days that defendants have denied him the right to celebrate. In the conferences and hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of each holy day at issue and described how the days must be observed according to his faith. The Court deems these statements to be incorporated into plaintiff's pleadings. Considering these statements on the present motion to dismiss comports with the special solicitude afforded *pro se* litigants.

10    In the Amended Complaint plaintiff alleges that the denial of his religious turban violates his First Amendment rights, but he fails to allege the significance of the turban to his religious beliefs. In the hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of wearing his turban. The Court deems these statements to be incorporated into plaintiff's pleadings.

---

End of Document                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.